JS 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Promptu Systems Corporation

**DEFENDANTS**

Comcast Corporation and
Comcast Cable Communications, LLC

**(b)** County of Residence of First Listed Plaintiff    San Mateo County, CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Philadelphia County, PA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
See attachment.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☒ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity):*
35 U.S.C. 1 et seq.

Brief description of cause:
Patent infringement and unfair uncompetition

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE
12/19/2016

SIGNATURE OF ATTORNEY OF RECORD
*Earl M---*

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

Attorneys for Plaintiff

**White and Williams LLP**
David H. Marion, Esq.
Frank A. Bruno, Esq.
1650 Market Street
One Liberty Place, Ste. 1800
Philadelphia, PA 19103-7395
215.864.6870 and 215.864.6225

**Carr / Ferrell, LLP**
Scott R. Mosko, Esq.
Robert J. Yorio, Esq.
120 Constitution Drive
Menlo Park, California 94025
650.812.3400

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Promptu Systems Corporation | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| Comcast Corporation and | : | NO. |
| Comcast Cable Communications, LLC | : | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)    (✓)

(f) Standard Management – Cases that do not fall into any one of the other tracks.    ( )

| | | |
|---|---|---|
| 12/19/2016 | David H. Marion | Promptu Systems Corporation |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-864-6870 | 215-789-6675 | mariond@whiteandwilliams.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: Promptu Systems Corporation, 333 Ravenswood Avenue, Building 201, Menlo Park, CA

Address of Defendant: Comcast Corp./Comcast Cable Communications, LLC, One Comcast Center, 1701 JFK Blvd., Philadelphia PA

Place of Accident, Incident or Transaction: Nationwide

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))  Yes☐  No☑

Does this case involve multidistrict litigation possibilities?  Yes☐  No☑
*RELATED CASE, IF ANY:*
Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
    Yes☐  No☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
    Yes☐  No☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
    Yes☐  No☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
    Yes☐  No☑

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☑ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, David H. Marion _____, counsel of record do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;
☑ Relief other than monetary damages is sought.

DATE: 12/19/2016 _____ _____ 3590
                        Attorney-at-Law            Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 12/19/2016 _____ _____ 3590
                        Attorney-at-Law            Attorney I.D.#

CIV. 609 (5/2012)

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: Promptu Systems Corporation, 333 Ravenswood Avenue, Building 201, Menlo Park, CA

Address of Defendant: Comcast Corp./Comcast Cable Communications, LLC, One Comcast Center, 1701 JFK Blvd., Philadelphia PA

Place of Accident, Incident or Transaction: Nationwide
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes☐  No☒

Does this case involve multidistrict litigation possibilities?    Yes☐  No☒
*RELATED CASE, IF ANY:*
Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
Yes☐  No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
Yes☐  No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
Yes☐  No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
Yes☐  No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☒ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
(Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
(Please specify) _____

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, David H. Marion , counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: 12/19/2016 _____  3590
Attorney-at-Law    Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 12/19/2016 _____  3590
Attorney-at-Law    Attorney I.D.#

CIV. 609 (5/2012)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PROMPTU SYSTEMS CORPORATION :
                              : CIVIL ACTION
            Plaintiff, :
                              : No. _____
     v. :
                              :
COMCAST CORPORATION and :
COMCAST CABLE COMMUNICATIONS, LLC : **RULE 7.1 DISCLOSURE**
                              : **STATEMENT**
                            :
          Defendants. :

       The nongovernmental corporate party, Promptu Systems Corporation in the above-listed

civil action does not have any parent corporation or publicly held corporation that owns 10% or

more of its stock.

                                  WHITE AND WILLIAMS LLP

                                    BY: _____
                                       David H. Marion

                                  WHITE AND WILLIAMS LLP
                                  David H. Marion (I.D. No. 3590)
                                  1650 Market Street
                                  One Liberty Place, Suite 1800
                                  Philadelphia, PA 19103-7395
                                  Tel. (215) 864-7000

                                  CARR AND FERRELL LLP
                                  Scott R. Mosko *(pro hac vice* pending)
                                  Robert J. Yorio *(pro hac vice* pending)
                                  120 Constitution Drive
                                  Menlo Park, CA 94025
                                  Tel. (650) 812-3400

Dated:  December 19, 2016

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PROMPTU SYSTEMS CORPORATION

              Plaintiff,

    v.

COMCAST CORPORATION and
COMCAST CABLE COMMUNICATIONS, LLC

              Defendants.

:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION

No. _____

**JURY TRIAL DEMANDED**

## CIVIL ACTION COMPLAINT WITH JURY TRIAL DEMAND

### SUMMARY OF ACTION

1.    Plaintiff Promptu Systems Corporation ("Promptu") brings this action against Comcast Corporation and Comcast Cable Communications, LLC (separately referred to herein as "Comcast Cable" and together with Comcast Corporation referred to herein as "Comcast") as follows:

    a.    First, for damages and injunctive relief by reason of Defendants' infringement of three United States patents assigned to Promptu, specifically U.S. Patent Nos. 7,260,538 (the "'538 Patent"); 7,047,196 (the "'196 Patent"); and RE44,326 (the "'326 Patent") (collectively referred to as the "Patents-in-Suit"); and

    b.    Second, for compensatory and punitive damages for claims of common law unfair competition, breaches of implied-in-law and implied-in-fact contract and unjust enrichment arising from Defendants' entering into a confidential relationship with Promptu designed to elicit its know-how, and then wrongfully using this information to deploy a voice

recognition system in Comcast's XFINITY® and X1 Entertainment Operating Systems® without compensating Promptu.

## THE PARTIES

2.      Promptu is a Delaware corporation with a principal place of business at 333 Ravenswood Avenue, Building 201, Menlo Park, California.

3.      On information and belief, Comcast Corporation is a Pennsylvania corporation with a principal place of business at One Comcast Center, 1701 John F. Kennedy Blvd., Philadelphia, Pennsylvania 19103.

4.      On information and belief, Comcast Cable Communications, LLC is a Delaware limited liability company with a principal place of business at One Comcast Center, 1701 John F. Kennedy Blvd., Philadelphia, Pennsylvania 19103.  Comcast Cable Communications, LLC is engaged in developing, managing and operating broadband cable networks and is indirectly wholly owned by Comcast Corporation.

## JURISDICTION AND VENUE

5.      This action includes claims for patent infringement concerning Comcast's manufacture, use, sale, offer for sale and/or importation in the United States of devices, including remotes, set-top boxes, receivers and others that receive and enable processing of voice commands that in turn generate content on a Comcast cable subscriber's television or other content-receiving device.  This action also includes claims for patent infringement concerning Comcast's products, methods and systems as they relate to voice recognition technology implemented in services and content offered by Comcast in its XFINITY® and its X1 Entertainment Operating Systems®.  As such, this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 et seq.  Accordingly, this Court has subject matter jurisdiction

2

pursuant to 28 U.S.C. §§ 1331 and 1338(a). For the non-patent claims asserted herein, this

Court has jurisdiction under 28 U.S.C. § 1338(b) as a result of their considerable overlap with

the federal claims.

   6.  Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(b).

   7.  This Court has general and/or specific personal jurisdiction over Comcast

Corporation, and venue is proper because, on information and belief, Comcast Corporation's

principal place of business is located in this district. In addition, Comcast Corporation, directly

and/or in combination with its subsidiaries and/or through its agents or others related to it, does

continuous and systematic business in this district including by providing infringing products and

services to residents of this district, by providing infringing products and services that it knew

would be used within this district, and/or by participating in the solicitation of business from

residents of this district. In addition, on information and belief, Comcast Corporation, directly or

through its subsidiaries, places infringing products within the stream of commerce, which are

directed at this district, with the knowledge and/or understanding that such products will be sold,

leased, or otherwise provided to customers within this district. In addition, on information and

belief, Comcast Corporation, directly or through its subsidiaries, employs individuals within this

district, including employees who provide infringing products and services to customers here,

and maintains offices and facilities here. Comcast Corporation, directly or through its

subsidiaries or others related to it, operates highly commercial websites through which regular

sales and/or leases of products and/or sales of services are made to customers in this district,

including products and services that, on information and belief, infringe the patents asserted

herein and/or is liable for its wrongful activities as herein alleged.

8.    This Court has general and/or specific personal jurisdiction over Comcast Cable, and venue is proper because, on information and belief, Comcast Cable's principal place of business is located in this district. In addition, Comcast Cable, directly and/or in combination with its parent, subsidiaries and/or through its agents or others related to it, does continuous and systematic business in this district including by providing infringing products and services to residents of this district, by providing infringing products and services that it knew would be used within this district, and/or by participating in the solicitation of business from residents of this district. In addition, on information and belief, Comcast Cable, directly or through its subsidiaries or others related to it, places infringing products within the stream of commerce, which are directed at this district, with the knowledge and/or understanding that such products will be sold, leased, or otherwise provided to customers within this district. In addition, on information and belief, Comcast Cable, directly or through its subsidiaries or others related to it, employs individuals within this district, including employees who provide infringing products and services to customers here, and maintains offices and facilities here. Comcast Cable, directly or through its subsidiaries or others related to it, operates highly commercial websites through which regular sales and/or leases of products and/or sales of services are made to customers in this district, including products and services that, on information and belief, infringe the patents asserted herein and/or is liable for its wrongful activities as herein alleged.

## FACTS

9.    In or about 2000, Promptu's predecessor, AgileTV Corporation ("AgileTV") was created and soon became an innovator in voice recognition and natural language understanding technology. Shortly after its inception, AgileTV further developed and applied this technology to the television and cable network industries.

4

10.     In or about August, 2006, AgileTV changed its name to Promptu Systems Corporation.  Throughout this Complaint, references to "Promptu" include AgileTV.

11.     The United States Patent and Trademark Office has granted Promptu's engineers and inventors numerous patents, many of which reflect inventions applicable to voice recognition in the television and cable industries.  Promptu is the assignee of multiple patents concerning voice recognition and its application to cable television, including the '538 Patent, entitled "Method and Apparatus for Voice Control of a Television Control Device," and including the '196 and '326 Patents, both entitled "System and Method of Voice Recognition Near a Wireline Node of a Network Supporting Cable Television and/or Video Delivery."

12.     Comcast has published that, through its operations of Comcast Cable, it is one of the nation's largest providers of video, high-speed Internet, and voice services to residential customers.  Comcast either by itself or through its wholly-owned subsidiaries or others, offers a voice recognition feature through its television cable service by and through its brand, XFINITY® and its X1 Entertainment Operating Systems®.

13.     A customer who subscribes with Comcast and/or its subsidiaries or others to receive cable television network access may now receive an XFINITY®-branded system capable of receiving voice commands, and other devices enabling access to Comcast's cable system.  By and through these devices, and the signals generated from and to these devices, Comcast receives and processes voice commands and provides content consistent with the spoken voice to the customer's television or other device that displays content.

14.     Beginning in or about 2001, Comcast expressed an interest in Promptu's capability of implementing a voice recognition feature into Comcast's television cable network

5

system. Prior to this time, Comcast had no ability to adopt and implement voice recognition technology into its cable network without Promptu's expertise.

15.     Consistent with and further to this expressed interest, Comcast entered into a confidential relationship with Promptu. During the course of this relationship, Promptu agreed to disclose its expertise and know-how of implementing voice recognition technology into Comcast's cable network system. Comcast encouraged these disclosures with assurances that Comcast would adopt this technology throughout its cable system and appropriately compensate Promptu.

16.     The relationship of trust and confidence created by Comcast and the course of dealings between the parties lulled Promptu into the reasonable belief that it could confide in and trust Comcast with the detailed disclosures Promptu provided. Promptu thereafter disclosed its technical know-how to Comcast and enabled voice recognition on portions of Comcast's cable television network. Promptu reasonably expected that if Comcast fully deployed voice recognition into its cable network, Comcast would compensate Promptu for sharing its technology and know-how with Comcast. Comcast has now fully deployed voice recognition into its cable network, yet, Comcast has failed to compensate Promptu for disclosing its know-how, which enabled this deployment.

17.     Shortly after this above-described confidential relationship was created, to elicit full disclosure of Promptu's technical knowledge and capabilities, Comcast conducted many in-person meetings with Promptu both at Comcast Headquarters in Philadelphia, Pennsylvania, and at Promptu's office in California. Several of Comcast's senior technical officials attended these meetings, including Comcast's Chief Technical Officer, Brad Dusto; Vice President of the

Digital TV Division, Mark Hess; Senior Vice President of Strategic Planning, Mark Coblitz; and Chief Financial Officer, Joe Donnolly.

18.    During these initial meetings, Comcast sought and received details, comprehensive presentations and demonstrations of Promptu's voice recognition technology applied to television and cable networks.

19.    At all relevant times, Comcast expressed great interest in implementing Promptu's technology into its network.

20.    In addition to encouraging Promptu's full disclosure of its technical know-how, Comcast also elicited confidential business information from Promptu, including details of Promptu's financial position, projected costs to implement voice recognition technology into the Comcast network, and profitability projections.

21.    Additional details elicited by Comcast and disclosed by Promptu included Promptu's intellectual property position and strategies related to its intellectual property holdings.  Consistent with Comcast's request, Promptu disclosed each of its granted patents, each of its patent applications, the status of said patent applications before the United States Patent and Trademark Office and future intellectual property strategies.  These disclosures, requested by Comcast and provided by Promptu included the applications that matured into the Patents-in-Suit.

22.    Comcast lead Promptu to believe that it intended to move quickly to implement Promptu's technology into the Comcast network.  Comcast requested and Promptu provided various economic models, cash flow analyses and revenue projections regarding the implementation of this technology into the Comcast cable network.

23.     Promptu also provided to Comcast detailed writings describing how voice recognition can be implemented into the Comcast network.

24.     Comcast praised Promptu upon receipt of the above-referenced presentations and information.  Consistent with Comcast's goal of fully eliciting technical disclosures from Promptu, Comcast invited Promptu to make multiple presentations of its technology to senior management, including those to Comcast's President, Steve Burke and its founder Ralph Roberts.  Mr. Burke encouraged Promptu to continue its work with Comcast by telling Promptu, among other things, that Comcast was in need of this technology as it would ease the problems the Comcast subscribers were having and increase the value of its Video-On-Demand products.

25.     Comcast also told Promptu that implementation of Promptu's technology would further Comcast's efforts to reduce what the industry refers to as "churn" and would increase the popularity of cable television.

26.     On or about May 6, 2003, and by addendum on February 9, 2004, Comcast's Senior Vice President of Strategic Planning, Mark Coblitz, signed a Memorandum of Understanding ("MOU") with Promptu.  Comcast had represented that it would also invest $2 million of capital into Promptu that would allow Promptu to continue its efforts of implementing its technology into the Comcast cable network, and those earlier representations were confirmed in the MOU.  This MOU stated in part, "Comcast believes that [Promptu's] speech recognition technology enabling the control and navigation of cable services on the television via voice commands has the potential to be an attractive service that could have a significant benefit to cable subscribers."  Sam Schwartz, the Managing Director of Comcast Interactive Capital, the entity responsible for effecting this stated investment, suggested to Promptu that Comcast would move quickly to finalize this investment.

8

27.     This above-referenced MOU and additional representations by Comcast reflected Comcast's intent to implement a phased deployment of Promptu's technology in the Comcast cable network.  Mr. Coblitz represented to Promptu that the initial deployment would involve approximately 50,000 subscribers.

28.     At Comcast's request, Promptu installed voice recognition into various locations throughout its network, including various "Labs" within Comcast that would allow its technicians full access to Promptu's technology and know-how, and the "Comcast Living Room," that would provide Comcast Executives access to, and ability to demonstrate Promptu's voice recognition technology on the Comcast cable network.

29.     In addition, Comcast requested and Promptu installed its voice recognition technology into its President, Brian Robert's office so he could use and demonstrate to others this voice recognition function on the Comcast network.

30.     As Promptu worked toward a viable cost effective system that could be fully deployed into the Comcast network, Promptu shared cost projections with Comcast.  Comcast repeatedly assured Promptu that its proposals and expected costs were acceptable, which assurances further encouraged Promptu to reasonably believe it would be compensated after voice recognition was fully deployed into Comcast's cable network.

31.     Shortly after voice recognition technology was deployed into the Comcast "Labs" and "Living Room," and consistent with the above-referenced MOU, Comcast committed to invest $2 million into Promptu.  This investment further validated Promptu's expectation that it would be compensated for its disclosures and implementations once voice recognition was fully deployed in the Comcast cable network.  Upon receiving this confirmation of investment, Comcast's Executive Vice President of Business, Stephan Silva told Promptu that Comcast

9

intended to ubiquitously deploy the voice recognition technology to its 21,000,000 subscribers so that Comcast would be the first large television content provider offering this feature. Comcast represented to Promptu that it intended to make voice recognition part of its core technology offering.

32.     In or about 2004, Comcast began negotiating what would become various written agreements with Promptu which were executed by Comcast on May 11, 2005. One of these agreements, entitled "Marketing Trial Agreement for Voice Activated Television Control Service," sought Promptu's assistance in " . . . conduct[ing] a field trial of limited scope and duration in which [Comcast] . . . [would] evaluate[] [Promptu's] voice-activated remote control and programming interface products and services . . . and measure[] consumer demand for voice-activated products and services in general..."

33.     Another written agreement Comcast entered into with Promptu was entitled, "License and Development Agreement." This Agreement included: (a) the details of Comcast's investment into Promptu; (b) an acquisition by Comcast of an option to license Promptu's earlier-disclosed intellectual property; (c) a process whereby Promptu would fully implement its voice-recognition technology capabilities into the Comcast cable network; and (d) a payment methodology that would apply if the contingencies set forth in the Agreement occurred.

34.     Pursuant to this License and Development Agreement, Comcast proposed that Promptu create a plan that would deploy voice recognition in Comcast's cable network in phases. Consistent with this proposal, Promptu prepared a series of documents referred to as "Statements of Work" detailing a phased deployment. In or about October 2005, Comcast's Executive Vice President of Business Development, Stephan Silva told Promptu that the then-

10

proposed Statement of Work prepared by Promptu reflected the detail Comcast needed to fully implement voice recognition into its network.

35.    Promptu was induced to believe that it would be appropriately compensated after voice recognition technology was fully deployed into the Comcast network.  This belief was encouraged and justified, inter alia, by (a) Comcast's intense interest in Promptu's capabilities of implementing voice recognition into the Comcast network; (b) the Comcast executive's continuing interaction with, and encouragement of Promptu; (c) the multiple meetings between Promptu and Comcast; (d) the substantial time and effort Comcast required Promptu to expend in the course of the confidential relationship; (e) the written agreements Comcast entered into with Promptu; and (f) Comcast's favorable response to the Statement of Work prepared by Promptu for the phased deployment of Promptu's System into the entire Comcast network, all described above.

36.    Contrary to these above-referenced representations, acts and inducements by Comcast that lead Promptu to reasonably expect compensation for disclosing to Comcast details of voice recognition implementation over the Comcast network, in or about 2006, Comcast terminated the voice recognition implementation by Promptu.  As a result, Promptu returned the money provided by Comcast, plus interest.

37.    In or about September, 2015, Comcast announced that it would begin to offer a voice recognition technology system substantially similar to that which Promptu had earlier disclosed and explained to Comcast in the course of the above-detailed confidential relationship.

## FIRST CLAIM FOR RELIEF
### (Infringement of the '538 Patent)

38.    Promptu incorporates by reference the allegations set forth in paragraphs 1 through 37 of this Complaint.

11

39.     The '538 Patent, entitled "Method and Apparatus for Voice Control of a Television Control Device," is attached to this Complaint as Exhibit A and is hereby incorporated by this reference.

40.     Comcast has infringed one or more claims of the '538 Patent by making, having made, designing, using, distributing, importing, offering for sale and/or selling XFINITY® and the X1 Entertainment Operating System®. On information and belief, the XFINITY® and the X1 Entertainment Operating System® incorporate a platform to access a library of live and on-demand video through voice commands. The remote control, set-top box and other equipment incorporated into this XFINITY® and the X1 Entertainment Operating System® and the methods employed by Comcast to effect voice recognition on its cable network allow subscribers to access different content on the X1 platform with their voice.

41.     The methods and systems practiced by Comcast through its XFINITY® and the X1 Entertainment Operating System® and the operation of the apparatus, including the units referenced above, utilized by Comcast in its XFINITY® and the X1 Entertainment Operating System® meet each limitation in several claims of the '538 Patent, including, for example, Claim 1 of this patent.

42.     Comcast infringes Claim 1, a method claim for at least the following reasons:

        a.      Comcast admits in its publications that the architecture upon which it's XFINITY® and the X1 Entertainment Operating System® cable network system is built includes a "head-end" where "content is aggregated and disseminated," and,

        b.      Comcast admits in its publications that its devices include a "remote" that allows the subscriber to "use simple voice commands to find something to watch easily," and

       c.      Comcast admits in its directions for setting up its devices in the

XFINITY® and the X1 Entertainment Operating System® that the remote is paired with a "set-

top box" "for control of the TV."

     43.     In addition to Claim 1, Comcast, through its XFINITY® and the X1 Entertainment

Operating System® infringes at least the following claims of the '538 Patent: 2, 3, 4, 6, 18, 19,

20, 21, 22, 23, 24, 33, 34, 35, 40, and 41.

     44.     Comcast's conduct is willful and deliberate.

     45.     As a direct and proximate result of Comcast's acts of patent infringement,

Promptu has been and continues to be injured and has sustained, and will continue to sustain

substantial damages in an amount not yet determined.

**SECOND CLAIM FOR RELIEF**
**(Infringement of the '196 Patent)**

     46.     Promptu incorporates by reference the allegations set forth in paragraphs 1

through 45 of this Complaint.

     47.     The '196 Patent, entitled "System and Method of Voice Recognition Near a

Wireline Node of a Network Supporting Cable Television and/or Video Delivery" is attached to

this Complaint as Exhibit B and is hereby incorporated by this reference.

     48.     Comcast has infringed one or more claims of the '196 Patent by making, having

made, designing, using, distributing, importing, offering for sale and/or selling XFINITY® and

the X1 Entertainment Operating System®. On information and belief, the XFINITY® and the X1

Entertainment Operating System® incorporate a platform to access a library of live and on-

demand video through voice commands. The remote control, set-top box and other equipment

incorporated into this XFINITY® and the X1 Entertainment Operating System® and the methods

13

employed by Comcast to effect voice recognition on its cable network allow subscribers to access different content on the X1 platform with their voice.

49.     The methods and systems practiced by Comcast through its XFINITY® and the X1 Entertainment Operating System® and the operation of the apparatus utilized by Comcast in its XFINITY® and the X1 Entertainment Operating System® meet each limitation in several claims of the '196 Patent, including, for example, Claim 2 of this patent.

50.     Comcast infringes Claim 2, a method claim for at least the following reasons:

a.     Comcast admits that its XFINITY® and the X1 Entertainment Operating System® use "fiber optic cable to send and receive signals to/from nodes located in neighborhoods where forward (or downstream) signals are transferred from light, on the fiber optic infrastructure, to Radio Frequencies (RF) for insertion onto the coaxial cable infrastructure for ultimate transmission and distribution to residents and business served by the particular node ...", and

b.     Comcast admits that these nodes "receive RF signals from subscribers via the coaxial cable infrastructure which feeds these signals into the node. The node converts these signals to light for transmissions, via the fiber optic infrastructure, to Comcast's headend or hub. Some return signals include upstream data, ordering information for [video on demand] and other video services ...", and

c.     Comcast admits that the remote that operates the XFINITY® and the X1 Entertainment Operating System® is paired with a TV box, and once paired with a TV box, the remote will not control any other TV box.

51.     In addition to Claim 2, Comcast, through its XFINITY® and the X1 Entertainment Operating System® infringes at least the following claims of the '196 Patent: 4, 15, 54, and 66.

52.    Comcast's conduct is willful and deliberate.

53.    As a direct and proximate result of Comcast's acts of patent infringement,
Promptu has been and continues to be injured and has sustained, and will continue to sustain
substantial damages in an amount not yet determined.

### THIRD CLAIM FOR RELIEF
### (Infringement of the '326 Patent)

54.    Promptu incorporates by reference the allegations set forth in paragraphs 1
through 53 of this Complaint.

55.    The '326 Patent, entitled "System and Method of Voice Recognition Near a
Wireline Node of a Network Supporting Cable Television and/or Video Delivery" is attached to
this Complaint as Exhibit C and is hereby incorporated by this reference.

56.    Comcast has infringed one or more claims of the '326 Patent by making, having
made, designing, using, distributing, importing, offering for sale and/or selling XFINITY® and
the X1 Entertainment Operating System®. The XFINITY® and the X1 Entertainment Operating
System® incorporate a platform to access a library of live and on-demand video through voice
commands. The remote control, set-top box and other equipment incorporated into the Comcast
system allow subscribers to access different content on the X1 platform with their voice.

57.    The methods, systems and apparatus in the XFINITY® and the X1 Entertainment
Operating System® infringe various claims of the '326 Patent, as found, for example in Claim 11
of this patent.

58.    Comcast infringes Claim 11, a method claim for at least the following reasons:

a.    Comcast admits that after a subscriber speaks into the remote for its
XFINITY® and the X1 Entertainment Operating System®, "the voice commands are sent to
Comcast and its contracted service provider for processing. Comcast and its provider use these

15

voice commands to provide the voice control service...", and

        b.      Comcast admits that "[o]nce the ASR module processes the user's request, the output (i.e. the request in text form) is sent on to the NLP [(Natural Language Processing)] module. NLP starts by parsing the text and uses a resulting parse tree to interpret the utterance, inferring the semantics from the rules used and the tags assigned in the parsing process. Once the NLP module has identified all the pieces of the request, it assembles them into a request structure that is passed to the Action Recognition (AR) module."

59.     Comcast's conduct is willful and deliberate.

60.     As a direct and proximate result of Comcast's acts of patent infringement, Promptu has been and continues to be injured and has sustained, and will continue to sustain substantial damages in an amount not yet determined.

**FOURTH CLAIM FOR RELIEF**
**(Common Law Unfair Competition)**

61.     Promptu incorporates by reference the allegations set forth in paragraphs 1 through 60 of this Complaint.

62.     Comcast entered into a confidential relationship with Promptu for the purpose of implementing Promptu's voice recognition technology into its cable network based on its above-alleged acts, its representations to Promptu, its course of dealing with Promptu, and the written agreements it signed with Promptu.

63.     In the course of this confidential relationship, Comcast induced Promptu to disclose its valuable and confidential information, including the following:

        a.      Promptu's expertise and technical know-how regarding the implementation of its voice recognition technology into Comcast's cable network system,

b.      Promptu's financial position, projected costs to implement voice

recognition technology into the Comcast network, and profitability projections, and

c.      Promptu's intellectual property position, including each of its granted and

pending patents, and strategies related to its intellectual property holdings.

64.      Based on this confidential relationship and the representations and promises by

Comcast, Promptu was lulled into the belief that it could trust and confide in Comcast with the

disclosures Promptu made to Comcast.

65.      Based on this confidential relationship and the representations and promises by

Comcast, Promptu reasonably believed that Comcast would adequately compensate Promptu

upon Comcast ubiquitously adopting the disclosed details regarding voice recognition into its

cable network.

66.      Comcast did adopt and use, and is currently using, some or all of the disclosed

information from Promptu made during the course of this above-described confidential

relationship, but has not compensated Promptu.

67.      Promptu has been damaged in a yet undetermined amount as a result of

Comcast's acts of unfair competition as alleged herein.

### FIFTH CLAIM FOR RELIEF
### (Breach of Implied-in-Fact Contract)

68.      Promptu incorporates by reference the allegations set forth in paragraphs 1

through 67 of this Complaint.

69.      Comcast impliedly promised to compensate Promptu for disclosing, sharing and

implementing voice recognition technology on its cable network as demonstrated by at least the

following reasons:

a.     Before Promptu shared its know-how of implementing voice recognition onto Comcast's cable network, Comcast had no ability to implement voice recognition through any other means,

b.     Comcast entered into a confidential relationship with Promptu the purpose of which was to elicit Promptu's know-how and capabilities for implementing voice recognition into Comcast's cable network,

c.     Comcast encouraged Promptu to disclose its know-how and capabilities of implementing voice recognition into Comcast's cable network by arranging for and attending numerous meetings between Promptu and Comcast key executives and technology experts who emphasized the importance and goals of adding voice recognition to its network,

d.     Comcast entered into written agreements with Promptu expressing its goal of adding voice recognition to its cable network, including a License and Development Agreement which confirmed that if Comcast ubiquitously deployed voice recognition over its cable network, Promptu would be fully compensated,

e.     Comcast officials approved the writings Promptu provided as called for in the above-described License and Development Agreement that would have obligated Comcast to compensate Promptu, but shortly thereafter ended the relationship between the parties, and

f.     Without notice to Promptu, Comcast thereafter implemented voice recognition on its cable network by using part or all of the disclosed information received from Promptu.

70.     Notwithstanding Comcast's termination of the relationship, the above-alleged facts and Comcast's course of conduct and dealing demonstrate Comcast impliedly represented it would adequately compensate Promptu for its efforts, expertise, and work in revealing for

18

Comcast's benefit the details of implementing voice recognition into Comcast's cable network if and when Comcast ubiquitously deployed this technology in its network.

71.    Promptu has been damaged in a yet undetermined amount as a result of Comcast's breach of an implied-in-fact contract, as alleged herein.

## SIXTH CLAIM FOR RELIEF
### (Breach of Implied-in-Law Contract)

72.    Promptu incorporates by reference the allegations set forth in paragraphs 1 through 71 of this Complaint.

73.    Promptu has conferred valuable benefits upon Comcast by disclosing its technical know-how of implementing Promptu's voice recognition technology into Comcast's cable network at a time when Comcast had no ability to implement voice recognition through any other means.

74.    Comcast adopted many of the disclosures Promptu provided to it in the launching and maintaining a voice recognition feature in its cable network, by and through its brand, XFINITY® and its X1 Entertainment Operating Systems®.

75.    Comcast failed to compensate Promptu for these disclosures.

76.    Promptu has been damaged in a yet undetermined amount as a result of Comcast's breach of an implied-in-law contract, as alleged herein.

## SEVENTH CLAIM FOR RELIEF
### (Unjust Enrichment)

77.    Promptu incorporates by reference the allegations set forth in paragraphs 1 through 76 of this Complaint.

78.    Promptu has conferred valuable benefits upon Comcast by disclosing its technical know-how of implementing Promptu's voice recognition technology into Comcast's cable

19

network at a time when Comcast had no ability to implement voice recognition through any other means.

79.     Comcast adopted many of the disclosures Promptu provided to it in the launching and maintaining a voice recognition feature in its cable network.

80.     Comcast has failed to compensate Promptu for these disclosures.

81.     Comcast has been unjustly enriched in an undetermined amount by obtaining and using the information it obtained from Promptu and benefitting thereby.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

a)      An entry of judgment that each of the Patents-in-Suit is valid and enforceable;

b)      An entry of judgment that Defendants have infringed one or more claims of the Patents-in-Suit;

c)      An award of damages adequate to compensate Plaintiff for Defendants' infringement of the Patents-in-Suit together with prejudgment and post-judgment interest and costs, in an amount according to proof;

d)      An entry of permanent injunction enjoining Defendants and their respective officers, agents, employees, and those acting in privity with them, from further infringement of the Patents-in-Suit, and further use of the confidential information and methodologies Defendants obtained from Plaintiff unless and until appropriate compensation is provided to Plaintiff;

e)      An entry of judgment awarding Plaintiff all damages, including treble damages, based on any infringement found to be willful, pursuant to 35 U.S.C. § 284, together with prejudgment interest;

f)      An entry of judgment of actual and punitive damages suffered by Plaintiff as a result of Defendants' unlawful conduct, in an amount to be proven at trial, as well as prejudgment interest as authorized by law;

g)      An entry of judgment that this is an exceptional case and an award to Plaintiff of its costs and reasonable attorneys' fees incurred in this action as provided by 35 U.S.C. § 285;

h)      An award to Plaintiff of Defendants' profits and gains resulting from Defendants' willful acts of unfair competition and/or Defendants' breach of implied-in-fact or implied-in-law contract;

i)      An award to Plaintiff, in law or equity, of such other costs, expenses, and further relief as the Court may deem just and proper.

21

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury on all issues raised by the Complaint.

Dated:  12/19/16

WHITE AND WILLIAMS LLP

By _____
David H. Marion

WHITE AND WILLIAMS LLP
David H. Marion (I.D. No. 3590)
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103-7395
Tel. (215) 864-7000

CARR AND FERRELL LLP
Scott R. Mosko (*pro hac vice* pending)
Robert J. Yorio (*pro hac vice* pending)
120 Constitution Drive
Menlo Park, CA  94025
Tel. (650) 812-3400

*Attorneys for Plaintiff*
*Promptu Systems Corporation*

# EXHIBIT A



US007260538B2

(12) **United States Patent**
Calderone et al.

(10) Patent No.: **US 7,260,538 B2**
(45) Date of Patent: **Aug. 21, 2007**

(54) **METHOD AND APPARATUS FOR VOICE CONTROL OF A TELEVISION CONTROL DEVICE**

(75) Inventors: **Theodore Calderone**, San Carlos, CA (US); **Mark J. Foster**, Palo Alto, CA (US); **Harry William Printz**, San Francisco, CA (US); **James Jay Kistler**, San Jose, CA (US)

(73) Assignee: **Promptu Systems Corporation**, Menlo Park, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 719 days.

(21) Appl. No.: **10/338,591**

(22) Filed: **Jan. 7, 2003**

(65) **Prior Publication Data**

US 2003/0167171 A1      Sep. 4, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/346,899, filed on Jan. 8, 2002.

(51) **Int. Cl.**
*G10L 15/00*      (2006.01)
(52) **U.S. Cl.** ..................................... 704/275; 348/14.05
(58) **Field of Classification Search** ............... 704/275; 348/14.05
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,267,323 | A | * | 11/1993 | Kimura | 381/110 |
| 5,774,859 | A | * | 6/1998 | Houser et al. | 704/275 |
| 5,832,439 | A | | 11/1998 | Cox | |
| 6,253,174 | B1 | * | 6/2001 | Ishii et al. | 704/231 |
| 6,397,186 | B1 | * | 5/2002 | Bush et al. | 704/274 |
| 6,415,257 | B1 | | 7/2002 | Junqua | |
| 7,006,974 | B2 | * | 2/2006 | Burchard et al. | 704/275 |

* cited by examiner

*Primary Examiner*—Daniel Abebe
(74) *Attorney, Agent, or Firm*—Michael A. Glenn; Glenn Patent Group

(57) **ABSTRACT**

A method and apparatus is disclosed for remotely processing voice commands for controlling a television. A voice command is uttered by a user into a microphone contained in a remote control. The voice command is digitized, modulated, compressed, and wirelessly transmitted to a wireless receiver connected to a set-top box. The voice command is then transmitted to a cable head-end unit for voice and word recognition processing. Once the command function is determined, the function is transmitted back to the set-top box where the set-top box performs the command. The microphone is activated and deactivated by pressing and releasing a push-to-talk (PTT) switch. The PTT activates other functions by being turned, double-clicked and toggled up and down, left and right.

**41 Claims, 6 Drawing Sheets**





**FIG. 1**



**FIG. 2**



**FIG. 3**



**FIG. 4**



**FIG. 5**



FIG. 6



**FIG. 7**          **FIG. 9**



**FIG. 8**



*FIG. 10*



*FIG. 11*

US 7,260,538 B2

1

## METHOD AND APPARATUS FOR VOICE CONTROL OF A TELEVISION CONTROL DEVICE

### CROSS-REFERENCE TO RELATED APPLICATION

This application claims priority to U.S. Provisional Patent Application No. 60/346,899 filed on Jan. 8, 2002.

### BACKGROUND OF THE INVENTION

1. Technical Field

The invention relates generally to voice controlled electronic devices. More particularly, the invention relates to a voice-controlled set-top box and remote control for performing television related processes.

2. Description of the Prior Art

Speech recognition systems are capable of recognizing words spoken by human beings. Isolated word recognition systems have been developed to recognize and discriminate isolated words, i.e. words separated by a pause, which have been trained into the systems. Such a speech recognition device is summarized in D. Raj Reddy, *Speech Recognition by Machine: A Review*, Proceedings of the IEEE, April 1976, pages 501-531. Connected word recognition systems are capable of recognizing and discriminating individual words from spoken phrases.

It is also known to use voice recognition systems to control system variables of various active systems. Speech recognition control system and method, U.S. Pat. No. 4,605, 080, Lemelson, Aug. 12, 1986, discloses a weighing scale involving calculating functions that include an automatic control system that can accept spoken words as input. A speech recognition system is used for processing and analyzing speech signals output by a microphone. The microphone is connected to a speech recognition computer that outputs and applies select command control signals to effect desired control functions. It is disclosed to control conveyors to place labels on containers automatically using the speech recognition system. The apparatus may be controlled to stop and start, slow down or speed up by an operator speaking the appropriate voice commands into a microphone.

Voice controlled welding system, U.S. Pat. No. 4,641,292, Tunnell, et al., Feb. 3, 1987 discloses an apparatus and method for permitting human voice control of a welding system. It is disclosed that a human operator is provided with an audio transmitter by which the operator adjusts the welding power supply through voice commands. The voice commands are issued by the operator and transmitted through a receiver to a voice recognition unit. The received signal is interpreted by a computer that is electrically connected to deliver power control signals to the welding power supply, and thereby adjusts the power delivered to the welding head. The operator may also issue voice commands to start and stop an internal combustion engine that drives the welding power supply, when such an engine is used.

A problem with the prior art voice recognition systems is that they require a sophisticated voice recognition system in close proximity to the user, requiring individual units which is quite costly. What is needed is a centralized voice command processing system such services a multitude of users.

A problem with television remote controls is their ever-increasing size. As remote controls become more sophisticated, more and more functions are added. As more functions are added, more buttons are added, causing the

2

aforementioned increase in size. Remote controls are now approaching a practical limit. Moreover, remote control manufacturers have standard template designs for their remote controls. The standard designs dictate where the buttons are located, as well what functions will exist. What is needed is a way to add functions to an existing remote control without greatly increasing its size and without interfering with existing manufacturer designs.

A problem with voice command remote control systems is that they are activated when a sound input reaches a predetermined amplitude. Often, ambient noise reaches the pre-determined level and the system is unintentionally activated. This leads to inadvertent input and a misuse of processing power because the speech recognition unit attempts to process the noise. What is needed is way to activate and deactivate a voice command system that is not substantially affected by ambient noise.

### SUMMARY OF THE INVENTION

A method and apparatus is disclosed for remotely processing voice commands for controlling a television. A voice command is uttered by a user and is received by a microphone contained in a television set-top box remote control. The voice command is modulated and wirelessly transmitted to a wireless receiver connected to the set-top box. Either before or after this transmission, it is digitized and compressed. Examples of compression algorithms used are low bit-rate encoding and conversion into cepstrals. The voice command is then transmitted, for example, to a central processing station located at a cable television head-end unit. A computer at the cable head-end unit processes the voice command for voice command recognition. Once the voice command is determined a command function is created. The command function is transmitted back to the set-top box where the set-top box performs the command function. Alternatively, the set-top box just passes on the command and the head end performs or carries out the command.

The microphone is activated by the depression of a push-to-talk (PTT) button or by word activation. Releasing the PTT button deactivates the microphone. Optionally, the PTT button can be turned to adjust the gain control on the microphone and can be toggled to activate wireless phone functions of the remote control. Double pressing the PTT button activates other functions, for example a help menu for television viewing.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a diagram illustrating elements of the voice control television system according to the invention;

FIG. 2 is a diagram illustrating a remote control for transmitting an analog voice command according to the invention;

FIG. 3 is a graph illustrating a voice command and noise;

FIG. 4 is a diagram illustrating a head-end unit for processing an analog voice command according to the invention;

FIG. 5 is a diagram illustrating a remote control for transmitting a digital voice command according to the invention;

FIG. 6 is a diagram illustrating a head-end unit for processing a digital voice command according to the invention;

US 7,260,538 B2

3

FIG. 7 is a diagram illustrating a remote control that transmits a voice command through a keypad transmitter and a dedicated voice transmitter according to the invention;

FIG. 8 is a diagram illustrating a control receiver according to the invention;

FIG. 9 is a diagram illustrating a frontal view of a remote control with a multi-function push-to-talk button according to the invention;

FIG. 10 is a diagram illustrating a side view of a remote control with a multi-function push-to-talk button according to the invention; and

FIG. 11 is a diagram illustrating a remote control with an instant-on delay-off circuit according to the invention.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

FIG. 1 is an operational diagram illustrating a preferred embodiment of the voice control system which, for purposes of example, is an interactive television voice control system. Those skilled in the art will appreciate that other systems may be used in connection with the invention herein, such as information browsing system and representational process control systems.

A remote control 110 receives voice commands from a user through a microphone preferably located within the remote control 110. The remote control wirelessly transmits the voice commands to a wireless receiver (RECEIVER) 120 that converts the wireless signal to a wired signal. The wireless transmission is typically infrared. Ultrasonic, radio, or other wireless transmissions are also contemplated.

The RECEIVER 120 transmits the voice command to a television controller such as a set-top box 130. Transmissions between the RECEIVER and the set-top box may be unidirectional or bi-directional. The RECEIVER 120 transmits to the set-top box 130 when the RECEIVER 120 receives a transmission from the remote control 110. Alternatively, the RECEIVER transmits to the set-top 130 after a specified period of time has elapsed when the RECEIVER 120 is not receiving a transmission from the remote control 110. The set-top box 130, RECEIVER 120 and remote control 110 may be capable of both receiving and transmitting data simultaneously. The functions of the RECEIVER 120 may also be incorporated into the television set-top box 130.

In a preferred embodiment, the RECEIVER 120 is connected and transmits to the set-top box 130 through a serial, USB, or other connection. In another preferred embodiment, the RECEIVER 120 communicates to the set-top box 130 through the modem interface using a modem emulator or modem protocols. Set-top boxes, such as the DCT-2000 produced by Motorola of Schaumburg, Ill., provide such a modem interface. In another embodiment, the RECEIVER 120 communicates wirelessly to the set-top box 130. A wireless receiving interface receives wireless transmission from the RECEIVER 120 and transmits the transmissions to the set-top box 130. This may occur, for example, by means of a physical connection.

The RECEIVER 120 contains a buffer that stores the voice commands. Alternatively, the buffer is a separate unit from the RECEIVER 120, or is contained in the set-top box 130 or the remote control 110. Voice transmissions are either analog or digital, and are typically modulated. Modulation types include amplitude modulation, frequency modulation, pulse-position modulation (PPM), and pulse code modulation (PCM). Modulation is performed at any of the remote control 110, the set-top box 130, or the RECEIVER 120. A

4

compression scheme may be used to compress the voice command. The compression is performed at any of the remote control 110, the set-top box 130, the RECEIVER 120 or at a head-end unit 160. It is also contemplated that a dedicated component may be provided that performs analog-to-digital conversions.

The voice commands are transmitted from the set-top box 130 to a node 140, a head-end receiver 150 and to a head end unit 160 along a cable television uplink, where speech recognition processing 170 is performed. In the preferred embodiment, speech recognition processing includes user voice identification and word recognition. Word recognition includes probability or semantic analysis checking especially where a voice command contains multiple words. The probability checking checks that the words logically go together.

The central processing station is designed to handle a multitude of voice command inputs from a multitude of cable television users. After the voice command is processed, the central processing station 160 sends a corresponding command function to the cable set-top box 130 or other system component where the command is then performed.

FIG. 2 illustrates one embodiment of the remote control, where an analog signal is transmitted from the remote control to a head end unit 460 for processing. The remote control 110 may include a keypad 210 that allows a user to perform such tasks as entering numerical values, adjusting the volume, and changing the channels. The keypad entries are processed by a CPU 211 that has a ROM 212 and RAM 213 electronically coupled to it. The CPU functions are typically either hardware implemented or an embedded software solution. The processed keypad entries are transmitted by infrared 214 to a RECEIVER 120, or to a set-top box 130 that can receive infrared transmissions.

A push-to-talk (PTT) button 220 activates the microphone 221 on the remote control, as well as activating a pre-amp 222, modulator 223, transmitter 224, and optionally, a sub-audible generator 225. The PTT button 220 brackets the voice command by indicating a beginning when depressed, and an end when released. The bracketing of the speech provides a higher signal to noise ratio because unintended noise at the beginning and end of the transmissions are eliminated. When the PTT button 220 is released, the microphone 221, pre-amp 222, modulator 223, transmitter 224 and sub-audible generator 225 are deactivated optionally after a suitable delay.

A voice command received by the microphone 221, is processed by the pre-amp 222, modulated 223, and transmitted 224 to the receiver 120 or set-top box 130. If the transmitter 224 is a radio frequency (RF) transmitter, then the modulator 223 is, for example, an FM modulator. If the transmitter 224 is an infrared transmitter, then the modulator 223 is an infrared modulator.

If present, the sub-audible generator 225 produces a sub-audible tone. The voice command and sub-audible signal are combined in the pre-amp 222. The voice command and sub-audible signal may also be combined in either in the set-top box 130 or in the RECEIVER 120. The sub-audible tone indicates to the receiver or head-end unit 460 that the microphone is on air and that the user is producing voice commands. Alternatively, the on-air status of the microphone may be detected by other means, such as carrier detection. The combined signal is transmitted to the RECEIVER 120 or to a set-top box 130 that can receive wireless transmissions.

US 7,260,538 B2

5                                                                                                                 6

FIG. 3 is graph that illustrates a voice command 303 and noise 301, 302 that precedes and comes after the voice command. In a typical voice activated system, the microphone is activated when an audible sound reaches pre-determined amplitude 320. Thus, in an amplitude activated system, the noise 301, 302 and voice command 303 all activate the microphone. However, with a PTT button, only the depression 311 of the button activates the microphone, and the release 312 of the button deactivates the microphone. Thus the microphone does not receive the unwanted noise 301, 302.

FIG. 4 illustrates a head-end unit 460 for processing an analog voice command. An audio diplexor 410 receives the transmissions and divides the signal into the voice command 421 and the sub-audible signal 422. A sub-audible decoder 411 processes the sub-audible signal 422. The sub-audible signal 422 contains information, such as the source of the transmission, and also indicates that the transmission is active. The head-end unit processes 170 the voice command and decoded sub-audible signal information, and determines a command function

FIG. 5 illustrates a remote control that transmits a digital signal to a head-end unit 660 for processing. Keypad entries 510 are processed by a CPU 511 to which a ROM 512 and RAM 513 is electronically coupled. The processed keypad entries are modulated 523 and transmitted 514 by infrared or RF to a digital server provider (DSP) carrier 550.

A PTT button 520 activates a microphone 521, pre-amp 522, and analog-to-digital converter 525. The microphone 521 receives a voice command and transmits it to a pre-amp 522. The pre-amp 522 transmits the voice command to the analog-to-digital converter 525 where the voice command is converted from analog to digital. The digital voice command is transmitted to the CPU 511 where header and footer information is added. A unique digital signature in the header identifies the remote control. Header information is typically stored in the ROM 512. The CPU 511 transmits the digital command to a digital service provider (DSP) carrier 550 either through an infrared or RF transmitter. The DSP carrier 550 is part of either the wireless receiver, the set-top box or may be a separate unit.

In considering FIG. 2 and FIG. 5, it is noted that a hybrid system is also envisioned, in which the remote control transmits analog speech to the receiver where it is digitized and sent in digital format to the head-end.

FIG. 6 illustrates a head-end unit 660 for processing a digital voice command. A digital DSP receiver 610 receives the digital signal and transmits the signal to an address decoder 612. The address decoder separates and interprets the header and footer information 621 from the digital voice command 622. The voice command portion 622 of the signal is transmitted to a digital-to-analog converter 611. The digital-to-analog converter 611 transmits the analog voice command to a speech recognition processor 670 where it analyzed for voice command recognition, and a command function is derived.

A transmission is cepstral analyzed for the purposes of facilitating the computer analysis of speech for voice recognition. Cepstral analysis is a method of feature extraction that is known in the art. Cepstral analysis, or feature extraction, is performed on a digitized speech signal and results in a representation of the signal that characterizes the relevant features of the speech. It can be regarded as a data reduction procedure that retains vital characteristics of the speech and eliminates undesirable interference from irrelevant characteristics of the digitized signal, thus easing the decision-making process of a computer. An example of a preferred

method of cepstral analysis is disclosed in Wang, Method of training neural networks used for speech recognition, U.S. Pat. No. 5,509,103, Apr. 16, 1996.

Typically, a remote control contains an existing infrared transmission method for transmitting keypad entries to a set-top box. Using the existing infrared transmitter alone is insufficient for voice commands as the transmission rate is approximately 1200 baud. Thus, a dedicated transmission method is used to transmit the voice commands from the remote control to the receiver.

Examples of transmission methods include infrared, FM radio, AM radio and ultrasonic. In one embodiment, a high digital signal rate is used for the transmissions, such as burst transmissions. In another embodiment, a high data rate is achieved by sending multiple signals simultaneously in the form of a multiplexed signal.

In a preferred embodiment, Bluetooth transceivers are used to facilitate communication between the remote control 110 and the RECEIVER 120. Bluetooth defines a universal radio interface in the 2.45 GHz Industrial-Scientific-Medical (ISM) frequency band. Specific portions of this bandwidth are available on an essentially global basis. Thus, Bluetooth-capable systems operate internationally. Bluetooth permits disparate electronic devices or systems to communicate with each other via short-range communications. A group of two or more devices in local communications, form a Bluetooth network, referred to as a piconet. A piconet comprises up to eight Bluetooth devices, with one device serving as the master and the remaining devices acting as slaves in the piconet. A given Bluetooth device in a given piconet may alternately participate in other piconets, with a group of piconets referred to as a scatternet.

While those skilled in the art may understand and practice the present invention absent detailed presentation of Bluetooth specifications, the papers *Bluetooth—The universal radio interface for ad hoc, wireless connectivity*, by Jaap Haartsen, Ericsson Review No. 3, 1998, pp. 110-117, and *Ericsson's Bluetooth Modules*, by Arfwedson and Sneddon, Ericsson Review No. 4, 1999, pp. 198-205, provide substantial detail regarding the implementation and operation of Bluetooth transceivers. Additional Bluetooth technical specifications may be obtained by accessing a Bluetooth Special-Interest-Group (SIG) website at http://www.blue-tooth.com.

FIG. 7 illustrates another preferred embodiment where a voice command is simultaneously transmitted over both a dedicated voice transmitter 710 and an existing keypad transmitter 720. Transmitting with both the dedicated and existing transmitter increases the baud rate of the transmission. In one embodiment, the voice command transmission is divided between the two transmitters.

In another embodiment, where the remote control transmits an analog signal, the existing keypad transmitter 720 transmits the sub-audible PTT signal, while the dedicated voice transmitter 710 transmits the voice command.

In another embodiment, the transmitters transmit at different frequencies. The RECEIVER has two receivers. One receiver receives transmissions at the dedicated voice transmitter frequency, while the other receiver receives transmissions at the existing keypad transmitter frequency.

In yet another embodiment the transmitters transmit at the same frequency. Each transmission is out of phase with the other. A single receiver at the RECEIVER receives both signals. Each signal has a header that defines how the transmissions are constructed, and how they should be combined.

US 7,260,538 B2

7

8

The remote control 110 may have the ability for bi-directional communication with the RECEIVER 120. If so, the bi-directional communication allows the transmission of information from the RECEIVER 120 to the remote control 110. The bi-directional communication may be accomplished by using the Bluetooth standard when radio transceivers are used, and by TWIRP, produced by SolutioNet, Ltd. of Williston, Vt., when infrared receivers and transmitters are used. Transmissions sent to the remote control are typically command functions. The command functions are used to control remote control functions such as the gain control.

The command functions may also be used to control the functions of other electrical devices. In one embodiment, the remote control relays command functions to electrical devices that are already capable of being controlled by a wireless control, for example, a stereo. In this example, the command functions include turning the stereo on and off, adjusting the volume, switching stereo functions and changing radio stations. Alternatively, the command functions may be relayed via a wired "IR blaster" transmitter connected to theremote or set-top box.

FIG. 8 illustrates another embodiment where the command functions control electrical devices that do not have an existing wireless control method. The remote control transmits command functions to a control receiver 810 that is connected in-line between an electrical device such as a light 830 and a power outlet 820. The command functions turn the power on and off to the device. For example, a user wishes to turn a light on. The user would say into the remote control, "lights on." The head-end unit would process the voice command and send a control function back to the remote control or IR blaster. The remote control transmits the control function to the control receiver 810 where it switches the power on to the light 830.

In another preferred embodiment a word recognition unit activates the microphone upon the speaking of a specific word. For example, when the word "agile" is spoken, the microphone is turned on. Once turned on, the microphone stays on continuously during speech, and turns off five seconds after the last word is spoken. The word recognition unit is typically constructed of a voice processor and a buffer. The unit is activated when the amplitude of speech reaches a predetermined level, similar to voice activation devices found in tape recorders. In this way, the remote control uses less power because the word recognition unit is not always on. Also, to reduce costs and weight, a low level processor is used with limited speech recognition. However, as processor speeds increase, and die sizes are cast smaller, more powerful processors may be used.

In another embodiment of the invention, low-bit rate audio encoding is used for non-repudiation purposes. Non-repudiation provides a method to guarantee that a party to a transaction cannot falsely claim that they did not participate in a transaction. Traditionally, handwritten signatures are used to ensure this. When a consumer writes a check, presenting a driver's license ensures the identity of the writer, i.e. authentication, while the signature on the check ensures that the consumer was in fact present and agreed to write the check, i.e. non-repudiation. When a user utters a voice command, the low-bit rate encoding is used to mark the transaction. Such marking is typically used when a user orders a pay-per-view event or other transaction involving goods or services for a fee. The low bit-rate recording serves as a non-memory intensive way of recording the user's voice command.

Non-repudiation is also performed by identifying the source of the voice command through an identification code that is attached in the header of a voice command. A user may also be required to enter on the remote control keypad an identifying code, such as the user's home phone number or "PIN" number.

FIGS. 9 and 10 illustrate another preferred embodiment of the invention, where multiple functions are associated with the PTT button 910. The primary function of the PTT button is to engage and disengage a command pathway for a voice command from the user to the head-end unit. Other functions are also activated by manipulation of the PTT button.

An on-screen help menu is activated by double clicking the PTT button 910 in rapid succession to provide, for example, a help screen. The help screen typically provides information on how to use the system and also provides program information.

Optionally, the PTT button 910 may also adjust the sensitivity of the microphone. A clockwise turn 911 of the button increases the sensitivity while a counter-clockwise turn 912 decreases it. The sensitivity can be decreased to a degree such that the microphone is muted. An indicator 950 is located on the remote control or receiver can be used to indicate the amplitude of a user's voice command. The indicator lets a user know whether his voice command meets the minimum amplitude required for an accurate and process able recording. The PTT button 910 also functions as a shift button. Thus, depressing the PTT button 910 along with pressing keypad buttons 960 on the remote control, gives the keypad buttons 960 a secondary function.

Optionally, the remote control may also functions as a wireless phone. Toggling the PTT button upward 913 turns the phone on, and a user is able to dial a phone number using the remote control keypad. Toggling the button downward 914 turns off the phone. After a user releases the PTT button from its toggled position, the PTT button returns to a middle, default position. The microphone 970 functions as a phone receiver and a speaker 920 on the remote control allows the user to hear a phone transmission. The RECEIVER functions 120 as the base station for wireless phone functions. The RECEIVER 120 connects to a phone jack using a standard telephone wire. The wireless phone transmissions are transmitted to the receiver using the same communication pathways that the voice commands use.

In one embodiment of the invention, infrared repeaters are used to improve the performance of an infrared remote control. Infrared repeaters are placed throughout the operating environment of the remote control and RECEIVER. When a user uses a keypad function, it is natural for a user to point the remote control at the RECEIVER of the set-top box making the need for infrared repeaters unnecessary. However, when speaking into the remote control, a user's tendency is to place his mouth in close proximity to the microphone on the remote control. In most cases the infrared transmitter is not aimed towards the RECEIVER. The placement of the infrared repeaters ensures that the RECEIVER receives the infrared transmission from the remote control.

In a preferred embodiment the PTT button is a metal switch that activates the microphone transmission functions by engaging mechanical contacts. Switches of this type suffer from bounce. Hardware and software solutions exist for debouncing the switch. One example of a hardware debouncing solution is a circuit that has an RC time constant that swamps out the bounce. A typical software solution runs a routine that kills time long enough to allow the contacts to stop bouncing. These examples are not meant to be exhaustive but merely illustrative of what exists in the art.

US 7,260,538 B2

9

Often, a user releases the PTT button prior to finishing a voice command. FIG. 11 illustrates a timing circuit 1110 with an analog remote control transmitter. The timing circuit keeps the microphone 221, sub-audible generator 225, pre-amp 222, modulator 223, and transmitter 224 activated for a period of time after the user has released the PTT button 220. The period of time is typically from one hundred milliseconds to one second. The timing circuit is activated only when the PTT button is depressed for more than some minimal time. This enables fast clicks of the PTT button to control other functions.

Although the invention is described herein with reference to the preferred embodiment, one skilled in the art will readily appreciate that other techniques and applications may be substituted for those set forth herein without departing from the spirit and scope of the present invention. Accordingly, the invention should only be limited by the claims included below.

The invention claimed is:

1. A method for providing voice recognition processing at a cable television head-end unit for a plurality of voice controlled television cable set-top boxes in a cable television network, comprising the steps of:

a television remote control receiving user-activated indication of a voice command;

receiving said voice command through a microphone associated with said television remote control;

said television remote control wirelessly transmitting a signal representing said voice command to a cable set-top box;

said cable set-top box transmitting a signal representing said voice command via cable television link to a remotely located head-end unit;

processing said voice command at said head-end unit;

the head-end unit deriving a set-top-box-compatible command function corresponding to said voice command;

the head-end unit transmitting said command function to said cable set-top box via the cable television link;

performing said command function at said cable set-top box.

2. A method for providing voice recognition processing at a cable television head-end unit for a plurality of television controllers in a cable television network, comprising the steps of:

a television remote control receiving indication of a voice command by user operation of an activation feature associated with the television remote control;

receiving said voice command through a microphone associated with said television remote control;

said television remote control wirelessly transmitting a signal representing said voice command to a television controller;

said television controller transmitting a signal representing said voice command via cable television link to a remotely located cable head-end unit;

the head-end unit deriving a controller-compatible command function corresponding to said voice command;

the head-end unit transmitting said command function to said controller via the cable television link; and

the controller performing said command function.

3. The method of claim 2, wherein the activation feature comprises a push-to-talk switch and activation of said push-to-talk switch comprises any of:

pressing said push-to-talk switch, double pressing said push-to-talk switch, turning said push-to-talk switch clockwise and/or counterclockwise, and toggling said push-to-talk switch.

10

4. The method of claim 2,

where the activation feature comprises a push-to-talk switch, and the steps further comprise, responsive to operation of the push-to-talk switch, performing functions including any of:

activating said microphone, deactivating said microphone, activating a help menu, deactivating a help menu, activating a telephone, deactivating said telephone, adjusting the gain on said microphone, muting said microphone and performing a shift function.

5. The method of claim 2,

where user operation of the activation feature comprises making one or more predetermined utterances to operate a voice-activation feature of the remote control.

6. The method of claim 2, wherein said remote control comprises a wireless transmitter employing any of the following wireless communication formats:

infrared, ultrasonic, radio frequency transmission, burst transmission, a multiplexed signal, a transmission device that conforms to a Bluetooth Specification, and an infrared repeater.

7. The method of claim 2,

where the television remote control includes a keypad and a first transmitter to wirelessly transmit signals representing user entries upon the keypad;

where the operation of wirelessly transmitting the signal representing the voice command to the television controller employs a second transmitter separate from the first transmitter.

8. The method of claim 2,

where the television remote control includes a keypad and a transmitter to wirelessly transmit signals representing user entries upon the keypad;

where the operation of wirelessly transmitting the signal representing the voice command to the television controller employs the transmitter;

where the steps further comprise distinguishing between signals representing the voice commands and the signals representing user entries upon the keypad by one or more of the following: using transmissions of same frequency and different phase, using different frequencies, using different header or footer information, including a sub-audible signal in one or both signals.

9. The method of claim 2,

where the steps further comprise:

the television remote control adding information to the signal representing the voice command transmitted to the television controller, said information contained in locations comprising any of:

header data, footer data, a sub-audible signal.

10. The method of claim 9 wherein said information comprises any of:

source of said voice command, identity of a user, on air signal, off air signal, beginning of a voice command, and end of a voice command.

11. The method of claim 2, further comprising converting signals representing said voice command into cepstrals, the converting step performed by any of:

said remote control, said television controller, a wireless transmission receiver that receives signals from said remote control.

12. The method of claim 2, performing non-repudiation measures comprising any of:

deriving a low bit rate codec of said voice command, determining the source of said voice command, analyzing said voice command for the identity of the user, and requiring the input of a code.

US 7,260,538 B2

11

13. The method of claim 2, further comprising:

automatically delaying deactivation of the activation feature for a period of time after user activation of the activation feature.

14. The method of claim 2, further comprising the step of:

the head-end unit transmitting further command functions to the television controller for relay to the television remote control;

responsive to receiving the further command functions, the television controller wirelessly forwarding the further command functions to the remote control.

15. The method of claim 14,

further comprising:

responsive to receiving the further command functions, the remote control performing any of: adjusting the gain control of said microphone and muting said microphone.

16. The method of claim 14, further comprising the step of:

responsive to receiving the further command functions, the remote control wirelessly transmitting said command function to a wirelessly operated device.

17. The method of claim 2, where the step of deriving the controller-compatible command function includes any of: word recognition, semantic analysis.

18. An apparatus for providing voice recognition processing at a cable television head-end unit for a plurality of voice controlled television cable set-top boxes in a cable television network, comprising:

a television remote control including: activation means for receiving user-activated indication of a voice command, microphone means for receiving the voice command, and transmission means for wirelessly transmitting a signal representing the voice command to a cable television controller;

a cable television controller including receiver means for receiving the signal representing the voice command from the television remote control and transmitter means for transmitting a signal representing the voice command via cable television link to a remotely located head-end unit;

a head-end unit including processing means for deriving cable-television-controller-compatible command functions corresponding to signals representing the voice commands received from the cable television controllers, and transmission means for transmitting signals representing the command functions back to respective cable television controllers;

where the cable television controller additionally includes second receiver means for receiving the signals representing the command functions from the head-end unit via the cable television link, and where the cable television controller includes means responsive to receipt of the command functions for executing the command functions.

19. An apparatus for providing voice recognition processing at a cable television head-end unit for a plurality of television controllers in a cable television network, comprising:

a television remote control including: activation feature to receive user indication of a voice command, a microphone to receive the voice command, and a transmitter to wirelessly transmit a signal representing the voice command to a cable set-top box;

a cable set-too box including a receiver to receive the signal representing the voice command from the television remote control and a transmitter to transmit a

12

signal representing the voice command via cable television link to a remotely located head-end unit;

a head-end unit to derive set-top-box-compatible command functions corresponding to signals representing voice commands received from the cable set-top-boxes and transmit signals representing the command functions back to respective cable set-too boxes;

where the cable set-top box additionally includes a second receiver to receive signals representing the command functions from the head-end unit via the cable television link, the cable set-top box responsive to receipt of the signals representing the command functions to execute the command functions.

20. The apparatus of claim 19, wherein said activation feature comprises a push-to-talk switch activated by any of:

pressing said push-to-talk switch, double pressing said push-to-talk switch, turning said push-to-talk switch clockwise and counterclockwise, and toggling said push-to-talk switch.

21. The apparatus of claim 19,

where the activation feature comprises a push-to-talk switch with functions comprising any of:

activating said microphone, deactivating said microphone, activating a help menu, deactivating a help menu, activating a telephone, deactivating said telephone, adjusting the gain on said microphone, muting said microphone, and performing a shift function.

22. The apparatus of claim 19,

where the activation feature is operated by receipt of one or more predetermined utterances.

23. The apparatus of claim 19, wherein said remote control comprises a wireless transmitter employing any of the following wireless communication formats:

infrared, ultrasonic, radio frequency transmission, burst transmission, a multiplexed signal, a transmission device that conforms to a Bluetooth Specification, and an infrared repeater.

24. The apparatus of claim 19,

where the television remote control includes a keypad and a first transmitter to wirelessly transmit signals representing user entries upon the keypad;

where the operation of wirelessly transmitting the signal representing the voice command to the cable set-top box employs a second transmitter separate from the first transmitter.

25. The apparatus of claim 19,

where the television remote control includes a keypad and a transmitter to wirelessly transmit signals representing user entries upon the keypad;

where the operation of wirelessly transmitting a signal representing the voice command to the cable set-top box employs the transmitter;

where the television remote control is configured to distinguish the signals representing the voice commands and the signals representing user entries upon the keypad by one or more of the following: using transmissions of same frequency and different phase, using different frequencies, using different header or footer information, including a sub-audible signal in one or both signals.

26. The apparatus of claim 19,

where the television remote control is configured to add information to the signal representing the voice command transmitted to the cable set-top box, where said information is contained in locations comprising any of:

header data, footer data and a sub-audible signal.

US 7,260,538 B2

13

27. The apparatus of claim 26 wherein said information comprises any of:

source of said voice command, identity of a user, on air signal, off air signal, beginning of a voice command, and end of a voice command.

28. The apparatus of claim 19,

where one of the following is configured to convert signals representing the voice command into cepstrals:

said remote control, said cable set-top box, a wireless transmission receiver that receives said transmission from said remote control.

29. The apparatus of claim 19, the television remote control further configured to automatically delay deactivation of the activation feature for a period of time after user activation.

30. The apparatus of claim 19, where:

the head-end unit is configured to transmit further command functions to the set-top box for relay to the remote control;

the set-top box is configured, responsive to receiving the further command functions, to forward the further command functions to the remote control.

31. The apparatus of claim 30,

where the remote control is configured, response to receiving the further command functions, to perform any of: adjusting the gain control of said microphone and muting said microphone.

32. The apparatus of claim 30,

the remote control is further configured, responsive to receiving the further command functions, to wirelessly transmit said command functions to a wirelessly operated device.

33. The apparatus of claim 19, where the head-end unit is programmed such that deriving the set-top-box-compatible command function includes any of: word recognition, semantic analysis.

34. A centralized multi-user voice operated television control system, comprising:

television remote controls configured to directly and wirelessly control television sets and additionally to receive user voice input and wirelessly transmit first output representative of the voice input to television set-top boxes;

television set top boxes configured to receive television input signals via cable television link and provide television output signals compatible with television sets, the set top boxes additionally responsive to receiving the first output from the television remote controls to transmit representative second output to a central processing station via the cable television link;

a centralized processing station configured to receive and process second output from a multitude of television set top boxes by applying voice recognition to the second output to identify user-intended voice commands, to derive set-top-box-compatible instructions to carry out the identified voice commands, and returning voice commands representing the instructions to respective top boxes via the cable television link;

where the set top boxes are further responsive to receiving the signals representing the instructions from the central processing station to execute the instructions.

35. The system of claim 34, where the television remote controls include circuitry to ignore user voice input except during activation of a user-operated activation feature.

36. The system of claim 34, where each television remote control includes a signature generator providing a predetermined signature signal concurrent with wireless transmis-

14

sion of the first output, and where the set top boxes are configured to prevent transmission to the central processing station of output from the television remote controls not containing the predetermined signature signal.

37. The system of claim 34,

where each television remote control includes a keypad and a first transmitter to wirelessly transmit signals representing user entries upon the keypad;

where the operation of wirelessly transmitting the first output employs a second transmitter separate from the first transmitter.

38. The system of claim 34,

where each television remote control includes a keypad and a transmitter to wirelessly transmit signals representing user entries upon the keypad;

where the operation of wirelessly transmitting the first output employs the transmitter;

where each television remote control is further configured to distinguish the first output from signals representing user entries upon the keypad by one or more of the following: using transmissions of same frequency and different phase, using different frequencies, using different header or footer information, including a sub-audible signal in one or both signals.

39. The system of claim 34, where:

the set top boxes are configured to only execute certain identified commands, and for other commands, to wirelessly forward a representative fourth output representing the other commands to the television remote controls;

the television remote controls further include receivers to receive the fourth output, and are further configured to directly control wireless devices by wirelessly transmitting signals representing the fourth output.

40. A centralized multi-user voice operated television control system, comprising:

a plurality of television remote control means each for directly and wirelessly controlling television sets and additionally receiving user voice input and wirelessly transmitting first output representative of the voice input to a television set-top box means;

a plurality of television set top box means each for receiving television input signals via cable television link and providing television output signals compatible with television sets, and responsive to receiving the first output from one of the television remote control means to transmit representative second output to a central processing station via the cable television link;

a centralized processing station configured to receive and process second output from a multitude of television set top box means by applying voice recognition to the second output to identify user-intended voice commands, to derive set-top-box-means-compatible instructions to carry out the identified voice commands, and returning signals representing the instructions to respective set top box means via the cable television link;

where each set top box means is further responsive to receiving the signals representing the instructions from the central processing station to execute the instructions.

41. A method for operating a centralized multi-user voice operated television control system that includes a multitude of television remote controls situated at various television

US 7,260,538 B2

15

viewing sites, a multitude of set top boxes situated at the television sites to receive television input signals via cable television link and provide television output signals compatible with television sets at the television viewing sites, and a centralized processing station remote from the television viewing sites and coupled to the set top boxes via the cable television link, the method comprising operations of:

operating the television remote controls to perform additional operations including receiving user voice input and wirelessly transmitting first output representative of the voice input to set-top boxes;

operating the set top boxes to perform additional operations including, responsive to receiving the first output from the television remote controls, transmitting rep-

16

resentative second output to a central processing station via the cable television link;

operating the centralized processing station to receive and process second output from a multitude of set top boxes by applying voice recognition to the second outputs to identify user-intended voice commands, to derive set-top-box compatible instructions to carry out the identified voice commands, and to return signals representing the instructions to the set top boxes via the cable television link;

operating the set top boxes to perform further operations including, responsive to receiving the signals representing the instructions from the central processing station, executing the instructions.

\* \* \* \* \*

# EXHIBIT B

US007047196B2

(12) **United States Patent** (10) Patent No.: **US 7,047,196 B2**
Calderone et al. (45) Date of Patent: **May 16, 2006**

(54) **SYSTEM AND METHOD OF VOICE RECOGNITION NEAR A WIRELINE NODE OF A NETWORK SUPPORTING CABLE TELEVISION AND/OR VIDEO DELIVERY**

(75) Inventors: **Theodore Calderone**, San Carlos, CA (US); **Paul M. Cook**, Woodside, CA (US); **Mark J. Foster**, Palo Alto, CA (US)

(73) Assignee: **AgileTV Corporation**, Menlo Park, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1138 days.

(21) Appl. No.: **09/785,375**

(22) Filed: **Feb. 16, 2001**

(65) **Prior Publication Data**

US 2001/0056350 A1    Dec. 27, 2001

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/708,315, filed on Nov. 7, 2000, now Pat. No. 6,480,703, and a continuation-in-part of application No. 09/679,115, filed on Oct. 4, 2000, and a continuation-in-part of application No. 09/664,874, filed on Sep. 19, 2000, now abandoned, and a continuation-in-part of application No. 09/661,486, filed on Sep. 14, 2000.

(60) Provisional application No. 60/210,440, filed on Jun. 8, 2000.

(51) **Int. Cl.**
*G10L 21/00* (2006.01)

(52) **U.S. Cl.** .................. **704/270.1**; 704/201; 704/231; 715/719; 715/512; 715/726; 709/217

(58) **Field of Classification Search** ........ 704/270–278, 704/231, 251, 246, 201; 715/719, 512, 513, 715/716, 721, 723, 726, 733; 709/217
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,506,387 A    3/1985    Walter ........................ 455/612

FOREIGN PATENT DOCUMENTS

EP    0 782 337    7/1997    .................... 7/173

(Continued)

OTHER PUBLICATIONS

*ACTV Awarded Three Key Digital Television Patents: Coverage Extended to ACTV's Core Technology for Eliminating Video Switching Delay*; May 8, 2001; PRNewswire.

(Continued)

*Primary Examiner*—Vijay Chawan
(74) *Attorney, Agent, or Firm*—Michael A. Glenn; Glenn Patent Group

(57) **ABSTRACT**

A method and system of speech recognition presented by a back channel from multiple user sites within a network supporting cable television and/or video delivery is disclosed. The preferred embodiment of the invention comprises ans system and method of using a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites presented to a speech processing system at a wireline node in a network that supports at least one of cable television delivery and video delivery. One embodiment of the invention comprises a method having the steps of receiving the back channel to create a received back channel; partitioning the received back channel into a multiplicity of received identified speech channels; processing the multiplicity of received identified speech channels to create a multiplicity of identified speech content; and responding to the identified speech content to create an identified speech content response that is unique, for each of the multiplicity of identified speech contents.

**66 Claims, 35 Drawing Sheets**



US 7,047,196 B2
Page 2

## U.S. PATENT DOCUMENTS

| Patent No. | Date | Name | Class |
|---|---|---|---|
| RE32,012 E | 10/1985 | Pirc et al. | 395/2.79 |
| 4,653,499 A | 12/1986 | Nishioka et al. | 381/43 |
| 4,653,045 A | 3/1987 | Stanley et al. | 370/62 |
| 4,757,541 A | 7/1988 | Beadles | 381/43 |
| 4,780,906 A | 10/1988 | Rajasekaran et al. | 381/43 |
| 4,783,809 A | 11/1988 | Glinski | 381/43 |
| 4,797,910 A | 1/1989 | Daudelin | 379/67 |
| 4,831,077 A | 4/1989 | Mallory et al. | 340/521 |
| 4,821,520 A | 4/1989 | Zeinstra | 381/43 |
| 4,837,830 A | 6/1989 | Wrench et al. | 704/238 |
| 4,847,885 A | 7/1989 | Vitrovfli | 379/88 |
| 4,847,902 A | 7/1989 | Hunat et al. | 381/64 |
| 4,811,950 A | 9/1990 | Downes et al. | 364/513.4 |
| 4,959,855 A | 9/1990 | Daudelin | 379/213 |
| 4,972,485 A | 11/1990 | Dautrich et al. | 381/43 |
| 4,991,217 A | 2/1991 | Garrett et al. | 381/43 |
| 5,006,987 A | 4/1991 | Harless | 364/419 |
| 5,125,024 A | 6/1992 | Gokcer et al. | 379/88 |
| 5,127,003 A | 6/1992 | Doll, Jr et al. | 370/110.1 |
| 5,155,760 A | 10/1992 | Johnson et al. | 379/67 |
| 5,163,083 A | 11/1992 | Dowden et al. | 379/88 |
| 5,181,237 A | 1/1993 | Dowden et al. | 379/88 |
| 5,197,005 A | 3/1993 | Shwartz et al. | 364/419 |
| 5,199,062 A | 3/1993 | Von Meister et al. | 379/67 |
| 5,208,848 A | 5/1993 | Pula | 379/67 |
| 5,274,560 A | 12/1993 | LaRue | 364/444 |

[Remainder of the reference listing continues across three columns of U.S. Patent Documents with patent numbers, issue dates, inventor names, and classification numbers.]

US 7,047,196 B2

Page 3

| | | | | |
|---|---|---|---|---|
| 6,204,843 B1 | 3/2001 | Freeman et al. | | 345/327 |
| 6,205,582 B1 | 3/2001 | Hoarty | | 725/93 |
| 6,215,484 B1 | 4/2001 | Freeman et al. | | 345/327 |
| 6,225,976 B1 | 5/2001 | Yates et al. | | 345/156 |
| 6,480,703 B1 * | 11/2002 | Calderone et al. | | 455/118 |
| 6,573,907 B1 * | 6/2003 | Madrane | | 715/719 |
| 6,785,653 B1 * | 8/2004 | White et al. | | 704/270.1 |

### FOREIGN PATENT DOCUMENTS

| WO | 98/26595 | 6/1998 | | 7/173 |
|---|---|---|---|---|
| WO | 99/30501 | 6/1999 | | 7/173 |
| WO | 00/24198 | 4/2000 | | 7/173 |

### OTHER PUBLICATIONS

*Sprint Begins Voice-Activated E-Mail*; May 23, 1001; Associated Press-New York Times.

John Dowding, Jean Mark Gawron, Doug Appelt, John Bear, Lynn Cherny, Robert Moore, and Douglas Moran; *Gemini: a Natural Language System for Spoken-Language Understanding*.

*Info Wiz: An Animated Voice Interactive Information System*; http://www.ai.sri.com/~oaa/infowiz.html.

Robert Moore, Douglas Appelt, John Dowding, J. Mark Gawron, and Douglas Moran; *Combining Linguistic and Statistical Knowledge Sources in Natural-Language Processing for ATIS*.

Amanda Stent, John Dowding, Jean Mark Gawron, eleizabeth Owen Bratt, and Robert Moore; *The CommandTalk Spoken Dialogue System*.

John Dowding, Elizabeth Owen Bratt and Sharon Goldwater;*Interpreting Language in Context in CommandTalk* Feb. 5, 1999.

Robert Moore, John Dowding, Harry Bratt, J. Mark Gawron, Yonael Gorfu, and Adam Cheyer; *CommandTalk: A Spoken-Language Interface for Battlefield Simulations*; Oct. 23, 1997.

John Dowding, Robert Moore, Francois Andry, and Douglas Moran; *Interleaving Syntax and Semantics in an Efficient Bottom-Up Parser*.

Robert C. Bedichek; *The Meerkat Multicomputer: Tradeoffs in Multicomputer Architecture*; Dissertation Given and University of Washington, 1994.

James Karney; *A Sound Proposition Even Early on, There are Already Ways to Voice-enable a Site*; Jan. 15, 2001; Internet World.

Sarah Roberts-Witt; *Talking to the Web*; Jan. 15, 2001; Internet World.

Hand out from SRI International; *Simple Ui to Retrieve Favorites*.

Email dated Jan. 15, 2001; Subject *Fwd: Large Linux Cluster*.

Email: *Cray inc. Announces Plans for Alpha Linux Supercluster System*; Feb. 12, 2001.

Email: *Fwd: Re: One Voice Technologies*; Feb. 15, 2001.

Email: *Fwd: Ars Technica: Inside the KLAT2 Supercomputer-  p. 1-*.

53 Page printout from: http://www.ai.sri.com CommandTalk.

Printout: http://www.speech.sri.com/demos/atis.html.

Bruce Meyerson, *Vice Recognition Still Selective*, Jan. 15, 2000, Yahoo! News Alerts.

*Where can I get an inVoca?*, http://invoca.com/home/htm.

*Integrated Audio-Graphics User Interface.*, Apr. 1991, IBM Technical Disclosure Bulletin.

Stephanie Miles, *Will Microsoft's next OS run your TV?*, Sep. 5, 2000, Yahoo! Daily News.

* cited by examiner



Fig. 1 Prior Art



Fig. 2 Prior Art



FIG. 3

U.S. Patent    May 16, 2006    Sheet 4 of 35    US 7,047,196 B2



FIG. 4

Case 2:16-cv-06516-JS    Document 1    Filed 12/19/16    Page 53 of 99



FIG. 5



Fig. 6



Fig. 7



Fig. 8

Case 2:16-cv-06516-JS    Document 1    Filed 12/19/16    Page 57 of 99



Fig. 9



Fig. 10



**Fig. 11A**

**Fig. 11B**

**Fig. 11C**



Fig. 12



Fig. 13A



Fig. 13B



Fig. 14



Fig. 15A



Fig. 15B



Fig. 16



Fig. 17B



Fig. 17A



Fig. 18A

Fig. 18B



Fig. 19A



Fig. 19B



Fig. 19C



Fig. 19D

20/35



Fig. 20A



Fig. 20B



Fig. 20C



Fig. 21



Fig. 22

U.S. Patent          May 16, 2006          Sheet 23 of 35          US 7,047,196 B2



Fig. 23

U.S. Patent

May 16, 2006

Sheet 24 of 35

US 7,047,196 B2



Fig. 24

U.S. Patent        May 16, 2006        Sheet 25 of 35        US 7,047,196 B2



Fig. 25 Prior Art

U.S. Patent    May 16, 2006    Sheet 26 of 35    US 7,047,196 B2



Fig. 26

U.S. Patent

May 16, 2006

Sheet 27 of 35

US 7,047,196 B2



Fig. 27



Fig. 28A



Fig. 28B



Fig. 29

U.S. Patent    May 16, 2006    Sheet 30 of 35    US 7,047,196 B2



Fig. 30

U.S. Patent

May 16, 2006

Sheet 31 of 35

US 7,047,196 B2



Fig. 31



Fig. 32A

Fig. 32B Prior Art



Fig. 33



Fig. 34

U.S. Patent    May 16, 2006    Sheet 35 of 35    US 7,047,196 B2



Fig. 35

US 7,047,196 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

### SYSTEM AND METHOD OF VOICE RECOGNITION NEAR A WIRELINE NODE OF A NETWORK SUPPORTING CABLE TELEVISION AND/OR VIDEO DELIVERY

This application claims priority from Provisional Patent Application No. 60/210,440, entitled Method and Apparatus for Centralized Voice-Driven Natural Language Processing, filed 8 Jun. 2000.

This application is a continuation in part from application Ser. No. 09/679,115, entitled System and Method of a Multi-dimensional Plex Communication Network, filed 4 Oct. 2000;

Application Ser. No. 09/664,874, entitled Increased Bandwidth In Aloha-Based Frequency-Hopping Transmission Systems, filed 19 Sep. 2000 now Abandoned;

Application Ser. No. 09/661,486, entitled N-way Demultiplexor, filed 14 Sep. 2000; and

Application Ser. No. 09/708,315, entitled Common Carrier, Multiple Output RF Upconverter, filed 7 Nov. 2000 now U.S. Pat. No. 6,480,703.

### BACKGROUND OF THE INVENTION

#### 1. Technical Field

This invention relates to speech recognition performed near a wireline node of a network supporting cable television and/or video delivery.

#### 2. Background Art

Currently, speech operated functions using the latest speech recognition technologies are limited to a handful of applications, such as toys, appliances, some computers, speech dictation, cellular phones, and speech control of one's home. Most of these applications use speech recognition technology running on a computer or speech recognition chip technology. These speech recognition systems typically offer only a limited number of commands and the recognition efficiency is only fair and often require speech training.

There have been numerous patents issued regarding speech recognition. Many apply in a telephone context or other dial-up context such as an Automated Teller machine (ATM), including the following: Rabin, *Voice command control and verification system*, U.S. Pat. No. 6,081,782, issued Jun. 27, 2000, Basore, et al, *Voice activated device and method for providing access to remotely retrieved data*, U.S. Pat. No. 5,752,232, issued May 12, 1998, and Kowalkowski, et al, *Voice-control integrated field support data communications system for maintenance, repair and emergency services*, U.S. Pat. No. 5,924,069, issued Jul. 13, 1999.

There is, however, another class of speech recognition technology referred to as natural language, which requires state of the art processing software and hundreds of megabytes of RAM to support. Natural language recognition is currently being used in high end systems, such as billing applications for utility companies and the New York Stock Exchange, because of its ability to recognize spoken words from any speech. Some natural language systems claim to be totally user independent and are also capable of recognizing speech in several different languages.

However, the problems of speech recognition at a centralized wireline node in a network supporting video delivery or cable television delivery have not been addressed by such prior art. For the purposes of the discussion herein, a centralized wireline node refers to a network node providing video or cable television delivery to multiple users using a wireline physical transport between those users at the node.

FIG. 1 depicts a typical network as found in a cable television and/or video delivery network employing a Hybrid Fiber-Coaxial (HFC) wiring scheme as disclosed in the prior art.

Each user site contains a Set Top Box, such as STB 180, coupling to the network through a coaxial cable 172, which interfaces 170 to a collective coaxial cable 160 which couples to a Node 126. The interface 170 may include bi-directional signal amplification and possibly further include the filtering and/or frequency shifting of these signals.

The Node 126 is hierarchically coupled 128 to a Headend 104, which in most cable television networks serves as the source of television programming and other signaling. The signals are sent through the Node 126 and couplings 160-170-172 to provide the STB 180 and others, with the television signaling. In certain large towns and cities, there may be a further hierarchical layer including a Metropolitan Headend 10 coupled 106 to Headend 104. These higher layers of the network use fiber optics for the physical transport of couplings 102, 106 and 108, as well as for 122, 126 and 128.

The couplings between STB 180 and Node 126 support bi-directional communication. The couplings between STB 180, Node 126 and Headend 104 may also support bi-directional communication. Such bi-directional communication allows the STB 180 to receive multiple television channels. This bi-directional communication allows STB 180 to signal at least limited information to the Node 126 and/or the Headend 104. Such information in either case may support management of Pay-per-View and other services.

User site accounting information usually resides at the highest level of the network, which tends to be either the Headend 104 or Metropolitan Headend 10.

In cable television, several downstream data channels that send channel and synchronization information are often transmitted in a previously reserved band of frequencies. They are typically assigned for re-broadcasting FM channels over cable in the United States. Currently, most cable systems reserve some of the 88 to 108 MHz FM spectrum for set-top data transmission. The unused portion of that spectrum are left for barker channels or for additional video channels. The Open Cable Standard requires that the 70 to 130 MHz band be available for what's called Out-of-Band or (OOB) or Downstream transmission.

Most current cable systems use the popular HFC architecture so that the downstream video signals, digital or analog, are sent from the Headend to hubs or nodes via fiberoptic cable. At the receiving side of the node, the optical signal from the fiber gets converted to an electrical signal containing all of the analog, digital video RF carriers and program/service information. This signal, in turn, is amplified and distributed via coaxial cable to the appropriate subscribers connected to the node.

A major design objective for existing cable television set-top boxes was efficient downstream information delivery, i.e. from cable plant to subscriber. Provision for upstream data transmission, i.e. from subscriber to cable plant, is much more restrictive, supporting only limited bandwidth. As new classes of interactive services become available, efficient use of upstream transmission bandwidth grows in importance. For example, if it is necessary to pass

US 7,047,196 B2

3

information from the subscriber to the cable headend (also known as the headend), sufficient upstream bandwidth must be made available.

One of the most popular digital set-top boxes, the General Instruments (now Motorola) DCT-2000, is a useful example. When this box was first deployed, upstream transmissions were restricted to user pay-per-view requests, and other simple, infrequent transmissions. As a consequence, the transmission format used for upstream transmissions was not required to be very efficient, and in fact, is not.

In this set-top box, the transmission hardware is capable of selecting twenty different 256K bps channels, each of which uses QPSK transmission coding. While the hardware is capable of frequency-hopping to avoid channels which are subject to interference, the scheme used is fairly static, with typical deployments only using two active upstream communications channels. This leads to an aggregate bandwidth of only 512K bps per cluster of set-top boxes converging in the network to a node, in cable television terms. The cable node typically supports between 500 and 2000 subscribers.

Upstream signals in the 5 to 40 MHz band from each subscriber connected to the node are collected, combined, and then sent to the Headend via either the same fiber used for the downstream video carriers, or a separate fiber.

Furthermore, the transmission control protocol used, referred to as Aloha, is one where an individual set-top box immediately transmits any pending request to the headend, without regard to whether or not the transmission channel is already in use. This transmission is repeated at regular intervals until the box receives an acknowledgement command from the headend, indicating successful receipt of the transmission.

This transmission control protocol is quite inefficient due to the number of collisions which ensue, e.g. simultaneous transmissions from different set-top boxes which interfere with one another, forcing all of the transmitters to repeat their transmissions again. This leads to typical channel utilization on the order of just 30%. As a consequence, the total bandwidth available for upstream transmission per node is only about 30% of 512K bps—137K bps, on average.

Downstream control data transmission typically occurs in a separate frequency band from the upstream channels.

Typically, HFC networks employ an optical fiber from a central office, or Headend, to a neighborhood node. The fiber has forward and reverse transmission capability, which can alternatively be accommodated on separate fibers. Wavelength Division Multiplexing (WDM) can be used to implement both on a single fiber. At the node, coaxial cable connects the users through a shared frequency division multiplexing (FDM) scheme with contention resolution protocols used to manage upstream data flows.

Such communication schemes having both forward and backward paths, and which may or may not involve a user, are referred to as loops herein. An example of a loop is the communication between Headend 104 and Node 126. Communication schemes having both forward and backward paths to multiple users are referred to as local loops. An example of a local loop is the communication between Node 126 and user site STBs 180, 182 and 184. Note that a loop may be constituted out of optical fiber or out of coaxial cable.

Hybrid-Fiber-Copper (HFCop) networks work in much the same manner, but substitute copper wire(s), often in twisted pairs, for coaxial cable. In such networks a local loop may further be constituted out of optical fiber, coaxial cable or twisted pairs.

4

Another alternative local loop configuration is commonly known as Switched Digital Video. It is a form of HFC coupling the fiber through a node to each user site with a distinct point-to-point coaxial cable. The node interfaces the user site coaxial cables with the optical fiber through a switch. The switch typically contains a network management unit which manages the switch, connecting the bandwidth service provider with multiple homes, today often in the range of five to 40 homes per switch.

The Synchronous Optical NETwork (SONET) scheme is also applied in the creation of high-speed networks for homes and businesses. This and similar communication schemes may be employed to deliver video streams to user sites.

FIG. 2 depicts a typical residential broadband network using local loop wiring of the network, as disclosed in the prior art.

As in FIG. 1, each user site contains a Set Top Box, such as STB 180, coupled to the network through a coaxial cable 172 which interfaces 170 to a collective coaxial cable 160 which is coupled to Node 126. Interface 170 may include bi-directional signal amplification, and possibly further include the filtering and/or frequency shifting of these signals.

As in FIG. 1, the couplings between STB 180 and Node 126 support bi-directional communication allowing the STB 180 to receive multiple television channels and allowing STB 180 to signal at least limited information to the Node 126, which may well include management of Pay-per-View and other services. The couplings between STB 180, Node 126 and Headend 104 may also support bi-directional communication allowing the STB 180 to receive multiple television channels and allowing STB 180 to signal at least limited information to the Headend 104, which may well include management of Pay-per-View and other services.

FIG. 2 shows a loop coupling Headend 104 through coupling 130 to Node 120 through coupling 132 to Node 124 through coupling 134 to Node 126 which in turn couples 136 to Headend 104 forming the loop.

The hierarchical coupling of Node 126 with Headend 104 is carried out along distinct paths through this loop. Communication from Headend 104 to Node 126 follows a path 130-132-134. Communication from Node 126 to Headend 104 follows the path 136. The specific wiring schemes are dominated by the choice of physical transport, communication protocols and network level management. The description just given for FIG. 2 is provided as a simplified discussion of the basics of how high speed residential broadband networks incorporate loops and local loops supporting network level hierarchies.

There has been extensive research into the mechanics of speech recognition. The progress has been sufficient to allow speech trading by stock brokers using their desk top computers.

While these innovations have been substantial, they do not resolve several central questions of great importance to cable television, video delivery systems, and commerce. There is no present system providing speech recognition to a collection of users over a cable television network. There is no present system providing user identification based upon that speech recognition over a network that supports cable television and/or video delivery. There is no present system sufficient for real-time auctions and contracting to be conducted over a cable television and/or video delivery network, based on user identification through speech recognition.

US 7,047,196 B2

5

## SUMMARY OF THE INVENTION

An embodiment of the invention provides speech recognition services to a collection of users over a network that supports cable television and/or video delivery. User identification based upon speech recognition is provided over a cable television and/or video delivery network. User identified speech contracting is provided over a cable television and/or video delivery network having sufficient bandwidth for real-time auctions and contracting.

The invention comprises a multi-user control system for audio visual devices that incorporates a speech recognition system that is centrally located in or near a wireline node, and which may include a Cable Television (CATV) Headend. The speech recognition system may also be centrally located in or near a server farm a web-site hosting facility, or a network gateway.

In these embodiments of the invention, spoken commands from a cable subscriber are recognized and then acted upon to control the delivery of entertainment and information services, such as Video On Demand, Pay Per View, Channel control, on-line shopping, and the Internet. This system is unique in that the speech command which originates at the user site, often the home of the subscriber, is sent upstream via the return path (often five to 40 MHz) in the cable system to a central speech recognition and identification engine. The speech recognition and identification engine described herein is capable of processing thousands of speech commands simultaneously and offering a low latency entertainment, information, and shopping experience to the user or subscriber.

The system is capable of overlaying text on the subscriber's TV screen immediately after a word is recognized by the system as a verification of correct or incorrect recognition, thereby providing instant visual feedback and opportunity for acceptance or correction of speech messages.

The system can recognize and process speech so that the key words of spoken commands are recognized and displayed. This may be applied in navigation mode, in search context, or in other contexts and modes.

The system responds to a command with a visual indication of the spoken request. This visual feedback indicates recognition of key words may and be in the form of written text or icons.

The system may mask delays in upstream transmission or speech recognition. Upon depressing an optional talk button on the remote, a digital address may be appended to the beginning of the digital speech packets to be processed. The address tells the system not only the user site, but it also provides a mechanism for the system to begin generating masking screens or icons. Data are sent to the central location when the button on the microphone is depressed, alerting the system as to the user site and a potential input. This function allows the system to generate an icon or overlay to respond to the subscriber quickly. This function also supports site specific dictionaries, as well as data references to be loaded for speech recognition or user recognition.

At least two operations are performed at a server-center located at a central location: upstream recognition of speech commands and performing speech command protocol(s).

Low latency visual prompts are provided to support fast and accurate speech navigation. Thus, when a command is spoken and recognized the system returns the key word and optionally generates a list of visual prompts that guides the subscriber through the next navigation step. By using prompts, the system incorporates optimum recognition of

6

the prompt words thus increasing the recognition accuracy and, at the same time, increasing satisfaction for user participation.

In this context of the invention, adaptive speech recognition is based on optimized word recognition by creating a subset of probable matches based on knowing what is in an entertainment database or the words on a Web page. This supports learning the user's habitual speech patterns.

Secure speech transactions provide a method of speech based contracting across a multimedia distribution system. Speech based contracting as used herein, refers to a process of generating and/or executing a contract, in which at least one step of that process is based upon the invention receiving, recognizing, and witnessing an identified user's speech.

Speech based contracting includes, but is not limited to, the following: a first identified user making an offer; a second identified user accepting an offer, which may or may not be acoustically presented; as well as the second identified user specifying acceptance particulars, such as payment arrangements and the number of units.

Speech based contacting also includes, but is not limited to, acknowledging receipt of goods or services of a tangible, and/or intangible nature, possibly involving real property, personal property and/or intellectual property, exercising options of the contract, as well as terminating a pre-existing contract. The acknowledgement of receipt may include, but is not limited to, a declaration of the condition of goods upon receipt or upon subsequent testing, which may include an estimate of damage.

Speech based contracting may also include at least one of the following: the second identified user making a counter-offer to the first identified user based upon the offer; and the first identified user responding to the counter offer. The response may include accepting the counter-offer, or making a second counter-offer to the second identified user.

Speech based contracting may also include the second identified user inviting offers. The invitation may or may not specify the first identified user and/or performance constraints such as time of delivery and/or the duration of the terms and/or optional terms which may be exercised after the contract has been accepted.

Speech based contracting may also include an identified user exercising one or more optional terms of a pre-existing contract. The exercise of the optional terms may further specify one or more amounts, delivery times, ranges of time and/or place during/over which a service may be performed or commodity delivered in accordance with the optional terms of the pre-existing contract.

The offer may originate at the offeror-user site, possibly involving speech, when it is sent to the central location and recognized at the central location, recorded, distributed, and presented to potential offeree user sites. The offer may be sent to the central location to be recorded and distributed to potential offeree user sites. The offeree may signal acceptance of the offer verbally at the offeree user site where the offeree is recognized. The system transmits the verbal acceptance to the central location, where it is recognized, recorded and then transmitted to the offeror.

Using the user site address accelerates speaker identification, increases reliability, enhances security and reduces latency in identifying a speaker. Using the user site address and user specific speech data references further accelerates speaker identification, increases reliability, enhances security, and reduces latency in identifying a speaker.

The invention supports automatic generation of serial-multiplexed video output streams, without additional video boards or multiplexers. The centrally located speech recog-

US 7,047,196 B2

7

nition system employs extremely fast, efficient arrays of microprocessors, many of which may possess a frame buffer in locally accessible memory. Each microprocessor translates the frame buffer into an MPEG stream. Several MPEG streams are merged within a single microprocessor to form a multi-media stream for distribution to subscribers.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 depicts a typical network hierarchy as found in a cable television or video delivery network employing a Hybrid Fiber-Coaxial (HFC) wiring scheme as disclosed in the prior art;

FIG. 2 depicts a typical residential broadband network using local loop wiring of the network as disclosed in the prior art;

FIG. 3 depicts a remote control unit 1000 coupled 1002 to set-top apparatus 1100, communicating via a two-stage wireline communications system containing a wireline physical transport 1200 through a distributor node 1300, and through a high speed physical transport 1400, possessing various delivery points 1510 and entry points 1512–1518 to a tightly coupled server farm 3000, with one or more gateways 3100, and one or more tightly coupled server arrays 3200, in accordance the invention;

FIG. 4 depicts a coupled server array 3200 of FIG. 3;

FIG. 5 depicts a gateway 3100 of FIG. 3;

FIG. 6 depicts the tightly coupled server farm 3000 of FIG. 3 implemented in a two-dimensional plex communication network with N=4 plex nodes in each of two orthogonal directions of the node array;

FIG. 7 depicts a gateway 3100 of FIG. 3 implemented in a two-dimensional plex communication network with N=4 plex nodes in each of two orthogonal directions of the node array;

FIG. 8 depicts a coupled server array 3200 of FIG. 3 implemented in a two-dimensional plex communication network with N=4 plex nodes in each of two orthogonal directions of the node array;

FIG. 9 depicts a simplified block diagram using an array of processors as shown as 3200 in FIG. 3;

FIG. 10 depicts a flowchart of a method using a back channel from a multiplicity of user sites containing a multiplicity of identified speech channels presented to a speech processing system at a wireline node in a network supporting cable television delivery in accordance with the invention;

FIG. 11A depicts a detail flowchart of operation 2012 of FIG. 10 further partitioning of the received back channel;

FIG. 11B depicts a detail flowchart of operation 2022 of FIG. 10 further processing the multiplicity of the received identified speech channels;

FIG. 11C depicts a detail flowchart of operation 2032 of FIG. 10 further responding to the identified speech content;

FIG. 12 depicts a detail flowchart of operation 2000 of FIG. 10 further performing the method using the back channel from multiple user sites;

FIG. 13A depicts a detail flowchart of operation 2112 of FIG. 11C further responding to the identified speech content;

FIG. 13B depicts a detail flowchart of operation 2112 of FIG. 11C further responding to the speech content;

FIG. 14 depicts a detail flowchart of operation 2112 of FIG. 11C further responding to the identified speech content from the associated user site;

FIG. 15A depicts a detail flowchart of operation 2112 of FIG. 11C further responding to the identified speech content from the associated user site;

8

FIG. 15B depicts a detail flowchart of operation 2252 of FIG. 15A identifying the user;

FIG. 16 depicts a detail flowchart of operation 2112 of FIG. 11C further responding to the identified speech content from the associated user site;

FIG. 17A depicts the speech content response 2350 including current response menu 2352 and cumulative user site response 2354 in accordance with the invention;

FIG. 17B depicts a detail flowchart of operation 2112 of FIG. 11C further responding to the identified speech content from the associated user site;

FIG. 18A depicts a detail flowchart of operation 2112 of FIG. 11C further responding to the identified speech content from the associated user site;

FIG. 18B depicts a detail flowchart of operation 2092 of FIG. 11B further processing the multiplicity of the received speech channels;

FIG. 19A depicts a simplified block diagram of a hand held remote 1000, containing microphone 1060 and keypad 1020 supporting user input which is organized and processed by embedded controller 1050 for communication by wireless interface 1040 coupled 1002 to set-top apparatus 1100, as shown in FIG. 3;

FIG. 19B depicts a simplified block diagram of set-top apparatus 1100 as shown in FIG. 3 showing coupling 1002 and first wireline physical transport 1200 further comprised of downlink coupling 1202 and uplink coupling 1204;

FIG. 19C further depicts set-top apparatus 1100 as shown in FIG. 19B containing a set-top appliance 1120 coupled 1002 with hand held remote 1000 and coupled 1112 with set-top box 1120 possessing downlink coupling 1202 and uplink coupling 1204;

FIG. 19D further depicts set-top apparatus 1100 as shown in FIG. 19B containing a set-top appliance 1120 coupled 1002 with hand held remote 1000 and possessing downlink coupling 1202 and uplink coupling 1204 as well as providing processed downlink coupling 1114 to set-top box 1110 and receiving initial uplink coupling 1112 from set-top box 1110;

FIG. 20A depicts a simplified block diagram of set-top appliance 1120 as shown in FIG. 19C supporting coupling 1002 with hand held remote 1000 and coupling 1112 with set-top box 1110;

FIG. 20B depicts a simplified block diagram of set-top appliance 1120 as shown in FIG. 19D supporting coupling 1002 with hand held remote 1000 and couplings 1112 and 1114 with set-top box 1110;

FIG. 20C depicts a block diagram further depicting accessibly coupled 1162 memory 1160 as shown in FIGS. 20A and 20B;

FIG. 21 depicts a remote control unit 1000-180 coupled 1002-180 to set-top apparatus 1100-180, communicating via a two-stage wireline communications system containing a wireline physical transport 1200 through an augmented distributor node 1310 interfacing to a wireline communications loop including an augmented Headend 1410 further supporting a communications loop including augmented metropolitan Headend 1410, in accordance with the invention;

FIG. 22 depicts a remote control unit 1000-180 coupled 1002-180 to set-top apparatus 1100-180, communicating via a two-stage wireline communications system containing a wireline physical transport 1200 through a distributor node 126 interfacing to a wireline communications loop including an augmented Headend 1414 further supporting a communications loop including augmented metropolitan Headend 1410, in accordance with the invention;

9
10

FIG. 23 depicts a detail block diagram of an augmented distributor node 1310, coupled to wireline physical transport 1200 and coupled to the wireline communications loop of FIG. 21;

FIG. 24 depicts an alternative detail block diagram of an augmented distributor node 1310, coupled to wireline physical transport 1200 and coupled to the wireline communications loop of FIG. 21;

FIG. 25 depicts a generic block diagram of a prior art Headend 104 as shown in FIG. 3;

FIG. 26 depicts an augmented Headend 1410 of FIG. 21 or an augmented Headend 1414 of FIG. 22 or an augmented metropolitan Headend 1410 of FIGS. 21 or 22, in accordance with the invention;

FIG. 27 depicts an alternative augmented Headend 1410 of FIG. 21 or an alternative augmented Headend 1414 of FIG. 22 or an alternative augmented metropolitan Headend 1410 of FIGS. 21 or 22, in accordance with the invention;

FIG. 28A depicts a block diagram of a speech engine 1330 as shown in FIG. 23;

FIG. 28B depicts a block diagram of a speech engine 1330 as shown in FIG. 24;

FIG. 29 depicts a more detailed block diagram of a speech engine 1330 as shown in FIG. 28A;

FIG. 30 depicts an alternative detailed block diagram of a speech engine 1330 as shown in FIG. 28A;

FIG. 31 depicts a second alternative detailed block diagram of a speech engine 1330 as shown in FIG. 28A;

FIG. 32A depicts a block diagram of modulator engine 1350 of FIGS. 23 and 24, and modulator engine 1450 of FIGS. 26 and 27;

FIG. 32B depicts a block diagram of a local oscillator as is known in the art for use as a local oscillator depicted in FIGS. 33 and 34 as LO1 1760, LO1 1860, LO2 1770 or LO2 1870;

FIG. 33 depicts a detail block diagram of frequency conversion circuitry 1710 of FIG. 32A;

FIG. 34 depicts an alternative detail block diagram of frequency conversion circuitry 1710 of FIG. 32A; and

FIG. 35 depicts a detailed diagram of speech engine 1330 as shown in FIG. 23 or speech engine 1430 as shown in FIG. 27 containing two plex communications grids with dual, redundant gateways.

DETAILED DESCRIPTION OF THE INVENTION

FIG. 3 depicts a remote control unit 1000 coupled 1002 to set-top apparatus 1100. Set-top apparatus 1100 communicates via a two-stage wireline communications system containing a wireline physical transport 1200 to a distributor node 1300. Set-top apparatus 1100 communicates through distributor node 1300 across a high-speed physical transport 1400 to a tightly coupled server farm 3000, possessing various delivery points 1510 and entry points 1512–1518. Tightly coupled server farm 3000 contains one or more gateways 3100, and one or more tightly coupled server arrays 3200.

As used herein, a server farm refers to a collection of at least two server components communicatively coupled to one another. The server components may or may not all be directly communicatively coupled to each other. A server component refers to at least a gateway, server array, server computer, database engine, or disk farm.

As used herein, gateway refers to at least one of the following: A gateway may perform protocol conversion between different types of networks or applications; gate-

ways may support complete conversion of one protocol to another, or support one protocol from within another protocol; a gateway may perform conversion between two messaging or mail protocols; a gateway may act as a go-between for two networks with similar protocols, providing an entry/exit point for one network in the other network. Such gateways include proxy servers; a gateway may switch speech and data between a terrestrial network and an orbiting satellite communications system; and a gateway may perform network layer switching tasks between at least two networks, coordinating the delivery of information, usually in the form of messages, packets or data streams to various destinations in the networks.

As used herein, a server array refers to a multi-dimensional lattice or array of server computers, each with an associated multi-dimensional array address, and a communication grid supporting communication between server computers based upon the multi-dimensional array addresses of the source and destination server computers. A tightly coupled server array is a server array possessing a very low latency communication grid.

The invention may include a remote control unit 1000 fitted with a microphone. Remote control unit 1000 may be fitted with such features as a special noise canceling microphone and/or a push-to-talk button.

The microphone in the remote relays the subscriber's speech commands to the central speech recognition engine. The push-to-talk button may begin the process of speech recognition by informing the system that the subscriber is about to speak and also to provide immediate address information. Address information identifies the user site at which the speaking occurs.

The invention may also include an array of microphones that are operated in conjunction with a remote control 1000 that is coupled to the set top box 1100. The microphone array may further provide an echo-canceling capability in receiving speech signals within the area of usage.

Note that there may be more than one remote control unit 1000 with one or more microphones, each remote control unit under the control of a distinct, identified user. Such situations are particularly useful in game playing settings, where different users may wish to make commands to the game simulation like "arm the photon torpedoes", etc.

A given residence may include more than one set-top box 1100, each of which has a distinct address in the network delivering video content and/or cable television. Each constitutes a distinct user site and may be parameterized differently. By way of example, a first set-top box in a recreation area for children may allow identified users, who are children, to select programming on only certain channels. Whereas a second set-top box in a private area of adults, such as a parental bedroom, may be parameterized so that child identifier users have no privileges.

Speech commands from the subscriber may be preprocessed. The analog signals picked up from the microphone are converted to digital signals where they undergo additional processing before being transmitted to the speech recognition and identification engine located in the cable Headend or other centralized location. Such speech preprocessing may include encryption, compression, or conversion to an alternative form of speech representation.

The preprocessing function may also take place in the remote control 1000 itself before being transmitted to the set-top box 1100, or set-top appliance 1100. Coupling 1002 may use a wireline or wireless physical transport. Coupling 1002 may use a wireless transport, including, but not limited to, at least one of the infra-red, microwave, or radio fre-

11
12

quency spectrum, as well as ultrasonic signaling. Coupling 1002 may support bi-directional communication between remote control 1000 and set-top box or appliance 1100. The communication may be predominantly or strictly from remote control 1000 to set-top box or appliance 1100.

The speech signal from the remote 1000 may be a digitally modulated RF signal whose properties may comply with Part 15 of the FCC rules. Alternatively, the set-top box 1100, or set-top appliance 1100, receives the speech signal from the remote 1000 and performs the preprocessing function mentioned above.

The set-top box 1100, or set-top appliance 1100 may also be used to transmit speech and subscriber address data to the centralized location or Headend for speech recognition and identification. The Radio Frequency (RF) signal from the remote 1000 is received by the set-top appliance 1100 and then remodulated for upstream transmission 1200 on the 5 to 40 MHz cable return path. If a commercial set-top box 1100 is used to transmit the upstream speech data, then the upstream channel allocation and transmission protocol are controlled by the bi-directional communication system which is resident in the set-top box.

In certain embodiments, a commercial set-top box 1100 may not be used to transmit the digitized speech data upstream. The set-top appliance 1100 is then responsible for receiving the upstream channel allocation and synchronization information. The data receiver in the set-top appliance 1100 can be tuned to any one of several downstream data channels to receive channel and synchronization information.

The set-top appliance 1100 is also capable of receiving and decoding data in the downstream path. This function is required to organize and synchronize the transmission of upstream data which may include user feedback. Downstream data can contain upstream channel allocation information and speech verification overlay information coded as text.

The set-top box 1100 may be used for both upstream and downstream communication for the described speech command function. The function of the set-top appliance 1100 may be to receive the RF signal from the remote control and then digitize and compress the speech signal and prepare it for upstream transmission.

New RF protocol standards, such as Blue Tooth, allow the remote control's RF signal to transmit the speech signal directly to the set-top box where again, the preprocessing can either be done in the remote control 1000 or executed from firmware within the set-top box 1100. Note that infrared signaling may be employed to transmit the speech signal to the set-top box.

Set-top boxes 1100 that employ the DOCSIS type cable modems such as Open Cable set-top boxes or the so called Heavy Set-top boxes from such companies as Scientific Atlanta and General Instruments are capable of sending and receiving speech data using efficient data transmission protocols. The DOCSIS protocol also incorporates error detection and correction capabilities as well as other transmission enhancements such as pre-equalization for more efficient and error free transmission.

FIG. 4 depicts a coupled server array 3200 of FIG. 3.
FIG. 5 depicts a gateway 3100 of FIG. 3.

The system uses the subscriber's address information as a mechanism by which the centrally located AgileTV™ Speech Processor can fetch a particular subscriber's parameter file. The parameter file contains speech training parameter data, speech identification parameters and user profiles for each user at that address. This file can also contain parental control information in a residential setting and other specifics for that particular address, such as language preferences or movie preferences or even internet preferences.

The Addressed Subscriber Parameter File (ASPF) gives the system an extremely high probability of speech recognition and user identification. Such addressing supports secure transactions such as banking because the speech recognition and identification system has to only identify a few parameter files for any one physical address, resulting in a very high probability of recognizing a specific speaker's speech.

Financial transaction security, e.g. speech banking and e-commerce, can be realized with this system and, with the addition of speech encryption processing in the Speech Preprocessor, even higher levels of security can be attained. This directly supports a method of contracting based upon an offer presented to the user by the system, and a recognizable acceptance of the offer by the identified user. The method of contracting may further include storing the offer and acceptance as a recording mechanism for the contract.

The speech signal transmitted from a subscriber's set-top box, or set-top appliance, 1100 is received 1510 by the five to 40 MHz data receiving equipment within gateway 3100 in the central location. As used herein, a central location may include a node, Headend, or metropolitan Headend for a residential broadband network.

When the digitized speech signal comes from a commercial set-top box, such as a General Instruments or a Scientific Atlanta set-top, then the return path receiving equipment in the central location may be specific to that type of box. Therefore, the data coming from this equipment, which contain other upstream traffic, may be parsed in such a way that only the speech commands and address information from the subscriber are input to the speech recognition engine in the central location.

When the digitized speech signal sent upstream comes from another set-top appliance, the upstream data receiver in the central location may be a separate unit that receives only speech command signals from set-top appliances at the user sites. Using the set-top appliance as the upstream transmitter allows the use of custom upstream protocols such as FM, AM, PSK, or spread spectrum digital transmission. Digital transmission techniques such as QPSK or QAM can also be employed.

Upon receiving the digitized and preprocessed speech signal from the subscriber's set-top box or set-top appliance, the received upstream signal may be in the form of a data stream containing speech and address information. The data stream containing speech and address information may be Ethernet compatible. Because the AgileTV™ Voice Processing Unit (AVPU) is a high speed speech processing unit capable of processing the data from several nodes, the digital speech signals from each of these nodes may be combined in the AVPU input multiplexer. The combining of digital speech signals may result in a smaller number of high speed digital streams.

Upstream signals such as 1510 are received at the gateway 3100. Speech and data signals may be received from commercial return path data receivers. Speech and data signals are also received and decoded by custom return path receivers using at least one of the following protocol options: FM or AM modulation/demodulation, FDMA, TDMA, FSK, PSK, or QPSK digital modulation/demodulation, Spread Spectrum modulation/demodulation, Telephony, cellular return, or Wireless.

The AVPU Engine may not be an application service, in and of itself. The system may provide new end user appli-

US 7,047,196 B2

13

cations. The AVPU Engine may provide speech recognition and control services for existing applications, such as Interactive Program Guides, Video On Demand (VOD) services or access to the Internet or World Wide Web.

Near network system initialization time, applications such as Video On Demand or Interactive Program Guides, that request service access with the speech recognition services may be required first to register with the AVPU system. At least one standard program interface may then be used to enable each application to specify its complete menu hierarchy. The invention may use exactly one standard program interface to enable applications to specify their complete menu hierarchy.

A list structure specifies each application's menu hierarchy. This list structure may be a tree. It contains labels for each menu, along with the text of each button on each menu screen, information the system needs to provide speech navigation services independently through the menu hierarchy on behalf of the application. This menu hierarchy represents the static portion of the application's data.

In addition to the static menu structure, it may also be the responsibility of the application to inform the system of dynamic content, for example the names of movies in a Video On Demand system or of program names and times in an interactive program guide. Each time a user enters a menu context in which dynamic content appears, the application may inform the speech system of this context by passing a handle associated with the list of names that comprise the dynamic content. The speech system may combine the static menu content with the augmented dynamic content (see Similarity Searching below), to form a complete grammar. Also, application-independent keywords, such as HELP, may be combined with the static menu content and augmented dynamic content to form the complete grammar. This construct may then be passed to the speech system to maximize recognition accuracy.

Given that dynamic content, by definition varies, applications may be required to inform the system whenever the content changes. In an interactive TV guide application, for example, the application registers a new set of dynamic content every one-half hour. For a VOD system, this registration may be performed whenever the database of offered movies changes.

Once registration has been completed, and the system is being used, recognition of a spoken request may cause a signal to be sent back to the application. This signal informs the application to perform the requested action, and/or to update the contents of the screen as a result of the user's request. In this manner, the application can use the system's speech recognition services with minimal modifications to the application's code, while retaining the same graphical look and feel to which users have become accustomed.

In the subscriber's premises, a speech-enabled remote control may be employed, e.g. containing a microphone, as well as traditional universal remote control functionality. The remote control may further contain a Push-To-Talk (PTT) button. Conventional remote control functions are transmitted via infra-red (IR). The speech output may be wirelessly transmitted to a set top pod, module, or appliance located at the set-top box. The wireless transmission from the remote control may employ an electromagnetic physical transport layer or ultrasonic physical transport layer. The electromagnetic physical transport layer may use a radio frequency carrier or an infra-red carrier.

When the PTT button is pushed by the user, the remote control sends a PTT active command to the set top appliance. The appliance may then inform the set-top box to place

14

an icon on the screen, or otherwise indicate to the user that the system is listening to them. Next, as the user speaks into the microphone, the speech is digitized, compressed, and transmitted to the set top appliance.

The set top appliance may perform any or all of the following: encrypt the speech sample to provide security; add subscriber address information; add a message length code; add error control coding to the assembled information. The error control coding may include a Cyclical Redundancy Code (CRC), enabling data transmission errors to be detected.

In homes with set-top boxes having the necessary features, the set top appliance may transmit speech information to the set-top box, which then transmits it to the central location as a series of packets.

Alternatively, the set top appliance may directly transmit the speech stream to the central location itself. This may continue until the set top appliance receives a PTT Release from the remote, indicating end of speech. This information is also transmitted to the central location, signaling end of spoken request.

Each individual consumer's interface, i.e. set-top box or set-top appliance, may have a unique address. The address of the individual consumer's interface may be determined during the manufacturing process. As speech packets are transmitted upstream, this address information may be appended to the speech packets. The address information enables rapid determination of the user site from which the speech sample is received. The address information may precede the speech packets. The address information improves the efficiency of at least some of the central location processing stages.

Assignment of an input buffer address to the speech sample may be based upon the user site address. This input buffer collects incoming speech packets until the final packet of a spoken request has been received. Recognition of the final speech packet receipt may be encoded in that speech packet. Final speech packet receipt recognition may include a delay in speech of greater than a predetermined amount of time. The speech delay amount may be one or more of at least the following: a globally defined constant, a user site defined constant, an identified user defined constant, or an application-defined constant for an application serviced by the speech recognition system. The final speech packet may be generated based upon the release of the PTT button in the remote control unit. The final speech packet may be generated at the remote control unit, set top pod, set top appliance, set top box, node, Headend or metropolitan Headend, or by the serviced application. The final speech packet may be generated by the serviced application based upon a time schedule, e.g. a fixed period in which participants may respond, a privilege scheme, and/or other application related scheme.

On-the-fly Cyclical Redundancy Code (CRC) error checking generation may be used. Each time a packet is read in, CRC in the processor registers may be computed as each byte is read, then the partial CRC is stored with the stored packet. The CRC may be stored at the end of the packet, at the beginning of the packet or in specifically designated locations within the packet. When the next packet arrives, the partial CRC is read from where it was stored, and the new packet data may be appended to the end of the previous packet, overwriting the temporary CRC. This continues until a complete speech sample has been received. This approach to CRC calculation cuts memory accesses in half compared to first storing the string, then making a second pass to generate the CRC.

US 7,047,196 B2

15

Once a complete spoken request has been received, the speech input processor may use the sample's source address identifying a user site to target the speech data to a specific speech processing processor. This direct correspondence between the source address and a specific speech processor allows speech processors to cache user-specific parameters for the user sites they serve. The mapping of source addresses to speech processor reduces the bandwidth necessary to move user site-specific data to each speech processor. In other embodiments of the invention, a translation table may be used to allow speech to processor assignments to be changed dynamically in the event of a hardware or other failure, e.g. capacity overload, while retaining the efficiency advantages of directly mapping the speech channel to the processor.

To process a speech sample by the speech processor into speech content, the speech processor must first contain in its local memory a copy of the grammar definition associated with the user site. A grammar is a structure often containing the words which are most likely to be spoken, the order in which these words may appear, and the meaning of various sequences of words. This structure may be a hardware configuration, software program, data structure, or a combination of two or more of these.

Before transferring the new speech sample to a speech processor, the grammar associated with the speech sample is transferred to the target speech processor. The grammar transfer may use a simple Least Recently Used (LRU) queue. If the speech processor contains enough empty space in its memory, then the indicated grammar is transferred directly to the empty memory from mass storage. Mass storage may include, but is not limited to, a disk, disk farm, or Redundant Array of Independent Disks (RAID), a high bandwidth disk farm. If not, then the least-recently-used grammar entry may be discarded, and the new grammar information loaded into the vacated memory.

The next step in processing the speech sample ensures that the current parameters associated with this user site are already cached in the specific speech processor's RAM. If these parameters are not present, then the least-recently-used parameter cache entry may be evicted from the cache.

To do this, the oldest cache entry on this speech processor is first examined to see if it has been modified. If it has, the cache entry is stored to mass storage, and the cache slot is then declared vacant. Next, the user site speech parameters associated with the new speech sample are loaded into the vacated cache block. During the relatively long access times needed to load a new set of user site parameters from mass storage (and optionally to write the old parameters to the disk, etc.), the current speech sample may be held in the input buffer in a waiting state.

After the new household speech parameters are loaded into the targeted speech processor, the speech sample is moved into the work queue for the speech processor. This minimizes speech processor delay for processing other speech requests during disk accesses. Instead, the speech processor may process other speech samples associated with user sites whose parameters are already in the cache.

Once the speech parameters associated with a speech sample are available in the speech processor, the speech sample may be assigned to the speech processor by placing a description of the speech sample into the target speech processor's work queue. As speech samples are processed, they may be removed from the front of the work queue by the speech processor.

Eventually, the speech processor reaches the current input sample. The speech sample is transferred into the speech

16

processor's local memory, and the status of this speech sample changed to Next. This transfer may occur in parallel with the processing of the prior speech sample, ensuring that speech processor utilization is maximized.

Once this transfer is complete, and the speech processor completes processing of the prior sample, the status of this speech sample changes to Current, and the speech recognition engine begins processing this sample.

Successful processing of a speech sample requires that both the proper grammar and the proper user site parameter information be simultaneously accessible by the speech processor.

The possibility exists in which a recently-loaded grammar or speech parameter file is erased prior to its use, in the process of loading the grammar or speech parameters for the current speech sample. To eliminate this condition, the total number of speech samples sitting in the waiting and working queues of a speech processor preferably should not exceed the number of cache entries in the speech processor.

The first step in recognizing the current speech sample may determine which individual person pronounced the current spoken request. The Speaker Identification software module running on the targeted speech processor compares the spoken characteristics of this speech sample with the characteristics of the speakers who have been previously identified in this user site.

In many spoken requests, the incoming speech sample matches the characteristics of a previously identified speaker. When this occurs, the speech sample is passed on to the next phase, speech recognition.

If the speech sample is not identified with an existing speaker, then a new user routine is invoked, enabling a new user to be associated with this household. This routine records the new individual's speech parameters into this user site's speech parameters, so that the new speaker may be identified during subsequent spoken requests. Optionally, the system may offer the user site manager the opportunity to erase or modify the new speaker parameters.

The inputs to the speech recognition software module may include a speech sample, an individual user's speech parameters, and the grammar to be recognized. The speech engine determines the most likely spoken request based on statistical analysis, and may return a text string corresponding to the spoken request. This matching process is probabilistic: along with the returned text string, the speech engine may also return a confidence measure, or percentage of match likelihood. The returned text string and confidence measure enables different applications to respond differently based on the calculated confidence in the recognition result.

For recognition results having a low cost to the user, such as a request to display listings for a particular movie, lower confidence criteria may be applied. For recognition results with a high cost to the user, such as a request to purchase a movie, higher confidence thresholds may be required. Furthermore, purchase verification may be requested.

When recognition accuracy is particularly low, the speech recognition engine may determine partial matches to more than one possible phrase, returning the text of several possible matches. This process enables an application or user to select from several alternative recognition results.

In cases where a transaction results in a charge to the user, the system may record the speech sample representing the purchase request onto mass storage. This speech sample recording is performed to provide verification that a purchase request was made, should a user dispute their intent to purchase. This further supports speech-based methods of contracting. Note that the recording may be compressed in

US 7,047,196 B2

**17**

either a standard or non-standard manner, which may further include encryption technology.

Due to the statistical nature of speech recognition, spoken requests are occasionally mis-recognized. Recognition errors have been a primary hindrance to further exploitation of speech recognition systems. This system provides a mechanism by which the user receives rapid visual feedback regarding the recognition process. Soon after the speech recognition engine has returned a result, visual text corresponding to the recognized spoken request is displayed on the display, e.g. television, screen.

This rapid visual feedback may be accomplished by transmitting the recognized text string back to the set-top box. Software executing within the set-top box displays the text information in a special window on top or overlaying of the existing application display. In cases where limitations in the set-top box prevent the window from appearing on top of existing content, software executing within the set-top box may select an alternative feedback display, for example, a different channel containing a background field, and displays the overlay information on top of this background.

In cases where the recognition accuracy is particularly poor, and the speech engine returns several possible recognition results, this overlay display capability may be used to help refine the user's query. By displaying the text of the possible recognition results, the user can easily select from the returned list.

If none of the recognized text strings match the user's spoken request, the user may elect to start again. However, more commonly, one of the displayed strings match, or be likely to readily lead to the user's speech request with appropriate modification. When this is the case, the user can readily select from the displayed alternatives, enabling improved productivity in low-recognition situations.

One key feature which can be used with applications such as Pay-Per-View and Video-On-Demand, is similarity searching. When the system is scanning for dynamic content, i.e. movie titles and actor names, a similarity search feature may be available. This enables searches for names which are only partially matched, or which resemble the recognized phrase, without requiring precise specification of the exact title or name. The technique used to deliver similarity searching is to augment the dynamic content list specified by the application. Words similar in meaning, content, or spelling to words in the content list may be automatically added to the dynamic content list whenever the application informs the system of a content update. This enables the recognition grammar to be extended to support a broader array of matches without requiring bandwidth-intensive text searches each time a user's speech request has been received. Links between similar and target words may be maintained in the internal representation of the grammar, thereby providing direct access to target names. This further enhances system performance.

Note that as used herein, similarity databases may be constructed from at least one or more of the following database architectures: relational, SQL, knowledge-based, inferential knowledge bases including Horn clause and extended Horn clause fact bases, fuzzy versions of the above, as well as neural networks and combinations of these techniques. Also, manual additions may be made at the AgileTV™ central office.

The entire system may provide fault tolerance for robust performance. For individual components, such as speech processors and associated memory, the system may automatically recognize most component failures, and disable faulty processors.

**18**

In addition, many system installations may require multiple AgileTV™ Voice Processing Unit (AVPU) boxes 3000 to meet the performance needs of the subscriber base. To ensure maximum operating time, even the total failure of an AVPU engine may not be catastrophic. The remaining AVPU engines continue to service the incoming speech traffic at a reduced performance level. This failover is carried out by a negotiation protocol between the AVPU boxes.

In addition to these internal diagnostics functions, the system may also communicate continuously with a network operations center, enabling rapid identification of system errors, as well as rapid service dispatch to correct any problems.

A speech command preprocessor may perform the function of speech filtering, digitizing, data compression, encoding pauses in speech, and address insertion. Preprocessing speech commands at user sites results in a lower upstream data rate. This processing can be located in the remote 1000, the Set-top appliance 1100, or the set top box.

A Speech Packet Processor may be centrally located in or near a wireline node specifically to capture and prepare the upstream speech packets that are to be fed to the Speech Recognition Engine.

A speech processor system may be centrally located in or near a wireline node, which may include a Cable Television (CATV) central location. The speech recognition system may be centrally located in or near a server farm. The speech recognition system may be centrally located in or near a web-site hosting location. The speech recognition system may be centrally located in or near a gateway.

The speech recognition engine processes speech packets to create speech content and formulate the response to the speech content for each of the user sites.

The system also performs address decoding for routing and latency reduction. It also performs the function of decoding the pauses between words or sounds originally encoded on the preprocessor at the user site.

A method is provided for a very high level of security based on the ability of being able to precisely recognize a parent's speech or a child's speech based on a limited subset of choices. The ability to recognize an individual speaker with a very high probability of identifying the specific speaker is based on knowing the address of the user site.

A large capacity, centrally located, natural speech recognition engine can readily identify a specific speaker from among a small set of choices, allowing a parent to voice print and therefore control the type, or amount or timing of content a child may request. A child may be able to learn PIN numbers but cannot readily fool the voice print. Speaker recognition is particularly appealing in this parental control application, and can be applied with very high accuracy, due to the limited number of speakers per user site. Parents may control the specific viewing times, total time, or content that a child can watch television through this system and its use.

The operational discussion just presented regarding FIGS. 3–5 is applicable to the relevant operational system embodiments based upon any and all of the FIGS. 19A to 24, as well as. FIGS. 26 to 31.

A parallel processor system supporting this sort of system is disclosed in U.S. Patent Application Ser. No. 60/210,440, entitled "System and Method of a Multi-dimensional Plex Communication Network", which describes plex processor networks and which is incorporated herein by reference.

A plex communications network has M orthogonal directions that support communications between an M dimensional lattice that may include $N^M$ plex-nodes, where M is at least two and N is at least four. Each plex-node pencil in

US 7,047,196 B2

19

20

a first orthogonal direction contains at least four plex-nodes and each plex-node pencil in a second orthogonal direction contains at least two plex-nodes. Each of the plex-nodes contains a multiplicity of ports.

A plex-node pencil refers to a 1-dimensional collection of plex-nodes differing from each other in only one dimensional component, i.e. the orthogonal direction of the pencil. By way of example, a nodal pencil in the first orthogonal direction of a two-dimensional array contains the plex-nodes differing in only the first dimensional component. A nodal pencil in the second orthogonal direction of a two-dimensional array contains the plex-nodes differing in only the second dimensional component.

The plex communications network is comprised of a communication grid interconnecting the plex-nodes. The communications grid may include $N \cdot (M-1)$ communication pencils, for each of the M directions. Each of the communication pencils in each orthogonal direction is coupled with a corresponding plex-node pencil containing a multiplicity of plex-nodes coupling every pairing of plex-nodes of the corresponding plex-node pencil directly.

Communication between two plex-nodes of a nodal pencil coupled with the corresponding communication pencil comprises traversal of the physical transport layer(s) of the communication pencil.

Such plex communications networks support direct communication between any two plex-nodes belonging to the same communication pencil. This supports communication between any two plex-nodes in at most M hops between plex-nodes.

FIG. 6 depicts a tightly coupled server farm 3000 of FIG. 3 implemented in a two-dimensional plex communication network with N=4 plex-nodes in each of two orthogonal directions of the plex-node array.

Consider the plex-node pencil in the first orthogonal direction containing Plex-node 0,0, Plex-node 1,0, Plex-node 2,0 and Plex-node 3,0. The communication pencil 400 in the first orthogonal direction couples to the plex-nodes of this plex-node pencil. Plex-node 0,0 is coupled 402 to communication pencil 400. Plex-node 1,0 is coupled 404 to communication pencil 400. Plex-node 2,0 is coupled 406 to communication pencil 400. Plex-node 3,0 is coupled 408 to communication pencil 400.

Consider the plex-node pencil in the first orthogonal direction containing Plex-node 0,1, Plex-node 1,1, Plex-node 2,1 and Plex-node 3,1. The communication pencil 410 in the first orthogonal direction couples to the plex-nodes of this plex-node pencil. Plex-node 0,1 is coupled 412 to communication pencil 410. Plex-node 1,1 is coupled 414 to communication pencil 410. Plex-node 2,1 is coupled 416 to communication pencil 410. Plex-node 3,1 is coupled 418 to communication pencil 410.

Consider the plex-node pencil in the first orthogonal direction containing Plex-node 0,2, Plex-node 1,2, Plex-node 2,2 and Plex-node 3,2. The communication pencil 420 in the first orthogonal direction couples to the plex-nodes of this plex-node pencil. Plex-node 0,2 is coupled 422 to communication pencil 420. Plex-node 1,2 is coupled 424 to communication pencil 420. Plex-node 2,2 is coupled 426 to communication pencil 420. Plex-node 3,2 is coupled 428 to communication pencil 420.

Consider the plex-node pencil in the first orthogonal direction containing Plex-node 0,3, Plex-node 1,3, Plex-node 2,3 and Plex-node 3,3. The communication pencil 430 in the first orthogonal direction couples to the plex-nodes of this plex-node pencil. Plex-node 0,3 is coupled 432 to communication pencil 430. Plex-node 1,3 is coupled 434 to communication pencil 430. Plex-node 2,3 is coupled 436 to communication pencil 430. Plex-node 3,3 is coupled 438 to communication pencil 430.

Three of these ports on each plex-node are devoted to providing a direct interconnect to the other plex-nodes of its row through a collection of communication paths forming the communication pencil in the second orthogonal direction. These plex-nodes belong to the same row as the plex-nodes of the plex-node pencil in the second orthogonal direction.

A plex-node may have at least one additional port. At least one of the additional ports may be connected to an external network. Further, at least one of the additional ports may be connected to an external mass storage system. In other embodiments of the invention, at least one of the additional ports may be connected to an external database system.

A plex-node may contain at least one instruction processor. As used herein, an instruction processor includes but is not limited to instruction set processors, inference engines and analog processors. An instruction set processor refers to instruction processors changing state directly based upon an instruction, and which change an internal state by executing the instruction. The instruction may include, but is not limited to, direct or native instructions and interpreted instructions. An inference engine changes state when presented an instruction, which may include an assertion, an assumption, or an inference rule. Inference engines include, but are not limited to, Horn clause engines such as Prolog requires, constraint based systems and neural network engines. As referred to herein, analog processors include, but are not limited to, optical signal processors, CCD's, and resonant cavity devices responding to data and/or controls asserted in the analog domain.

Communication includes, but is not limited to, communication using a digital communications protocol. Communication also includes a messaging protocol using the digital communications protocol. Communications also includes a messaging protocol supporting TCP-IP, supporting the Internet, and/or supporting the World Wide Web.

Communications may also include at least one video stream protocol using a digital communications protocol. Communications may include at least one multi-media stream protocol using the video stream protocols including motion JPEG and/or at least one form of MPEG.

The invention may support Wavelength Division Multiplex (WDM) through the physical transport of the communication paths of the communication pencils.

Each plex-node may include a communication processor. Each plex-node may further include M communications processors. The ports of each communications processor may be connected to each one of the pencils supporting pencil communications processing.

FIG. 7 depicts a gateway 3100 of FIG. 3 implemented in a two-dimensional plex communication network with N=4 plex-nodes in each of two orthogonal directions of the plex-node array.

In FIGS. 6 and 7, upstream signals 1510 may be received at the Plex-node 0,0, performing functions similar in nature to processor node 3110 of FIGS. 3, 4 and 5. Plex-node 0,1 may couple 3142 to RAID 3130 subsystem, providing high-speed access to a high capacity disk farm. Various signals 1512 to 1518 may be generated by various plex-nodes. Note that because of the uniformity of the communication structure, there is great flexibility in choosing which plex-node generates which communication signals.

FIG. 7 also shows coupling 3002 to a speech recognition server array 3200.

US 7,047,196 B2

FIG. 8 depicts a coupled server array 3200 of FIG. 3 implemented in a two-dimensional plex communication network with N=4 plex-nodes in each of two orthogonal directions of the plex-node array.

Each plex-node of FIG. 8 may include a plex communications network supporting a two or more dimensional array of internal plex-nodes, each including at least one instruction processor.

FIG. 9 depicts a simplified block diagram using an array of processors as shown as 3200 in FIG. 3.

Consider an array of plex-nodes, where each plex-node uses multiple-processor IC's labeled CPU. Each CPU may possess three or more high speed serial protocol channels C1-3, a high speed interconnect bus B1, a low speed interconnect bus PCI and a local memory access bus R. Each CPU may include at least two processors. Each processor may be an instruction processor. Each CPU may be an integrated circuit. The integrated circuit may be a BCM12500 manufactured by Broadcom Corporation of Irvine, Calif.

CPU1 and CPU2 are locally coupled via at least one of the interconnect buses. Each CPU possesses locally accessible memory via an R bus. Each CPU may further access locally accessible memory via its own R bus. The R bus accessed memory may include DDR SDRAM (Double Data Rate Synchronous DRAM).

Three serial protocol channels for the first CPU of each CPU pair are dedicated to communication within each row of CPU pairs. Three serial protocol channels for the second CPU of each CPU pair are dedicated to communication within each column of CPU pairs.

Assume each CPU contains at least two processors. Assume each processor is operating at K billion integer operations/second and L billion floating point operations/second. Assume the high speed serial channels support a gigabit/second bidirectional transfer rates. The DDR DRAMs support M gigabyte/second access rates. This system provides 64*K billion integer operations, 64*L billion floating point operations, 128 gigabits/second interconnect communication bandwidth throughout the array through the high speed serial channels, as well as 64*M gigabytes/second local memory access. By decoupling the tasks running on each processor, making them independent and concurrent, this system architecture achieves the dream of Multiple-Instruction Multiple Datapath computing (MIMD), providing essentially linear speed up with the increase in processors for up to 64 processors.

Such architectures can support each processor generating a frame in a local frame buffer and rendering it into a motion video stream, which is merged into a multiplexed video content stream suitable for a variety of multi-media applications. This apparatus meets or exceeds the requirements of a number of teraflop-class computing applications, which today have no cost effective solution. Note that the processors may each be dual instruction processors housed in a single package.

Each of these arrays will process over 1K speakers concurrently and fit into a single rack mount enclosure. Standard 72 inch, tall racks could then hold 4 such speech engines, also known herein as an AVPU, supporting up to 140,000 subscribers. Each server contains at least dual, redundant, hot-swappable power supplies, and redundant, hot-swappable disks with automatic recovery for failed disk drives. The hot-swappable power supplies may further be half-sized, each supporting the power requirements of half the server engine.

Real-time, extensive diagnostics and continuous connectivity to a 24 hours per day, seven days per week (24×7) Network Operations Center insuring timely failure detection and service dispatch. In systems with more than one speech engine, the server automatically handles catastrophic failures gracefully. Even if an entire speech engine fails, the remaining ones pick up the workload.

FIG. 10 depicts a flowchart of a method that uses a back channel containing a multiplicity of identified speech channels for speech recognition at a wireline node in a network supporting video or cable television delivery in accordance with the invention. The back channel is from a multiplicity of user sites and is presented to a speech processing system at the wireline node in the network. The speech processing system performs the operations of the method.

Operation 2000 starts the operations of this flowchart. Arrow 2002 directs the flow of execution from operation 2000 to operation 2004. Operation 2004 performs receiving the back channel to create a received back channel. Arrow 2006 directs execution from operation 2004 to operation 2008. Operation 2008 terminates the operations of this flowchart.

Arrow 2010 directs the flow of execution from starting operation 2000 to operation 2012. Operation 2012 performs partitioning the received back channel into a multiplicity of received identified speech channels. Arrow 2014 directs execution from operation 2012 to operation 2008. Operation 2008 terminates the operations of this flowchart.

Arrow 2020 directs the flow of execution from starting operation 2000 to operation 2022. Operation 2022 performs processing the multiplicity of the received identified speech channels to create a multiplicity of identified speech content. Arrow 2024 directs execution from operation 2022 to operation 2008. Operation 2008 terminates the operations of this flowchart.

Arrow 2030 directs the flow of execution from starting operation 2000 to operation 2032. Operation 2032 performs responding to the identified speech content to create an identified speech content response, for each of the multiplicity of the identified speech contents. Arrow 2034 directs execution from operation 2032 to operation 2008. Operation 2008 terminates the operations of this flowchart.

Portions of the flowchart of FIG. 10 related to operations 2022 and 2032 may operate a speech processing system coupled to a wireline node in a network. The wireline node provides multiple received identified speech channels to the speech processing system. The received identified speech channels are based upon a received back channel at the wireline node from multiple user sites coupled to the network. The network supports video delivery to the user sites and/or cable television delivery to the user sites.

The speech processing system may include at least one computer. Operations 2022 and 2032 may be implemented as program steps of a program system operating at least part of the computers included in the speech processing system. Implementations of these operations as program steps may reside in memory accessibly coupled to at least one computer in the speech processing system.

Note that operations 2002 and 2012 may be implemented in hardware and/or implemented as program steps used in operating computers located at the wireline node. Such computers may or may not be part of the speech processing system.

At least one, and possibly all, of the identified speech channels may have an associated user site.

FIG. 11A depicts a detail flowchart of operation 2012 of FIG. 10 further partitioning the received back channel.

US 7,047,196 B2

23

Arrow 2070 directs the flow of execution from starting operation 2012 to operation 2072. Operation 2072 performs partitioning the received back channel into a multiplicity of received identified speech channels from the associated user site. Arrow 2074 directs execution from operation 2072 to operation 2076. Operation 2076 terminates the operations of this flowchart.

FIG. 11B depicts a detail flowchart of operation 2022 of FIG. 10 further processing the multiplicity of the received identified speech channels.

Arrow 2090 directs the flow of execution from starting operation 2022 to operation 2092. Operation 2092 performs processing the multiplicity of the received identified speech channels from the associated user site to create multiple identified speech contents. Arrow 2094 directs execution from operation 2092 to operation 2096. Operation 2096 terminates the operations of this flowchart.

FIG. 11C depicts a detail flowchart of operation 2032 of FIG. 10 further responding to the identified speech content.

Arrow 2110 directs the flow of execution from starting operation 2032 to operation 2112. Operation 2112 performs responding to the identified speech content from the associated user site to create the identified speech content response for the associated user site. Arrow 2114 directs execution from operation 2112 to operation 2116. Operation 2116 terminates the operations of this flowchart.

FIG. 12 depicts a detail flowchart of operation 2000 of FIG. 10 further performing the method using the back channel from multiple user sites.

Arrow 2120 directs the flow of execution from starting operation 2000 to operation 2122. Operation 2122 performs determining the associated user site from the received identified speech channel. Arrow 2124 directs execution from operation 2122 to operation 2126. Operation 2126 terminates the operations of this flowchart.

Arrow 2130 directs the flow of execution from starting operation 2000 to operation 2132. Operation 2132 performs determining the associated user site from the identified speech content. Arrow 2134 directs execution from operation 2132 to operation 2126. Operation 2126 terminates the operations of this flowchart.

Arrow 2140 directs the flow of execution from starting operation 2000 to operation 2142. Operation 2142 performs determining the associated user site from the identified speech content and a speaker identification library. Arrow 2144 directs execution from operation 2142 to operation 2126. Operation 2126 terminates the operations of this flowchart.

Arrow 2150 directs the flow of execution from starting operation 2000 to operation 2152. Operation 2152 performs determining the associated user site from the identified speech content and a speech recognition library. Arrow 2154 directs execution from operation 2152 to operation 2126. Operation 2126 terminates the operations of this flowchart.

Arrow 2160 directs the flow of execution from starting operation 2000 to operation 2162. Operation 2162 performs determining the associated user site from an identification within the speech channel. Arrow 2164 directs execution from operation 2162 to operation 2126. Operation 2126 terminates the operations of this flowchart.

Note that the determination of the associated user site may be provided by an identification within the speech channel. By way of example, a technician may be recognizable at many user sites, and may identify the user site as Room 432 or 10 Main Street in the process of activities at that user site.

The invention can include at least one of the operations 2120, 2132, 2142, 2152 and 2162.

24

FIG. 13A depicts a detail flowchart of operation 2112 of FIG. 11C further responding to identified speech contents.

Arrow 2170 directs the flow of execution from starting operation 2112 to operation 2172. Operation 2172 performs processing the identified speech content response to create the identified user site response. Arrow 2174 directs execution from operation 2172 to operation 2176. Operation 2176 performs sending the identified user site response to the identified user site. Arrow 2178 directs execution from operation 2176 to operation 2180. Operation 2180 terminates the operations of this flowchart.

FIG. 13B depicts a detail flowchart of operation 2112 of FIG. 11C further responding to the identified speech content.

Arrow 2190 directs the flow of execution from starting operation 2112 to operation 2192. Operation 2192 performs assessing the speech content response identified as to the user site to create a financial consequence identified as to the user site. Arrow 2194 directs execution from operation 2192 to operation 2196. Operation 2196 performs billing the user site based upon the financial consequence. Arrow 2198 directs execution from operation 2196 to operation 2200. Operation 2200 terminates the operations of this flowchart.

FIG. 14 depicts a detail flowchart of operation 2112 of FIG. 11C further responding to the identified speech content from the associated user site.

Arrow 2210 directs the flow of execution from starting operation 2112 to operation 2212. Operation 2212 performs assessing the speech response to create a financial consequence identified as to the user site. Arrow 2214 directs execution from operation 2212 to operation 2216. Operation 2216 performs displaying the financial consequence to create a displayed financial consequence at the user site. Arrow 2218 directs execution from operation 2216 to operation 2220. Operation 2220 performs confirming the displayed financial consequence from the user site to create a financial commitment. Arrow 2222 directs execution from operation 2220 to operation 2224. Operation 2224 performs billing the user site based upon the financial commitment. Arrow 2226 directs execution from operation 2224 to operation 2228. Operation 2228 terminates the operations of this flowchart.

FIG. 15A depicts a detail flowchart of operation 2112 of FIG. 11C further responding to the identified speech content from the associated user site.

Arrow 2250 directs the flow of execution from starting operation 2112 to operation 2252. Operation 2252 performs identifying a user based upon the speech content identified with the user site to create an identified user. Arrow 2254 directs execution from operation 2252 to operation 2256. Operation 2256 terminates the operations of this flowchart.

FIG. 15B depicts a detail flowchart of operation 2252 of FIG. 15A further identifying the user.

Arrow 2270 directs the flow of execution from starting operation 2252 to operation 2272. Operation 2272 performs fetching a user profile list based upon the user site and the user profile list containing at least one user profile. Arrow 2274 directs execution from operation 2272 to operation 2276. Operation 2276 performs identifying the user based upon the speech content and based upon the user profile list to create an identified user. Arrow 2278 directs execution from operation 2276 to operation 2280. Operation 2280 terminates the operations of this flowchart.

FIG. 16 depicts a detail flowchart of operation 2112 of FIG. 11C further responding to the identified speech content from the associated user site.

Arrow 2290 directs the flow of execution from starting operation 2112 to operation 2292. Operation 2292 performs assessing the speech response based upon the identified user

to create a financial consequence for the identified user. Arrow 2294 directs execution from operation 2292 to operation 2296. Operation 2296 performs displaying the financial consequence to create a displayed financial consequence at the user site. Arrow 2298 directs execution from operation 2296 to operation 2300. Operation 2300 performs confirming the displayed financial consequence from the user site based upon the identified user to create a financial commitment. Arrow 2302 directs execution from operation 2300 to operation 2304. Operation 2304 performs billing the identified user based upon the financial commitment. Arrow 2306 directs execution from operation 2304 to operation 2308. Operation 2308 terminates the operations of this flowchart.

FIG. 17A depicts the speech content response 2350, including the current response menu 2352 and the cumulative user site response 2354, in accordance with the invention.

The speech content response may include a current response menu and a cumulative user site response identified as to the user site for at least one of the user sites.

FIG. 17B depicts a detail flowchart of operation 2112 of FIG. 11C further responding to the identified speech content from the associated user site.

Arrow 2330 directs the flow of execution from starting operation 2112 to operation 2332. Operation 2332 performs responding to the speech contents based upon the current response menu and based upon the cumulative user site response to create a new cumulative user site response. Arrow 2334 directs execution from operation 2332 to operation 2336. Operation 2336 terminates the operations of this flowchart.

Arrow 2340 directs the flow of execution from starting operation 2112 to operation 2342. Operation 2342 performs assessing the speech contents based upon the current response menu and based upon the cumulative user site response to create a new current response menu. Arrow 2344 directs execution from operation 2342 to operation 2336. Operation 2336 terminates the operations of this flowchart.

At least one of operations 2332 or 2342 may be performed.

FIG. 18A depicts a detail flowchart of operation 2112 of FIG. 11C further responding to the identified speech content from the associated user site.

Arrow 2370 directs the flow of execution from starting operation 2112 to operation 2372. Operation 2372 performs responding to the speech content, identified as to the user site, based upon a natural language, to create a speech content response of the speech content identified as to user site. Arrow 2374 directs execution from operation 2372 to operation 2376. Operation 2376 terminates the operations of this flowchart.

FIG. 18B depicts a detail flowchart of operation 2092 of FIG. 11B further processing the multiplicity of the received speech channels.

Arrow 2390 directs the flow of execution from starting operation 2092 to operation 2392. Operation 2392 performs processing the received speech channels from the user site based upon a natural language for the user site to create the speech content identified as to the user site. Arrow 2394 directs execution from operation 2392 to operation 2396. Operation 2396 terminates the operations of this flowchart.

FIG. 19A depicts a simplified block diagram of a hand held remote 1000, containing microphone 1060 and keypad 1020 supporting user input organized and processed by

embedded controller 1050 for communication by wireless interface 1040 coupled 1002 to set-top apparatus 1100, as shown in FIG. 3.

FIG. 19B depicts a simplified block diagram of set-top apparatus 1100 as shown in FIG. 3 showing coupling 1002 and first wireless physical transport 1200 comprised of downlink coupling 1202 and uplink coupling 1204.

Note that microphone 1060 may include more than one audio-sensor and/or a microphone array of two or more microphone units.

FIG. 19C further depicts set-top apparatus 1100 as shown in FIG. 19B containing a set-top appliance 1120 coupled 1002 with hand held remote 1000. Set-top appliance 1120 is coupled 1112 with set-top box 1110 possessing downlink coupling 1202 and uplink coupling 1204.

FIG. 19D further depicts set-top apparatus 1100 as shown in FIG. 19B containing a set-top appliance 1120 coupled 1002 with hand held remote 1000 and possessing downlink coupling 1202 and uplink coupling 1204. Set-top appliance 1120 provides processed downlink coupling 1114 to set-top box 1110 and receives initial uplink coupling 1112 from set-top box 1110.

Regarding FIG. 19A–19D, the following observations may be made.

The invention supports uni-directional communication via coupling 1002, supporting communicative transfer from the remote 1000 via coupling 1002 to set-top apparatus 1100.

The invention supports bi-directional communication via coupling 1002. Note that noise-canceling microphones 1060 may use bi-directional communication on coupling 1002. Noise cancellation may be performed within set-top apparatus 1100, by at least one of the set-top box 1110 and set-top appliance 1120.

Wireless interface 1040 interacts with coupling 1002. Coupling 1002 may use a wireless transport, including, but not limited to, at least one of infra-red, microwave or radio frequency spectrum regions, as well as ultrasonic signaling. Embedded controller 1050 controls 1042 wireless interface 1040. Embedded controller 1150 communicates via 1042 with wireless interface 1040 to direct communication across coupling 1002.

FIG. 20A depicts a simplified block diagram of set-top appliance 1120 as shown in FIG. 19C supporting coupling 1002 with hand held remote 1000 and coupling 1112 with set-top box 1110.

Computer 1150 is coupled 1132 to remote interface 1130 and also coupled 1142 to set-top box interface 1140. Computer 1150 executes a program system including program steps residing in accessibly coupled 1162 memory 1160.

The program system executed by computer 1150 includes program steps maintaining hand held remote 1000 communication through remote interface 1130 and maintaining set-top box 1120 communication through set-top box interface 1140.

Remote interface 1130 couples 1002 with hand held remote 1000 (not shown in FIG. 20A).

Remote interface 1130 incorporates the necessary device or devices to provide communications using the embodiment's physical transport layer.

Set-top box interface 1140 couples 1112 with set-top box 1120, as shown in FIG. 19C. Coupling 1112 may use a wireline or wireless physical transport. Coupling 1112 may use a wireless transport, including, but not limited to, at least one of the infra-red, microwave or radio frequency spectrum, as well as ultrasonic signaling. Set-top box interface

US 7,047,196 B2

27                                                28

1140 incorporates the necessary device or devices to provide communications using the embodiment's physical transport layer.

FIG. 20B depicts a simplified block diagram of set-top appliance 1120 as shown in FIG. 19D supporting coupling 1002 with hand held remote 1000 and couplings 1112 and 1114 with set-top box 1110.

Set-top box interface 1140 provides processed downlink coupling 1114 to set-top box 1110 and receives initial uplink coupling 1112 from set-top box 1110 as shown in FIG. 19D. Set-top box interface 1140 incorporates the necessary device or devices to provide these communications.

FIG. 20C depicts a block diagram further depicting accessibly coupled 1162 memory 1160 as shown in FIGS. 20A and 20B.

Accessibly coupled 1162 memory 1160 may contain RAM memory 1180 coupled 1182 to computer 1150. Accessibly coupled memory 1160 may include more than one RAM memory 1180. Distinct RAM memories 1180 may be distinctly coupled to computer 1150. One or more RAM memories 1180 may act as a cache memory for computer 1150.

Accessibly coupled 1162 memory 1160 may contain non-volatile memory 1190 coupled 1192 to computer 1150. Accessibly coupled memory 1160 may include more than one non-volatile memory 1190. Distinct non-volatile memories 1190 may be distinctly coupled to computer 1150. A non-volatile memory may be organized as file management system.

Note that the coupling 1182 of RAM memory 1180 may be distinct from coupling 1192 of non-volatile memory 1190 with computer 1150. Either RAM memory and/or non-volatile memory components may be packaged with computer 1150.

FIG. 21 depicts a remote control unit 1000-180 coupled 1002-180 to set-top apparatus 1100-180. Set-top appliance 1100-180 communicates via a one- or two-stage wireline communications system containing a wireline physical transport 1200 to an augmented distributor node 1310. The communications traverse augmented distributor node 1310 interfaced to a wireline communications loop including an augmented Headend 1410. The network may further support a communications loop including augmented metropolitan Headend 1410.

As used herein, the adjective augmented is used to refer to a node incorporating at least one embodiment of the invention.

Augmented node 1310 may control and support optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled "Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems" by Calderone and Foster, both inventors of this application and commonly assigned to AgileTV, incorporated herein by reference.

Augmented node 1310 may provide cached content such as popular videos for a VOD service.

Speech processing may be performed in many situations at augmented node 1310.

Augmented Headend 1410 and augmented metropolitan Headend 1410 provide speech processing capabilities. Augmented Headend 1410 may be used to handle speech processing for nodes 120 and 124. Augmented metropolitan Headend 1410 may be used to handle speech processing for Headends 100 and 106. Headends 100 and 106, and nodes 120 and 124 are not augmented by this invention.

Alternatively, augmented Headend 1410 may control the optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled "Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems". Node 1310 may support the optimized upstream communication. Upstream communication from augmented node 1310 and from augmented Headend 1410 may employ the same upstream communications protocol, or different upstream communications protocol.

Note that metropolitan Headend 1410 may not be involved in the optimized upstream communication scheme.

Alternatively, metropolitan Headend 1410 may be involved in the optimized upstream communication scheme. Augmented metropolitan Headend 1410 may further control the optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled "Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems". Augmented Headend 1410 may support the optimized upstream communication between node 1310 and set-top apparatus 1100-180. Node 1310 may then carry out the optimized upstream communication. Upstream communication from augmented node 1310 and from augmented Headend 1410 may employ the same upstream communications protocol, or different upstream communication protocols.

Note that in certain network installations, there may be no metropolitan Headend, augmented or otherwise. Further, in certain network installations, there may only be one Headend.

FIG. 22 depicts a remote control unit 1000-180 coupled 1002-180 to set-top apparatus 1100-180, communicating via a two-stage wireline communications system containing a wireline physical transport 1200 to a distributor node 126. Distributor node 126 interlaces to a wireline communications loop including an augmented Headend 1414. The network may further support a communications loop including augmented metropolitan Headend 1410, in accordance with the invention.

Augmented Headend 1414 may control and support optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled "Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems" by Calderone and Foster, both inventors of this application and commonly assigned to AgileTV, incorporated herein by reference.

Augmented Headend 1414 may provide cached content such as popular videos for a VOD service. Speech processing may be performed in many situations at augmented Headend 1414.

Augmented metropolitan Headend 1410 may further provide speech processing capabilities. Augmented metropolitan Headend 1410 may be used to handle speech processing requirements for Headends 100 and 106, which are not augmented by this invention.

The couplings between STB 1100-180, Node 126 and Headend 1410 may also support bi-directional communication allowing the STB 1100-180 to receive multiple television channels and allowing STB 1100-180 to signal at least limited information to augmented Headend 1410, which may well include management of Pay-per-View and other services.

Alternatively, augmented metropolitan Headend 1410 may control the optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems. Augmented Headend 1414 may then support the optimized upstream communication. Upstream communication from augmented node 126 and

29

from augmented Headend **1410** may employ the same upstream communications protocol, or a different upstream communications protocol.

Note that metropolitan Headend **1410** may not be involved in the optimized upstream communication scheme.

Alternatively, metropolitan Headend **1410** may be involved in the optimized upstream communication scheme. Augmented metropolitan Headend **1410** may further control the optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems. Augmented Headend **1410** may support the optimized upstream communication between node **126** and set-top apparatus **1100-180**. Node **126** may then carry out the optimized upstream communication. Upstream communication from node **126** and from augmented Headend **1410** may employ the same upstream communications protocol, or different upstream communication protocols.

Note that in certain network installations, there may be no metropolitan Headend, augmented or otherwise. Further, in certain network installations, there may only be one Headend.

FIG. 23 depicts a detail block diagram of an augmented distributor node **1310**, coupled to wireline physical transport **1200** and coupled to the wireline communications loop of FIG. 21.

Note that there may be one transport **1200**. Transceiver **1320** couples to transport **1200** to provide uplink **1204** and downlink **1202** communications between STB's **1100** of FIG. 21.

There may be multiple transports **1200** corresponding to wireline circuits servicing combinations of at least one of the interfaces **170**, **174** and **178**, as shown in FIGS. 1, 2, 21 and 22. Transceiver **1320** couples to transport **1200** to provide uplink **1204** and downlink **1202** communications between STB's **1100** of FIGS. 21 and 22. Note that transceiver **1320** may provide multiple uplinks **1204**. Transceiver **1320** may provide multiple downlinks **1202**.

Transceiver **1320** may include transmitter **1324** providing downlink **1202** communications to wireline physical transport **1200**. Multiple downlinks **1202** may be provided by transmitter **1324**. Alternatively, multiple downlinks **1202** may be provided by more than one transmitter **1324**.

Transceiver **1320** may include receiver **1322** providing uplink **1204** communications from wireline physical transport **1200**. Multiple uplinks **1204** may be provided by receiver **1322**. Alternatively, multiple uplinks **1204** may be provided by more than one receiver **1322**.

Wireline physical transport **1200** may further include separate uplink physical transport **1204** and downlink physical transport **1202**. Various embodiments of the invention may include multiple uplink physical transports **1204**. Various embodiments of the invention may include multiple downlink physical transports **1202**. There may be a difference in the number of uplink physical transports **1204** and the number of downlink physical transports **1202**.

Note that there may be a difference in the number of transmitters **1324** and the number of receivers **1322**.

By way of example, referring to FIG. 21, one downlink stream **1202** may be sent to interface **170**, and a second downlink stream, not shown in FIG. 21 or FIG. 23, may be sent to interface **174**. One uplink stream **1204** may be received from interface **170**, and a second uplink stream, not shown in FIG. 21 or FIG. 23, may be received from interface **174**.

Hereafter, the discussion focuses on a single transmitter **1324** providing as many downlinks **1202** and on a single

30

receiver **1322** providing as many uplinks **1204** as required. This is done strictly to simplify the discussion and is not meant to imply any limitation on the invention.

Uplink **1204** communication includes a back channel. This back channel includes multiple identified speech channels from multiple user sites (STBs) **1100**, as shown in FIGS. 21 and 22. Receiver **1322** provides **1326** a back channel to speech engine **1330**. Speech engine **1330** performs at least the operations of FIG. 10.

Speech engine **1330** further communicatively interacts **1374** with network interface **1370**. Network interface **1370** couples **1372** to other network components. Network coupling **1372** may further include a predominantly input coupling **1306** and a predominantly output coupling **1308**.

Network interface **1370** may communicatively interact **1376** with local system management and billing **1380**. Local system management and billing **1380** may include systems management and billing data relevant to the elements of the overall network managed or controlled through the local node.

Local system management and billing **1380** may further maintain systems management and billing data relevant to the elements of the overall network managed or controlled through the local node.

Local system management and billing **1380** may include a cache of systems management and billing data relevant to the elements of the overall network managed or controlled through the local node.

Receiver **1322** provides **1326** a back channel to speech engine **1330**. Speech engine **1330** performs at least the operations of FIG. 10. Speech engine **1330** further communicatively interacts **1374** with network interface **1370**.

Speech engine **1330** may communicatively interact **1382** with system management and billing **1380**. Speech engine **1330** may send **1382** system management and billing **1380** requests for user account information, including, but not limited to, credit information, authorization profiles for channel viewing, credit limits, and parental safeguards. Speech engine **1330** may send **1382** system management and billing **1380** user passwords, confirmation of commitments, commands regarding authorization levels of other users, such as children within a user's household.

Speech engine **1330** may receive **1382** from system management and billing **1380** credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech engine **1330** may receive **1382** from system management and billing **1380** confirmation of acceptance of contracts from financial engines. Acceptance of contracts from external financial engines may be received in a number of different ways, including through interactions with network interface **1370** or other external communications networks **1312**.

System management and billing **1380** may further include interfaces to other external communications networks. Such circuitry is not the subject of this invention and is not discussed further herein.

Similarly, the mechanism of contract acceptance between system management and billing **1380** and financial engines is not the subject of this invention and is not discussed further herein.

Speech engine **1330** may receive **1338** from content engine **1340** content status information. Content status information may include a list of available services through the coupled network(s). Content status information may further include a list of services available within the node.

Content status information may include a list of content items cached through the network. Content status informa-

US 7,047,196 B2

31

tion may further include a list of content items cached at the
node. Cached content items may include Interactive Pro-
gram Guide (IPG) listings for some period of time. Cached
content items may include one or more video sequences
provided through Video On Demand (VOD) or Pay-Per-
View services.

Content engine 1340 communicatively interacts 1378
with network interface 1370. Content engine 1340 may
provide at least one locally generated multi-media stream
1342 to Multiplexor engine 1360 as well as at least one
multi-media stream 1344 received 1378 through network
interface 1370. Content engine 1340 may modify multi-
media stream 1344 received 1378 from network interface
1370 through network input 1306. Content engine 1340 may
stimulate 1378 network interface 1370, altering network
output 1308 from network interface 1370.

Content engine 1340 may have more than one registered
application server each presenting static menu content and
dynamic content. A speech processor within speech engine
1330 may be presented a grammar based upon the static and
dynamic content of multiple registered application servers.
The merged services may be presented to the users as
specialized, multi-application service menus provided by the
speech engine 1330 to the users.

Speech engine 1330 may generate one or more channels
of speech response content through coupling 1332 to modu-
lator engine 1350. Modulator engine 1350 may further
provide 1334 status and reliability information to speech
engine 1330. Speech response content channels presented
through coupling 1332 may be digital. Speech response
content channels may be presented as bits or clusters of bits
of a specific bit width.

Multiple channels may be multiplexed onto coupling
1332 by speech engine 1330. The multiplexing mechanism
onto channel 1332 may perform time division multiplexing.
Modulator engine 1350 may demultiplex multiple multi-
plexed channels received through coupling 1332. Modulator
engine 1250 may convert one or more demultiplexed chan-
nels into modulated channels, or modulated collections of
channels, presented 1352 and 1354 to multiplexor engine
1360.

Multiplexor engine 1360 accepts the multiple locally
generated channels 1352, 1354 and 1342 as well as the
locally received, and possibly modified, external stream
1344 to create at least one merged stream 1362. Multiplexor
engine 1360 may create more than one merged stream, e.g.
1364.

Transmitter 1324 receives at least one merged stream
1362 from multiplexor engine 1360 to generate at least one
downlink stream 1202 of physical transport 1200. Transmit-
ter 1324 may receive more than one merged stream 1364
from multiplexor engine 1360.

Speech engine 1330 may further interact 1312 with an
external network. Such an interaction may involve at least
one wireline physical transport layer. The wireline physical
layer may support at least one or a combination of commu-
nication protocols using optical, infra-red and radio fre-
quency regions of the electromagnetic spectrum. Network
interactions 1312 may support message passing protocols,
including, but not limited to, TCP-IP. Network interactions
1312 may further support communications with the Internet
and World Wide Web.

FIG. 24 depicts an alternative detail block diagram of an
augmented distributor node 1310, coupled to wireline physi-
cal transport 1200 and coupled to the wireline communica-
tions loop of FIG. 21.

32

Receiver 1322 provides a back channel to speech engine
1330 through interactions 1328 with switch 1390 delivering
1392 the back channel to speech engine 1330.

Speech engine 1330 communicatively interacts 1374 with
network interface 1370 by the speech engine 1330 interact-
ing 1392 with switch 1390 which interacts 1398 with
network interface 1370.

Network interface 1370 may communicatively interact
with local system management and billing 1380 by com-
municatively interacting 1398 with switch 1390, which
communicatively interacts 1396 with system management
and billing 1380.

Speech engine 1330 may communicatively interact 1382
with system management and billing 1380 by communica-
tively interacting 1392 with switch 1390, which communi-
catively interacts with system management and billing 1380.

Speech engine 1330 may receive content status informa-
tion from content engine 1340 by content engine 1340
interacting 1394 with switch 1390, which delivers 1392 the
content status information to speech engine 1330.

Content engine 1340 communicatively interacts with net-
work interface 1370 by content engine 1340 communica-
tively interacting with switch 1390 and network interface
1370 communicatively interacting with switch 1390.

Switch 1390 may support digital interfaces. Switch 1390
may include a circuit switch. The circuit switch may support
Ethernet protocols. Switch 1390 may include an ATM
switch. Switch 1390 may support analog interfaces. Such
analog interfaces may include wavelength division multi-
plexing. Switch 1390 may be composed of more than one
switch.

The invention may include various combinations of direct
interconnections and switch networks as shown in FIGS. 23
and 24.

FIG. 25 depicts a generic block diagram of a prior art
Headend 104 as shown in FIG. 3.

Uplink 138 communication includes a back channel.

This back channel includes multiple response channels
from multiple user sites STBs, as shown in FIGS. 1 and 2.
Receiver 1422 provides 1427 a back channel to content
engine 1440.

Network interface 1470 may communicatively interacts
1476 with Headend system management and billing 1480.
Headend system management and billing 1480 may include
systems management and billing data relevant to the ele-
ments of the overall network managed or controlled through
the Headend.

Headend system management and billing 1480 may fur-
ther maintain systems management and billing data relevant
to the elements of the overall network managed or controlled
through the Headend.

Headend system management and billing 1480 may
include a cache of systems management and billing data
relevant to the elements of the overall network managed or
controlled through the Headend.

System management and billing 1480 may further include
interfaces to other external communications networks. Such
circuitry is not the subject of this invention and is not
discussed further herein.

Content status information may include a list of content
items cached through the network. Content status informa-
tion may further include a list of content items cached at the
node. Cached content items may include Interactive Pro-
gram Guide (IPG) listings for some period of time. Cached
content items may include one or more video sequences
provided through Video On Demand (VOD) or Pay-Per-
View services.