## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PROMPTU SYSTEMS CORPORATION, | ) CIVIL ACTION |
| Plaintiff, | ) No. 16-cv-06516-JS |
| v. | ) |
| COMCAST CORPORATION and COMCAST CABLE COMMUNICATIONS, LLC, | ) |
| Defendants. | ) |

## AMENDED ANSWER TO FIRST AMENDED COMPLAINT

## REDACTED VERSION

1

## Introduction

Defendants Comcast Corporation and Comcast Cable Communications, LLC ("Comcast Cable") (collectively, "Comcast"), by and through their undersigned counsel, hereby respond to the Amended Complaint filed by plaintiff Promptu Systems Corporation ("Promptu"). *See* Doc. 30. Comcast denies each and every allegation of any improper conduct or knowledge or intent that Promptu makes against Comcast or any of Comcast's representatives.

Approximately 23 years ago, in 2001, Promptu solicited Comcast Corporation's interest in Promptu's version of a voice-recognition system for cable television. Voice-recognition technology had existed for decades, and Comcast Corporation entered into an agreement with Promptu to test its system and provide Comcast Corporation the option to implement it. But Promptu's technology was a failure in testing. As a result, Promptu repaid Comcast Corporation its initial investment, with interest, and the business relationship ended. Years later, in or around 2012, and with no help from Promptu, Comcast Cable and its technology partners developed Comcast Cable's own, voice-recognition system based on a fundamentally different network architecture, platform, and design. Comcast Cable's voice-recognition system does not rely on any alleged proprietary information, patented technology, or other know-how of Promptu. And at no point did Comcast ever violate any contractual or other duty to Promptu, or infringe any valid patent claim of Promptu.

## Preliminary Statement

1.     Comcast admits that Promptu's Amended Complaint ("AC") purports to assert claims for patent infringement, breach of contract, unfair competition, promissory estoppel, and unjust enrichment. Comcast denies the remaining allegations in Paragraph 1.

## Jurisdiction and Venue

2.      Paragraph 2 sets forth conclusions of law to which no response is required.  To the extent a response is deemed to be required, Comcast admits that the AC purports to assert claims for patent infringement and that this Court has subject matter jurisdiction over those claims.  Comcast also admits that this Court has supplemental subject matter jurisdiction over the AC's purported state-law claims.  Comcast denies the remaining allegations in Paragraph 2.

3.      Paragraph 3 sets forth conclusions of law to which no response is required.  To the extent a response is deemed to be required, Comcast admits that venue is proper in this district.  Comcast denies the remaining allegations in Paragraph 3.

## The Parties

4.      Comcast lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4 and on that basis denies those allegations.

5.      Comcast admits that Comcast Corporation is a Pennsylvania corporation with a principal place of business at One Comcast Center, 1701 John F. Kennedy Blvd., Philadelphia, Pennsylvania 19103.

6.      Comcast admits that Comcast Cable Communications LLC is a Delaware limited liability company with a principal place of business at One Comcast Center, 1701 John F. Kennedy Blvd., Philadelphia, Pennsylvania 19103.  Comcast also admits that Comcast Cable Communications LLC is indirectly wholly owned by Comcast Corporation.  Comcast further admits that Comcast Cable is one of the nation's largest providers of pay-TV, cable-TV, internet, and telephone services.

## Factual Background

7.      Comcast lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7 and on that basis denies those allegations.

8.      Comcast will treat references to "Promptu" in the AC as inclusive of AgileTV. Comcast lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 8 and on that basis denies those allegations.

9.      Comcast lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9 and on that basis denies those allegations.

10.     Comcast admits that the '538 patent, the '196 patent, and the '326 patent are each, on their face, assigned to Promptu or its predecessor AgileTV. Comcast admits that the '538 patent on its face is entitled "Method and Apparatus for Voice Control of a Television Control Device." Comcast admits that the '326 patent and '196 patent each, on its face, is entitled "System and Method of Voice Recognition Near a Wireline Node of a Network Supporting Cable Television and/or Video Delivery."

11.     Comcast admits that Comcast Cable offers a voice recognition feature through its television cable service by and through its XFINITY and its X1 Entertainment Operating Systems.

12.     Comcast denies the allegations in Paragraph 12.

13.     Comcast admits that it and Promptu had discussions regarding voice recognition beginning around 2001. Comcast denies the remaining allegations in Paragraph 13.

14.     Comcast denies the allegations in Paragraph 14.

15.     Comcast denies the allegations in Paragraph 15.

16. Comcast admits that Comcast Corporation and Promptu executed several agreements containing confidentiality obligations. Comcast denies ever making any improper use or disclosure of "Promptu's expected disclosures" or "its ideas and capabilities," and denies the remaining allegations in Paragraph 16.

17. Comcast admits that certain Comcast representatives met with Promptu. Comcast denies the remaining allegations in Paragraph 17, including allegations relating to any purported "plan to encourage Promptu to disclose its ideas and know-how" and/or any activity by Comcast "[i]n furtherance [there]of."

18. Comcast admits that certain Comcast representatives met with Promptu. Comcast denies the remaining allegations in Paragraph 18.

19. Comcast admits that certain Comcast representatives met with Promptu. Comcast denies the remaining allegations in Paragraph 19.

20. Comcast lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 and on that basis denies those allegations.

21. Comcast lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 and on that basis denies those allegations.

22. Comcast lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 and on that basis denies those allegations.

23. Comcast lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 and on that basis denies those allegations.

24. Comcast lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 and on that basis denies those allegations.

25.     Comcast admits that it had discussions with Promptu.  Comcast denies the remaining allegations in Paragraph 25.

26.     Comcast admits that it had discussions with Promptu.  Comcast denies the remaining allegations in Paragraph 26.

27.     Comcast admits that it had discussions with Promptu.  Comcast denies the remaining allegations in Paragraph 27.

28.     Comcast admits that it had discussions with Promptu.  Comcast denies the remaining allegations in Paragraph 28.

29.     Comcast admits that it had discussions with Promptu.  Comcast denies the remaining allegations in Paragraph 29.

30.     Comcast admits that it had discussions with Promptu.  Comcast denies the remaining allegations in Paragraph 30.

31.     Comcast admits that it had discussions with Promptu.  Comcast denies the remaining allegations in Paragraph 31.

32.     Comcast admits that it had discussions with Promptu.  Comcast denies the remaining allegations in Paragraph 32.

33.     Comcast admits that on or about May 6, 2003, and by addendum on February 9, 2004, Mr. Coblitz signed a Memorandum of Understanding ("MOU") with Promptu.  Comcast admits that Exhibit A to the AC purports to be the MOU.

34.     Comcast admits that the MOU contains the text excerpted in Paragraph 34.

35.     Comcast denies the allegations in Paragraph 35.

36.     Comcast lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36 and on that basis denies those allegations.

37. Comcast lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 and on that basis denies those allegations.

38. Comcast admits that Promptu attempted to install voice-recognition functionality, but failed to deliver any viable or operable system. Comcast denies the remaining allegations in Paragraph 38.

39. Comcast admits that Promptu attempted to install voice-recognition functionality, but failed to deliver any viable or operable system. Comcast denies the remaining allegations in Paragraph 39.

40. Comcast admits that Promptu attempted to install voice-recognition functionality, but failed to deliver any viable or operable system. Comcast denies the remaining allegations in Paragraph 40.

41. Comcast admits that it had discussions with Promptu. Comcast further admits that Promptu attempted to install voice-recognition functionality, but failed to deliver any viable or operable system. Comcast denies the remaining allegations in Paragraph 41.

42. Comcast admits that it had discussions with Promptu. Comcast further admits that Promptu attempted to install voice-recognition functionality, but failed to deliver any viable or operable system. Comcast denies the remaining allegations in Paragraph 42.

43. Comcast admits that it had discussions with Promptu. Comcast denies the remaining allegations in Paragraph 43, including any allegation that any of Promptu's offerings were ever "acceptable," or that there was any basis for Promptu to have any "reasonable belief that it would be compensated after voice recognition was fully deployed into Comcast's cable network."

44.     Comcast lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 and on that basis denies those allegations.

45.     Comcast admits that it had discussions with Promptu. Comcast denies the remaining allegations in Paragraph 45.

46.     Comcast admits that the License and Development Agreement ("Agreement") between Comcast and Promptu was executed on or around May 11, 2005. Comcast admits that Exhibit B to the AC purports to be the Agreement.

47.     Comcast admits that it had discussions with Promptu. Comcast denies the remaining allegations in Paragraph 47.

48.     Comcast admits that it had discussions with Promptu. Comcast denies the remaining allegations in Paragraph 48, including any allegation that Comcast ever breached any obligation to Promptu.

49.     Comcast denies the allegations in Paragraph 49.

50.     Comcast admits that it chose not to exercise its *license option*. Comcast denies the remaining allegations in Paragraph 50.

51.     Comcast denies the allegations in Paragraph 51.

52.     Comcast denies the allegations in Paragraph 52.

### First Claim for Relief
**(Infringement of the '538 Patent)**

53.     Comcast incorporates its responses to Paragraphs 1-52.

54.     Comcast admits that the '538 patent on its face is entitled "Method and Apparatus for Voice Control of a Television Control Device," but denies that it is a valid or properly issued patent. Comcast admits that Exhibit C to the AC purports to be a copy of the '538 patent.

55.     Comcast denies the allegations in Paragraph 55.

56.     Comcast denies the allegations in Paragraph 56.

57.     Comcast denies the various allegations in Paragraph 57 that Comcast infringes any claim of the '538 patent.

58.     Comcast denies the allegations in Paragraph 58.

## Second Claim for Relief
### (Infringement of the '196 Patent)

59.     Comcast incorporates its responses to Paragraphs 1-58.

60.     Comcast admits that the '196 patent on its face is entitled "System and Method of Voice Recognition Near a Wireline Node of a Network Supporting Cable Television and/or Video Delivery," but denies that it is a valid or properly issued patent. Comcast admits that Exhibit D to the AC purports to be a copy of the '196 patent.

61.     Comcast denies the allegations in Paragraph 61.

62.     Comcast denies the allegations in Paragraph 62.

63.     Comcast denies the various allegations in Paragraph 63 that Comcast infringes any claim of the '196 patent.

64.     Comcast denies the allegations in Paragraph 64.

65.     Comcast denies the allegations in Paragraph 65.

## Third Claim for Relief
### (Infringement of the '326 Patent)

This claim for relief has been dismissed with prejudice (ECF No. 316) and thus no response is necessary.

## Fourth Claim for Relief
### (Breach of Contract)

This claim for relief has been dismissed with prejudice (ECF No. 311) and thus no response is necessary.

### Fifth Claim for Relief
**(Breach of Contract)**

This claim for relief has been dismissed with prejudice (ECF No. 316) and thus no response is necessary.

### Sixth Claim for Relief
**(Unfair Competition)**

This claim for relief has been dismissed with prejudice (ECF No. 316) and thus no response is necessary.

### Seventh Claim for Relief
**(Promissory Estoppel)**

This claim for relief has been dismissed with prejudice (ECF No. 316) and thus no response is necessary.

### Eighth Claim for Relief
**(Unjust Enrichment)**

This claim for relief has been dismissed with prejudice (ECF No. 316) and thus no response is necessary.

### Prayer for Relief

Comcast denies that Promptu is entitled to any relief.

## DEFENSES

Subject to the responses above, Comcast alleges and asserts the following defenses in response to the allegations without undertaking or shifting any applicable burdens of proof. In raising such defenses, Comcast does not concede that it bears the burden of proof or the burden of persuasion as to any of these issues, whether in whole or in part. None of Comcast's defenses should be understood as an admission of any allegation in Promptu's Amended Complaint and/or of any wrongful conduct. Discovery is not yet complete in this lawsuit, and therefore Comcast

specifically reserves all rights to assert additional defenses, amend, modify, or expand these defenses and to take further positions that become known through the course of discovery.

## FIRST DEFENSE
## (FAILURE TO STATE A CLAIM)

Promptu's claims all fail to state a claim upon which relief can be granted.

## SECOND DEFENSE
## (INVALIDITY)

One or more of the claims of the patents-in-suit asserted by Promptu are invalid for failure to satisfy the conditions of patentability set forth in The Patent Act, including without limitation 35 U.S.C. §§ 101, 102, 103, and/or 112.

## THIRD DEFENSE
## (NON-INFRINGEMENT OF THE PATENTS)

Comcast has not infringed and does not infringe any valid and enforceable claim of the patents-in-suit, literally or under the doctrine of equivalents, alone or jointly with third parties.

## FOURTH DEFENSE
## (ACQUIESCENCE, ESTOPPEL, WAIVER, OR LACHES)

Upon information and belief, Promptu's claims and the relief are barred in whole or in part by the equitable doctrines of acquiescence, estoppel, waiver, and/or laches.

## FIFTH DEFENSE
## (PROSECUTION HISTORY ESTOPPEL)

Promptu's claims in relation to the patents-in-suit are barred in whole or in part by the doctrine of prosecution history estoppel.

## SIXTH DEFENSE
## (PROSECUTION LACHES)

Promptu's claims in relation to the patents-in-suit are barred in whole or in part by the doctrine of prosecution laches.

## SEVENTH DEFENSE
## (REDUCED DAMAGES)

Promptu's damages are limited or unavailable pursuant to 35 U.S.C. §§ 286, 287, and/or 288.

## EIGHTH DEFENSE
## (NO INJUNCTIVE RELIEF)

Promptu is not entitled to injunctive relief because it has an adequate remedy at law.

## NINTH DEFENSE
## (LICENSE AND EXHAUSTION)

Promptu's claims in relation to the patents-in-suit are barred, in whole or in part, by the doctrines of license and exhaustion.

## TENTH DEFENSE
## (INEQUITABLE CONDUCT RE '538 PATENT)

The '538 patent is unenforceable due to inequitable conduct by one or more of Promptu's agents for at least the reasons set forth below in Comcast's first counterclaim.

## ELEVENTH DEFENSE
## (INEQUITABLE CONDUCT RE '196 PATENT)

The '196 patent is unenforceable due to inequitable conduct by one or more of Promptu's agents for at least the reasons set forth below in Comcast's second counterclaim.

## RESERVATION OF ADDITIONAL DEFENSES

Comcast reserves any and all additional defenses available under Section 35 of the United States Code, the rules, regulations, or laws related thereto, the Federal Rules of Civil

Procedure, the Rules of this Court, applicable state law, and/or otherwise in law or equity, now existing, or later arising, as may be discovered.

## COUNTERCLAIMS

Comcast hereby asserts the following Counterclaims against Promptu.

## NATURE OF THE ACTION

1.      Through these Counterclaims, Comcast seeks a declaratory judgment that U.S. Patent Nos. 7,260,538 (the "'538 patent) and 7,047,196 (the "'196 patent") are unenforceable due to inequitable conduct by one or more of Promptu's agents.

## PARTIES

2.      Comcast Corporation is a Pennsylvania corporation with a principal place of business at One Comcast Center, 1701 John F. Kennedy Blvd., Philadelphia, Pennsylvania 19103.

3.      Comcast Cable Communications, LLC is a Delaware limited liability company with a principal place of business at One Comcast Center, 1701 John F. Kennedy Blvd., Philadelphia, Pennsylvania 19103.

4.      Promptu Systems Corporation is a Delaware corporation with a principal place of business at 333 Ravenswood Avenue, Building 201, Menlo Park, California.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the Counterclaims for declaratory judgment pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202, based on an actual, substantial, and continuing justiciable case or controversy between Comcast and Promptu arising under the Patent Laws of the United States, 35 U.S.C. §§ 1 et seq.

6.     This Court has personal jurisdiction over Promptu because, among other reasons, Promptu subjected itself to the jurisdiction of this Court by filing its Complaint here.

7.     Venue is proper in this District with respect to Promptu as to these Counterclaims under 28 U.S.C. §§ 1391(b)-(c) and 1400(b) at least because the assertion of Promptu's infringement action against Comcast in this District gave rise to these Counterclaims. Promptu asserts in its Complaint that venue is proper in this District.

## FIRST COUNTERCLAIM
## (FOR DECLARATORY JUDGMENT OF UNENFORCEABILITY – '538 PATENT)

8.     Comcast restates and re-alleges each of the allegations set forth in the paragraphs above.

9.     Because Promptu has filed a patent infringement lawsuit against Comcast, an actual and justiciable controversy exists between Comcast and Promptu with respect to whether Comcast has infringed any valid and enforceable claim of the '538 Patent. Absent a declaration of unenforceability, Promptu will continue to wrongfully assert the '538 Patent against Comcast, and thereby cause Comcast irreparable injury and damage. This controversy has sufficient immediacy and reality to warrant the issuance of declaratory judgment.

10.     The '538 patent is unenforceable due to the inequitable conduct by one or more of Promptu's agents, specifically the named inventors of the '538 patent (Theodore Calderone, Mark J. Foster, Harry William Printz, James Jay Kistler), Promptu's prosecution counsel at Glenn Patent Group (Michael A. Glenn), Promptu's then-CEO Paul Cook, and Promptu consultant Steven Rose.

11.     Promptu and its prosecution counsel Glenn Patent Group filed the application leading to the '538 patent on January 7, 2003. Each of the named inventors and attorneys involved in prosecuting the application leading to the '538 patent had a duty to disclose to the

14

United States Patent Office all information known to them to be material to patentability. That duty continued throughout the pendency of all claims in the application.

12.     While Cook was not an inventor of the application leading to the issuance of the '538 patent, he was the founder and CEO of the assignee of the application leading to the issuance of the '538 patent. Promptu was a startup company, and Cook was involved in all aspects of Promptu, including its research and development. Cook is a listed inventor on the '196 patent, which was being prosecuted at the same time as the '538 patent, and claims closely related subject matter. Cook also communicated frequently with the listed inventors of the '538 patent regarding the development of the technology claimed in the '538 patent. Thus, Cook was substantively involved in the preparation and prosecution of the application leading to the issuance of the '538 patent, and had a duty to disclose to the United States Patent Office all information known to him to be material to patentability. That duty continued throughout the pendency of all claims in the application.

13.     While Rose was not an inventor of the application leading to the issuance of the '538 patent, he was a consultant for Promptu, the assignee of the application leading to the issuance of the '538 patent, during the prosecution of the '538 patent. Moreover, on information and belief, Rose was substantively involved in the preparation and prosecution of the application leading to the issuance of the '538 patent. For example, Rose's LinkedIn profile indicates that he "consult[ed] with Agile TV [Promptu's predecessor] in Menlo Park, CA, working on patent documents, marketing, and underlying technology." Rose was also an author of two documents that were submitted with U.S. App. No. 60/346,899, the provisional application from which the '538 patent claims priority. Thus, Rose had a duty to disclose to the United States Patent Office

all information known to him to be material to patentability. That duty continued throughout the pendency of all claims in the application.

14. The Patent Office did not issue the '538 patent until August 21, 2007. Between January 7, 2003 and August 21, 2007, the named inventors, prosecuting attorneys, Cook, and Rose had at least the right and opportunity to comment on, and suggest changes to, the application leading to the '538 patent. On January 18, 2007, Promptu's agents also submitted an information disclosure statement to the Patent Office purporting to identify "patents, publications, or other information of which applicant(s) are aware, which applicant(s) believe(s) may be material to the examination of this application and for which there may be a duty to disclose." In view of the foregoing, Promptu's agents deliberately withheld material prior art that they knew of and had analyzed in depth, and instead selectively disclosed only certain, less relevant prior art information.

15. One or more of the named inventors, prosecuting attorneys, Cook, and Rose knew of at least one material prior art patent, and/or one material prior art system, and with specific intent to deceive, withheld them from the United States Patent and Trademark Office (the "Patent Office") during the prosecution of the '538 patent. The Patent Office would not have allowed one or more claims of the '538 patent had it been aware of the withheld prior art.

16. The prior art patent that Promptu's agents failed to disclose to the Patent Office during the prosecution of the '538 patent includes at least U.S. Patent No. 6,513,063, filed on March 14, 2000 and issued on January 28, 2003 ("Julia Patent") that is "but/for" material to at least one claim of the '538 patent.

17. The Julia Patent alone, in combination with the knowledge of a person of ordinary skill in the art, or in combination with other prior art, discloses or suggests each and every

element of, and anticipates or renders obvious, at least one claim of the '538 patent. By way of example, a detailed comparison of Julia's disclosures to claim 34 of the '538 patent is attached as Exhibit 1. Had the Patent Office been made aware of the Julia Patent, at least this claim would not have issued.

18.     The prior art Julia Patent describes a cable network where voice commands from multiple system users are transmitted to a central remote server for speech recognition processing. For example, in one embodiment, "voice input device 102 is a portable remote control device with an integrated microphone, and the voice data is transmitted from device 102 … to communication box 104" (e.g., a "set-top box"). Julia Patent at 3:45-54. The voice data is "transmitted across network 106 to a remote server or servers 108" where it is "processed by request processing logic 300 in order to understand the user's request and construct an appropriate query or request for navigation of remote data source 110," which "may include multimedia content, such as movies or other digital video and audio content." *Id*. at 3:54-64, 4:10-13. After the requested information has been retrieved, "it is electronically transmitted via network 106 to the user for viewing on client display device 112" (e.g., "a television monitor"). *Id*. at 4:18-24.

19.     The Julia Patent was particularly material to the prosecution of the '538 patent, and was not cumulative of other information already on record with the Patent Office. The Examiner who considered the application for the '538 patent allowed its issuance after concluding that "the claims are allowed because the prior arts of record do not teach where the voice command is transmitted from the set-top-box to a remote head end unit for processing as recited in the claims." For the reasons provided in Exhibit 1, Julia alone, in combination with the knowledge of a person of ordinary skill in the art, or in combination with other prior art, does

17

teach or fairly suggest the combination of features that the Examiner identified as missing from the "prior arts of record." In particular, the Julia Patent teaches the element that the Examiner claimed is missing from the prior art, specifically that a voice command is transmitted from a communications box 104 (i.e., set-top box) to a remote server for processing. *See, e.g.,* Julia Patent at 3:45-55.

20.     Indeed, the PTAB instituted two *inter partes* reviews against claims 1-7, 17-24, and 33, and claims 34-35, 37, 40, and 41 of the '538 patent, respectively, based on the Julia Patent. IPR2018-00340 at Paper 10; IPR2018-00341 at Paper 10. A decision to institute means that the Patent Office (the office that issued the patents in the first instance) finds that "there is a reasonable likelihood that Petitioner would prevail [in showing the unpatentability] with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314(a).

21.     The PTAB later concluded that "Petitioner has not established, by a preponderance of the evidence, that [the challenged claims] would have been obvious over Julia." IPR2018-00340, Paper 58 at 37; IPR2018-00341, Paper 58 at 31. However, with respect to at least claim 34, this was due to a finding that Julia does not teach a limitation that was clearly taught by another reference. In particular and by way of example, the PTAB found that the Julia Patent alone does not teach the limitation "to derive set-top-box-compatible instructions to carry out the identified voice commands" of independent claim 34. IPR2018-00341, Paper 58 at 21-22. However, this limitation was clearly taught by U.S. Patent No. 5,774,859 ("Houser"). In Houser, the user issues a voice command that is transmitted to a remote network node (i.e., "node 517" in Figure 15) for speech recognition processing. Houser at 33:56-61. The recognized "command(s)" are then transmitted back to the "terminal unit 519" (e.g., set-top box) and ultimately to "controlled device 521" (e.g., a television). Houser at 33:61-63. Houser discloses

using "spoken commands to navigate viewing guides and other electronic programming guide menus as well as change channels, control a VCR if present, adjust volume, and power his or her television on and off." Houser at 14:67-15:4. Houser also describes using voice commands to locate and view particular programs and movies (e.g., "FIND STAR TREK"). Houser at 30:26-31:5. Although Petitioner asserted that claim 34 was obvious over the Julia Patent in view of Houser, the PTAB found that the Petitioner did not articulate a sufficient motivation to combine the Julia Patent with Houser because Petitioner did not inform "what teaching of one reference is proposed to be combined with what teaching of the other reference, or why and how the combination would have been made." IPR2018-00341, Paper 58 at 20-21.

22. However, unlike the PTAB, the Examiner of the '538 patent was not concerned with the limitation "to derive set-top-box-compatible instructions to carry out the identified voice commands." Rather, the Examiner found that the prior art did not teach a system "where the voice command is transmitted from the set-top-box to a remote head end unit for processing as recited in the claims"—a limitation that is taught by Julia. *See, e.g.,* Julia Patent at 3:45-55, 4:31-45. Thus, the PTAB's conclusion that Petitioner had not met its burden to show the claims are unpatentable has little relevance as to whether the Examiner would have allowed the claims in view of Julia. Moreover, even if the Examiner had been concerned with the same limitation as the PTAB, namely "to derive set-top-box-compatible instructions to carry out the identified voice commands," the Examiner of the '538 patent was aware of the Houser reference as it was cited during prosecution. As the Examiner is not subject to the strict procedural requirements of a PTAB proceeding, the Examiner would not have allowed at least claim 34 over the Julia Patent in view of Houser.

23. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████

24. ███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

25. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

26.     The prior art system that Promptu's agents failed to disclose to the Patent Office during the prosecution of the '538 patent is the Full Service Network ("FSN") developed by Time-Warner Cable ("TWC") and BBN HARK Systems ("BBN") in the mid-1990's. The FSN is "but/for" material to at least on claim of the '538 patent.

27.     The FSN alone, in combination with the knowledge of a person of ordinary skill in the art, or in combination with other prior art, discloses or suggests each and every element of, and anticipates or renders obvious, at least one claim of the '538 patent. By way of example, a detailed comparison of the FSN's disclosures to claim 34 of the '538 patent is attached as Exhibit 2. Had the Patent Office been made aware of the FSN, at least this claim would not have issued.

28.     In November 1994, TWC publicly announced that it had decided to implement speech recognition and voice control into FSN, TWC's next-generation, interactive cable service. As part of the announcement, TWC disclosed that BBN's technology would allow cable subscribers to control their cable systems by voice commands. On December 14, 1994, TWC launched a trial of FSN in Orlando, Florida, at an industry and press event held at the Orlando Sheraton ("Orlando Event"). The Orlando Event included demonstrations of the digital, interactive FSN system, including video-on-demand and VCR-like control over content playback. As part of the event, TWC disclosed how the FSN system will involve "the equipment in the home [i.e., set-top box], the equipment at the headend and the bandwidth of the "back channel" linking the home to the headend systems." COM-PROMPTU00000242. It also conducted tours of its head-end Network Operations Center, which housed the servers and switches that delivered the content over the network, and featured exhibits where attendees could use the remote control and interact with the live FSN system. COM-PROMPTU00013679-681.

29.     The Orlando Event further included public demonstrations of services that were planned to be offered as part of FSN, including BBN's "Voice Navigator" speech recognition technology. *See, e.g.*, COM-PROMPTU00000242. BBN publicly demonstrated a prototype of its Voice Navigator for FSN at the Orlando Event, which "changed channels, served up menus of various categories and performed other tasks in response to voice instructions." *Id.* BBN's

representatives disclosed to press attending the Orlando Event that they expected to integrate the microphone used for voice control into the FSN remote control, which would perform some processing on the voice signal before transmitting it over "the infrared channel to the set-top." BBN further indicated at the Orlando Event that "[t]he core technology we're offering commercially will serve the needs we see for interactive TV browsing and navigation control without any further development," and that "[i]t's really a matter of adapting the system to the specific application, which we're under contract to do with Time Warner." COM-PROMPTU00013757-763.

30.     The FSN was particularly material to the prosecution of the '538 patent, and was not cumulative of other information already on record with the Patent Office. The Examiner who considered the application for the '538 patent allowed its issuance after concluding that "the claims are allowed because the prior arts of record do not teach where the voice command is transmitted from the set-top-box to a remote head end unit for processing as recited in the claims." For the reasons provided in Exhibit 2, the FSN does teach or fairly suggest the combination of features that the Examiner identified as missing from the "prior arts of record."

31.     At least Foster, Cook, and Rose were aware of the FSN prior to the issuance of the '538 patent. According to Rose's LinkedIn profile, he consulted with "Time-Warner Cable (1991-1993) on VOD deployment, represented TWC in initial meetings with server vendors leading to the first deployment of the Full Service Network in Orlando, FL." After his time working to develop the FSN, Rose consulted with Promptu's predecessor AgileTV and worked closely with the inventors of the '538 patent as well as with Cook. For example, in 2001 Steve Rose drafted the document "Agile TV Potential Application Summary." The document describes management of incoming spoken word requests on the Agile Engine. Also in 2001,

Rose co-authored the document "Lohi Aloha Protocol" with Mark Foster, one of the inventors of the '538 patent. These two documents were part of U.S. App. No. 60/346,899, the provisional application from which the '538 patent claims priority. PROMPTU_CC000000031 at 162, 206.

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

32.     In addition to Foster, Cook, and Rose, on information and belief, the other inventors of the '538 patent were also likely aware of the FSN. On information and belief, those working in voice technology for cable television would have been aware of the well-publicized FSN trial and its trial of voice recognition technology. For example, a 2005 news article about AgileTV's voice recognition technology notes that TWC "tried out voice recognition for navigation" in its FSN trial in Orlando. PROMPTU_CC000039845.

33.     On January 18, 2007, Promptu's agents submitted an information disclosure statement, listing just three pieces of prior art relating to the '538 patent, but not listing the Julia Patent and the FSN. This was the sole submission by Promptu of patents, publications, or other information "which applicant(s) believe(s) may be material to the examination of this application and for which there may be a duty to disclose." Thus, despite ████████████████████████

███████████████████████████████ and being aware of the FSN and its material voice command feature, Promptu's agents did not disclose the Julia Patent or the FSN during the prosecution of the '538 patent.

34.     Moreover, Promptu's inventors and patent counsel disclosed to the PTO, in the '538 patent, problems in the prior art while at the same time withholding the Julia Patent and the

FSN that disclosed the inventors' solutions to the problems. For example, the '538 patent provides that "[a] problem with voice command remote control systems is that they are activated when a sound input reaches a pre-determined amplitude. Often, ambient noise reaches the pre-determined level and the system is unintentionally activated. This leads to inadvertent input and a misuse of processing power because the speech recognition unit attempts to process the noise. What is needed is way to activate and deactivate a voice command system that is not substantially affected by ambient noise." '538 patent at 2:9:17. The '538 patent's solution is the use of a "push-to-talk (PTT) button" on the remote control. *Id*. at 4:37-48. The Julia Patent discloses this solution. Julia Patent at 3:41-45 ("Preferably voice input device 102 includes a button or the like that can be pressed or held down to activate a listening mode, so that the system need not continually pay attention to, or be confused by, irrelevant background noise."). Similarly, the '538 patent provides that "[a] problem with the prior art voice recognition systems is that they require a sophisticated voice recognition system in close proximity to the user, requiring individual units which is quite costly. What is needed is a centralized voice command processing system such services a multitude of users." '538 patent at 1:59-63. The Julia Patent discloses a solution to this problem too. Julia Patent at 3:61-64 ("At remote server 108, the voice data is processed by request processing logic 300 in order to understand the user's request and construct an appropriate query or request for navigation of remote data source 110 . . . ."). Like the Julia Patent, the use of voice recognition with FSN also provides solutions to the "problems" identified in the '538 patent. *See, e.g.,* Exhibit 2.

35. Promptu's agents deliberately withheld the known and highly material Julia Patent and the FSN during the prosecution of the '538 patent's application with the specific intent to deceive the Patent Office. The clear inference that the aforementioned individuals

deliberately withheld highly material prior art with deceptive intent is bolstered by (i) evidence that Promptu's agents were aware of the Julia Patent and the FSN; (ii) evidence that ███████ ████████████████████████████████████████████████████████████ ███ (iii) Promptu's agents' selective disclosure of little and far less relevant prior art; and (iv) the absence of a good faith explanation for their nondisclosure of the Julia Patent and the FSN.

36.     The '538 patent is unenforceable due to inequitable conduct committed by one or more Promptu's agents, including the inventors of the '538 patent, Promptu's prosecution counsel, then-CEO Paul Cook, and Promptu consultant Steven Rose. These individuals withheld, with specific intent to deceive, at least the Julia Patent and the FSN from the Patent Office during the filing and prosecution of the application for the '538 patent.

**SECOND COUNTERCLAIM**
**(FOR DECLARATORY JUDGMENT OF UNENFORCEABILITY – '196 PATENT)**

37.     Comcast restates and re-alleges each of the allegations set forth in the paragraphs above.

38.     Because Promptu has filed a patent infringement lawsuit against Comcast, an actual and justiciable controversy exists between Comcast and Promptu with respect to whether Comcast has infringed any valid and enforceable claim of the '196 Patent. Absent a declaration of unenforceability, Promptu will continue to wrongfully assert the '196 Patent against Comcast, and thereby cause Comcast irreparable injury and damage. This controversy has sufficient immediacy and reality to warrant the issuance of declaratory judgment.

39.     The '196 patent is unenforceable due to the inequitable conduct of one or more of Promptu's agents, specifically the named inventors of the '196 patent (Theodore Calderone, Paul M. Cook, and Mark J. Foster), Promptu's prosecution counsel at Glenn Patent Group (Michael A. Glenn), and Promptu consultant Steven Rose.

40.     Promptu and its prosecution counsel Glenn Patent Group filed the application leading to the '196 patent on February 16, 2001.  Each of the named inventors and attorneys involved in prosecuting the application leading to the '196 patent had a duty to disclose to the United States Patent Office all information known to them to be material to patentability.   That duty continued throughout the pendency of all claims in the application.

41.     While Rose was not an inventor of the application leading to the issuance of the '196 patent, he was a consultant for Promptu, the assignee of the application leading to the issuance of the '196 patent, during the prosecution of the '196 patent.  Moreover, on information and belief, Rose was substantively involved in the preparation and prosecution of the application leading to the issuance of the '196 patent.  For example, his LinkedIn profile indicates that he "consult[ed] with Agile TV [Promptu's predecessor] in Menlo Park, CA, working on patent documents, marketing, and underlying technology."   Thus, Rose had a duty to disclose to the United States Patent Office all information known to him to be material to patentability.   That duty continued throughout the pendency of all claims in the application.

42.     The Patent Office did not issue the '196 patent until May 16, 2006.  Between February 16, 2001 and May 16, 2006, the named inventors, prosecuting attorneys, and Rose had at least the right and opportunity to comment on, and suggest changes to, the application leading to the '196 patent.  On May 21, 2001, July 20, 2001, October 4, 2001, January 31, 2002, and April 27, 2005, Promptu's agents also submitted information disclosure statements to the Patent Office purporting to identify "patents, publications, or other information of which applicant(s) are aware, which applicant(s) believe(s) may be material to the examination of this application and for which there may be a duty to disclose."  Promptu's agents deliberately withheld material

prior art that they knew of and had analyzed in depth, and instead selectively disclosed only certain, less relevant prior art information.

43.     One or more of the named inventors, prosecuting attorneys, and Rose knew of at least one material prior art patent, and/or one material prior art system, and with specific intent to deceive, withheld them from the United States Patent and Trademark Office (the "Patent Office") during the prosecution of the '196 patent. The Patent Office would not have allowed one or more claims of the '196 patent had it been aware of the withheld prior art.

44.     The prior art patent that Promptu's agents failed to disclose to the Patent Office during the prosecution of the '196 patent include at least U.S. Patent No. 6,513,063, filed on March 14, 2000 and issued on January 28, 2003 ("Julia Patent") that is "but/for" material to at least one claim of the '196 patent.

45.     The Julia Patent alone, in combination with the knowledge of a person of ordinary skill in the art, or in combination with other prior art, discloses or suggests each and every element of, and anticipates or renders obvious, at least one claim of the '196 patent. Had the Patent Office been made aware of the Julia Patent, at least one claim of the '196 patent would not have issued.

46.     Indeed, on August 25, 2021, the PTAB issued a Final Written Decision on Remand invalidating claims 1, 2, 4, 5, 6, 12, and 13 of the '196 patent in light of the Julia Patent in combination with other prior art references. Specifically, the PTAB found that the Julia Patent alone discloses the preamble of claim 1 ("[a] method of using a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites presented to a speech processing system at a wireline node in a network supporting at least one of cable television delivery and video delivery,"), "the receiving limitation" of claim 1, "the processing and

responding limitations" of claim 1, and that Julia in combination with other prior art references discloses "the partitioning limitation" of claim 1. The PTAB further held that Julia in combination with other references, discloses the limitations of claims 2, 4, 5, 6, 12, and 13, each of which depend from claim 1. On January 16, 2024, the Federal Circuit affirmed the PTAB's decision. Julia is thus "but/for" material to the prosecution of the '196 patent.

47. █████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████

48. █████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████

49. █████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████

50.     The prior art system that Promptu's agents failed to disclose to the Patent Office during the prosecution of the '196 patent is the Full Service Network ("FSN") developed by Time-Warner Cable ("TWC") and BBN HARK Systems ("BBN") in the mid-1990's. The FSN is "but/for" material to at least on claim of the '196 patent.

51.     The FSN alone, in combination with the knowledge of a person of ordinary skill in the art, or in combination with other prior art, discloses or suggests each and every element of, and anticipates or renders obvious, at least one claim of the '196 patent. By way of example, a detailed comparison of the FSN's disclosures to claim 1 of the '196 patent is attached as Exhibit 3. Had the Patent Office been made aware of the FSN, at least this claim would not have issued.

52.     In November 1994, TWC publicly announced that it had decided to implement speech recognition and voice control into FSN, TWC's next-generation, interactive cable service. As part of the announcement, TWC disclosed that BBN's technology would allow cable subscribers to control their cable systems by voice commands. On December 14, 1994, TWC launched a trial of FSN in Orlando, Florida, at an industry and press event held at the Orlando Sheraton ("Orlando Event"). The Orlando Event included demonstrations of the digital, interactive FSN system, including video-on-demand and VCR-like control over content playback. As part of the event, TWC disclosed how the FSN system will involve "the equipment in the home [i.e., set-top box], the equipment at the headend and the bandwidth of the "back channel" linking the home to the headend systems." COM-PROMPTU00000242. It also conducted tours of its head-end Network Operations Center, which housed the servers and switches that delivered the content over the network, and featured exhibits where attendees could use the remote control and interact with the live FSN system. COM-PROMPTU00013679-681.

53.    The Orlando Event further included public demonstrations of services that were planned to be offered as part of FSN, including BBN's "Voice Navigator" speech recognition technology. *See, e.g.*, COM-PROMPTU00000242. BBN publicly demonstrated a prototype of its Voice Navigator for FSN at the Orlando Event, which "changed channels, served up menus of various categories and performed other tasks in response to voice instructions." *Id.* BBN's representatives disclosed to press attending the Orlando Event that they expected to integrate the microphone used for voice control into the FSN remote control, which would perform some processing on the voice signal before transmitting it over "the infrared channel to the set-top." BBN further indicated at the Orlando Event that "[t]he core technology we're offering commercially will serve the needs we see for interactive TV browsing and navigation control without any further development," and that "[i]t's really a matter of adapting the system to the specific application, which we're under contract to do with Time Warner." COM-PROMPTU00013757-763.

54.    The FSN was particularly material to the prosecution of the '196 patent, and was not cumulative of other information already on record with the Patent Office. The Examiner who considered the application for the '196 patent allowed its issuance after concluding that "[t]he cited prior art alone or in combination does not teach or fairly suggest the claimed combination of features." For the reasons in Exhibit 3, FSN does teach or fairly suggest the combination of features that the Examiner identified as missing from the "cited prior art": "a method of using a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites presented to a speech processing system at a wireline node in a network supporting at least one of cable television delivery and video delivery, comprising receiving said back channel to create a received back channel, partitioning said received back channel into a multiplicity of said received

identified speech channels to create a multiplicity of identified speech channels to create a multiplicity of identified speech content, and responding to said identified speech content to create an identified speech content response that is unique for each of the said multiplicity of identified speech contents."

55.    At least Foster, Cook, and Rose were aware of the FSN prior to the issuance of the '196 patent. According to Rose's LinkedIn profile, he consulted with "Time-Warner Cable (1991-1993) on VOD deployment, represented TWC in initial meetings with server vendors leading to the first deployment of the Full Service Network in Orlando, FL." After his time working to develop the FSN, Rose consulted with Promptu's predecessor AgileTV and worked closely with the inventors of the '196 patent, including Cook. For example, in 2001 Steve Rose drafted the document "Agile TV Potential Application Summary." The document describes management of incoming spoken word requests on the Agile Engine. PROMPTU_CC000000031 at 206. Also in 2001, Rose co-authored the document "Lohi Aloha Protocol" with Mark Foster, one of the inventors of the '196 patent. *Id*. at 162. ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

56.    In addition to Foster, Cook, and Rose, on information and belief, the other inventors of the '538 patent were also likely aware of the FSN. On information and belief, those working in voice technology for cable television would have been aware of the well-publicized FSN trial and its trial of voice recognition technology. For example, a 2005 news article about AgileTV's voice

recognition technology notes that TWC "tried out voice recognition for navigation" in its FSN trial in Orlando. PROMPTU_CC000039845.

57.     During the prosecution of the '196 patent, Promptu's agents submitted five information disclosure statements, listing over 100 pieces of prior art, but not listing the Julia Patent and the FSN. Thus, despite ███████████████████████████████ ██████ and being aware of the FSN and its material voice command feature, Promptu's agents did not disclose the Julia Patent or the FSN during the prosecution of the '196 patent.

58.     Moreover, Promptu's inventors and patent counsel disclosed to the PTO, in the '196 patent, problems in the prior art while at the same time withholding the Julia Patent and the FSN that disclosed the inventors' solutions to the problems. For example, the '196 patent provides that "the problems of speech recognition at a centralized wireline node in a network supporting video delivery or cable television delivery have not been addressed by such prior art." '196 patent at 1:63-66. The Julia Patent addresses this problem by disclosing a system that transmits voice data across a network to remote servers (Julia Patent at 3:54-55), and that the remote server processes voice data to understand a user's request and construct an appropriate query or request for navigation of a remote data source (*id*. at 3:61-64). The Julia Patent further explains that the "[d]ata source 110 may include multimedia content, such as movies or other digital video or audio content . . . ." *Id*. at 4:10-13. Like the Julia Patent, the use of voice recognition with FSN also provides solutions to the "problems" identified in the '196 patent. *See, e.g.,* Exhibit 3.

59.     Promptu's agents deliberately withheld the known and highly material Julia Patent and the FSN during the prosecution of the '196 patent's application with the specific intent to deceive the Patent Office. The clear inference that the aforementioned individuals

deliberately withheld highly material prior art with deceptive intent is bolstered by (i) evidence that Promptu's agents were aware of the Julia Patent and the FSN; (ii) evidence that ██████████ ████████████████████████████████████████████████████ ██ (iii) Promptu's agents' selective disclosure of many and far less relevant prior art; and (iv) the absence of a good faith explanation for their nondisclosure of the Julia Patent and the FSN.

60.     The '196 patent is unenforceable due to inequitable conduct committed by one or more Promptu's agents, including the inventors of the '196 patent, Promptu's prosecution counsel, and Promptu consultant Steven Rose. These individuals withheld, with specific intent to deceive, at least the Julia Patent and the FSN from the Patent Office during the filing and prosecution of the application for the '196 patent.

**PRAYER FOR RELIEF**

WHEREFORE, Comcast denies that Promptu is entitled to any relief requested in its Prayer for Relief. Comcast therefore requests that the Court enter judgment in Comcast's favor and against Promptu on all of Promptu's claims; that the Court enter judgment that the '538 and '196 patents are unenforceable; that the Court find this case exceptional and award Comcast its costs and attorneys' fees pursuant to 35 U.S.C. § 285; and that the Court award Comcast such other further relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Comcast demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: May 10, 2024

/s/ Stephen J. Kastenberg
Stephen J. Kastenberg
David L. Axelrod
Marc S. Segal
John W. Scott
Madhundra Sivakumar
BALLARD SPAHR LLP
1735 Market Street, 51st Floor Philadelphia, PA 19103-7599
(215) 665-8500

Richard W. Miller (admitted *pro hac vice*)
Kirsten E. Fehlan (admitted *pro hac vice*)
BALLARD SPAHR LLP
999 Peachtree Street NE, Suite 1600 Atlanta, Georgia 30309
(678) 420-9300

Jonathon A. Talcott (admitted *pro hac vice*)
BALLARD SPAHR LLP
1 E. Washington Street, Suite 2300 Phoenix, AZ 85022
(602) 798-5400

*Attorneys for Defendants*
*Comcast Corporation and Comcast Cable Communications, LLC*